UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-----------------------------------------------------------------x

| | |
|---|---|
| FIH, LLC, | : |
| Plaintiff, | : |
| -against- | : |
| FOUNDATION CAPITAL PARTNERS LLC, F/K/A FOUNDATION MANAGING MEMBER LLC; DEAN BARR; JOSEPH MEEHAN; THOMAS WARD; and JOSEPH ELMLINGER, | : |
| Defendants. | : |

**COMPLAINT**

**JURY TRIAL REQUESTED**

-----------------------------------------------------------------x

## I.   INTRODUCTION

1.      This is a matter involving two separate frauds, engaged in by two separate factions of management of a failing business enterprise.

2.      Foundation Capital Partners LLC, f/k/a Foundation Managing Member LLC ("Foundation") is a company whose business plan is to raise very substantial amounts of funds – on the order of billions of dollars – and then use them to acquire minority ownership interests in hedge fund general partnerships ("GP").

3.      This business model required raising committed or contingent funds, ready to be drawn upon when investment opportunities arose, and identifying investment opportunities in which, for one reason or another, a hedge fund management company would want to sell a minority interest in itself to an outsider.

4.      Foundation was formed in or about 2009 by two of its partners, Dean Barr and Joseph Meehan.

5.      Ultimately, Foundation was a failure.

6.      It had raised in equity and debt, prior to the investment by the plaintiff, an amount in excess of $14,500,000 – plus approximately $4.7 million in secondary sales by Defendant Barr and $500,000 in secondary sales by Defendant Meehan.  However, Foundation had run through that money without ever having actually made a *single* hedge fund general partner ("GP") minority interest investment as per its business plan.  Instead, it had paid out all the money in salaries, rent, and other expenses and activities.

7.      It is now apparent that Foundation's failure was not the product of unlucky circumstance.  In fact, Foundation was a fundamentally flawed organization.

8.      First, while Foundation had obtained a non-binding letter of intent to provide investment funds on a contingent basis from one source, those funds were not committed capital, and even that non-binding amount was less than Foundation claimed in public it had available on standby and committed capital.

9.      Second, aside from one deal that did not materialize because Foundation did not have the proper financing lined up, it had not been able to ever get beyond the stage of the most rudimentary identification of other hedge fund GP minority interest investment opportunities. This lack of "deal sourcing" was mostly a function of Foundation's internal dysfunction and its overinflated perception of its principals' industry connections and network.

10.      Third, Foundation's partners were ill-suited to properly develop the business, in at least the following respects:  (a) certain of them were profligate spenders of corporate resources for personal benefit; (b) at least some of them were consistently dishonest in their dealings with others and each other; and (c) two of the most important members of management were brothers-in-law, married to sisters, and one of the marriages was failing – placing those two colleagues at odds with each other and often unable to work with each other, despite multiple representations to investors that they had a professional working relationship.

11.     Fourth, and perhaps most importantly, at least some of the members of management were privately convinced all along that all of the forgoing deficiencies existed.  A faction of management had concluded that the managing partner of Foundation, defendant Barr, was incompetent, dishonest and wasting corporate assets, so much so that the company could never succeed with him as its leader – or even with him involved.

12.     In the Fall of 2013 the situation described above had reached a critical point: Foundation was on the verge of collapse.

13.     It was at this point that Foundation was introduced to a representative and member of plaintiff, FIH (FIH was not formed until the investment was made, and its members will be referred to herein as "FIH").  FIH was looking for an investment opportunity, and Foundation gravely needed an investor to forestall liquidation.

14.     The individual defendants then set about enticing FIH to invest.

15.     To induce FIH's investment, Foundation's partners took great pains to conceal Foundation's fundamental problems, making a series of material misrepresentations and material omissions about the business prospects of Foundation, its capacity for acquisitions in a short period of time, and the potential of its leadership and partners.

16.     All of the individual defendants – Foundation's partners – participated in these misrepresentations that were calculated to get FIH to invest, but they had different agendas.

17.     For Barr, the most important objective was to keep the company afloat so as to enable it to pay him a salary, and then some, to fuel a profligate lifestyle to which he had become accustomed.

18.     Barr's partners, aware of his profound limitations, had a separate fraud in mind. They actively believed that Barr was incompetent and dishonest.  They had even begun to compile a dossier detailing all of his transgressions.  Their plan was to entice FIH to invest in

Foundation, acting together with Barr in an effort to do so, and then, after closing, to reveal the truth about Barr and enlist FIH in an effort to purge the company of Barr.  The hope was that after having invested its money, FIH would feel it had no choice but to comply with Foundation's management's efforts to remove Barr.

19.     These two fraudulent plans were successfully executed.  Over a several month courtship, FIH was told a series of misrepresentations designed to induce it to invest in Foundation, despite the truth about its deal pipeline and despite management's awareness of Barr's potential to destroy the company.

20.     Closing was held on February 28, 2014.  At that point, Barr's plan was complete: he had successfully gotten what he wanted – more money to fund his Foundation salary which funded his lifestyle.

21.     But the second fraudulent plan – that of Barr's partners – was only half complete.

22.     A mere couple of weeks after the closing, and after the elaborate construction of a pretext, Barr's partners revealed Barr's failings to a representative of FIH.  Shortly thereafter, in an almost comical effort at skullduggery, the dossier on Barr, entitled "Project Soothsayer," was delivered to one of FIH's representatives.

23.     Barr's partners then set about trying to take control by inducing FIH to join with them in trying to unseat Barr.  But all the while, Foundation's business had come to a halt.  There was virtually no external activity by the principals in lining up new hedge fund GP minority interest investments or, at a minimum, securing LP capital and other separately managed account funding.  Eventually, the group that was plotting to depose Barr began to leave the company, convinced that its failure was imminent.

24.     In the end, the defendants pocketed approximately $9 million in salary and secondary sales since Foundation's inception.  Left behind, however, was FIH – an innocent

investor whose multi-million dollar investment, given under fraudulent pretenses, was – despite repeated demands – never returned.

## II.     PARTIES

25.     Plaintiff is FIH, LLC, a Delaware limited liability company.

26.     Defendant Foundation Capital Partners LLC, f/k/a Foundation Managing Member LLC (hereinafter, "Foundation"), is a Delaware limited liability company.

27.     Defendant Dean Barr is the managing partner and managing principal of Foundation.  Barr is a citizen of Connecticut.

28.     Defendant Joseph Meehan was, until November 20, 2014, a partner, managing principal, and the Chief Operating Officer of Foundation.  Meehan is a citizen of Connecticut.

29.     Defendant Thomas Ward is a partner, principal, and Head of Distribution of Foundation.  Ward is a citizen of Connecticut.

30.     Defendant Joseph Elmlinger was a partner, principal, and Head of Risk and Structuring at Foundation until September 5, 2014.  Elmlinger is a citizen of Connecticut.

## III.    JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because plaintiff asserts a claim for violation of the federal securities laws.

32.     This Court has personal jurisdiction over the parties because they have submitted to the jurisdiction of this Court pursuant to the governing agreements.

33.     Venue is proper because the defendants are all residents of the state of Connecticut.

## IV.    STATEMENT OF FACTS

### A.     Foundation Capital Partners ("Foundation")

34.     Foundation, a Delaware limited liability company, is a private equity vehicle whose business plan was to make minority investments of up to 25% in the management

companies of large, well-established hedge funds.  It asserted to potential investors that it expected to raise $4,000,000,000 to pursue this type of investment.

35.     Foundation was founded in 2009 as a start-up business that had no operating experience of any kind.  Its pitch to potential investors was that its managers were highly experienced professionals who had worked together well and were committed to the success of this new venture.

36.     The founding members of Foundation, defendants Barr and Meehan, and their partners, defendants Elmlinger and Ward, marketed themselves as experienced professionals in the field of alternative investments and raising capital.  Specifically, the due diligence materials circulated by Foundation stated that the partners "built/managed a number of successful asset management businesses, managed nearly $1 trillion in assets, and participated in dozens of growth capital investments."  Based on this, the due diligence materials continued, "[t]he principals believe that these experiences in successfully building alternative investment firms will enable Foundation to enjoy a strong start and long term success."

37.     As a start-up, Foundation was unable to present any of its own achievements to potential investors and thus relied instead upon representations that the management team had experience in building and operating businesses and that it had substantial contacts in the industry for deal sourcing.

38.     In essence, Foundation was selling to investors the confidence of its managers, their experience and reputation in the industry, and the fact that they had relationships with entities with whom transactions of the type envisioned in its business plan could be brought about.

39.     Specifically, in a document entitled Preliminary Due Diligence Materials drafted by Foundation and circulated via email to FIH on or about November 18, 2013, Foundation described its "competitive advantage" as follows:

> [Foundation's] team maintains extensive relationships with leading managers, prime brokers and operations/administrative servicing professionals that will assist the firm with deal sourcing and execution.… [Foundation] is differentiated due to its unique corporate structure, the quality of its employees and the firm's ability to provide valued fund managers. …
>
> [Foundation]'s principals bring highly valued skills, experience and relationships to large hedge fund managers. … The firm's partners maintain close working relationships with … some of the world's largest investors in hedge funds.  The firm's sourcing strategy will benefit from the decades of experience in the alternative investment industry of Mr. Barr, Mr. Ward, Mr. Meehan and Mr. Elmlinger.

40.     Yet from the time of its inception up to September 2013, prior to the introduction of FIH to Foundation, and despite infusions of cash, Foundation did not successfully make a single investment to purchase a GP minority interest investment in a hedge fund, as was its objective.

41.     Indeed, the capital raised by Foundation through September 2013 was being spent on expenses such as exorbitant partner salaries and overhead.

42.     In or around May 2013, Foundation reached a non-binding agreement with a reputable investment management firm for it to potentially provide Foundation with as much as $1 billion of capital with which to make investments.

43.     Despite this potential source of funds for investments, Foundation found itself continuing to struggle to obtain appropriate hedge fund targets for these investments.

44.     And by the Fall of 2013, Foundation needed more operating cash, despite having made no hedge fund GP minority interest investments.

45.     Foundation was so low on cash reserves by the time it began courting FIH in the Fall of 2013 that, if FIH had not made its investment, Foundation would have had to wind up and liquidate.

46.     Indeed, on January 16, 2014, Meehan sent an email to his partners Elmlinger and Ward indicating that if FIH did not follow through with its proposed funding, Foundation would be forced to "wind up."  And in an email sent later on January 20, 2014 to Barr, Ward, and Elmlinger, Meehan similarly noted, "If we do not close with [FIH], we'll need the remaining money to close the business and report to our partners."

47.     Barr had another agenda in securing FIH's investment:  he depended on using corporate resources to fund an extravagant lifestyle that was becoming harder to fund on the low cash reserves at Foundation.

48.     On February 5, 2014, Barr emailed his partners Meehan, Elmlinger and Ward, and others, noting that "[FIH] are not taking us seriously. We need to create a sense of urgency."

49.     Thus, Foundation did everything in its power – including continuing to make material misrepresentations and omitting critical information – to induce FIH to invest.

**B.     FIH Invests with Foundation Based On Its Partners' Material Misrepresentations and Omissions**

50.     FIH was introduced to Foundation in September 2013.  The initial call between the representatives of FIH and Foundation took place in October 2013.

51.     For the next five months, Foundation, through the individual defendants, engaged in extensive communications with representatives of FIH to persuade them to make a substantial investment in Foundation.

52.     Over the course of these negotiations, FIH conducted due diligence on the partners and employees, the investment management firm, and other Foundation investors.

53.     Despite Foundation's dismal track record, Foundation, through the individual defendants, assured FIH that the stars were now aligned and that Foundation was on the brink of success:  namely, the strong confirmed interest of the investment management firm to commit investment capital and a list of very viable hedge fund targets in the pipeline.  Foundation, through the individual defendants, made express assurances to FIH that Foundation had the present capacity to support its plan for imminently closing on several hedge fund GP minority interest investments.

54.     Specifically, in advance of FIH's investment, Barr made representations in a December 30, 2013 email to FIH that Foundation had four "possible transactions in the works."

55.     And in emails in early 2014, Barr and the other individual defendants made representations that at least two other transactions were very promising and imminent.  Specifically, on January 22, 2014, Barr, copying Meehan, emailed FIH that, with respect to one of these targets, "I believe we can move expeditiously on this deal."  Barr sent a similar email on February 3, 2014 to FIH, copying his partner Meehan.  In that email, in reference to another one of these potential targets, Barr stated:  "We have some reasonably good intel that suggests that this offer would be given serious consideration."  In sum, as Barr noted in the February 3, 2014 email, copying Meehan:  "Our pipeline continues to expand with ***real [and] immediate*** deals."  (emphasis added)

56.     Foundation and the individual defendants complemented these misrepresentations about the firm's present capacity for closing deals imminently in the preliminary due diligence materials it provided to FIH.  Specifically, in a document entitled Preliminary Due Diligence Materials provided to FIH via email on November 18, 2013, Foundation stated that it was poised to "close on three or four transactions each year."  And on December 2, 2013, Barr circulated to a representative of FIH a forecast entitled "[Foundation] Portfolio Model," indicating that

Foundation would have closed on four hedge fund GP minority interest transactions by June 30, 2014.  This same information – that Foundation was in the position to close on four deals by June 30, 2014 – was conveyed in a document entitled "Project Foundation General Partner Forecast" emailed on December 19, 2013 from a Foundation analyst to FIH, copying defendants Barr, Meehan, and Elmlinger.

57.     Based on all of these representations, FIH reasonably believed that Foundation and the individual defendants genuinely believed that Foundation had the present capacity to support its target acquisition plan according to its model.  But in fact, at the time they made these misrepresentations, the individual defendants knew that these statements were false.

58.     FIH also conducted diligence on the partners themselves.  FIH learned in the course of its due diligence that Barr was a "talented but flawed" individual, but was told unequivocally by Barr's partners, the individual defendants Elmlinger and Meehan, that he would be kept in check and that he was not a threat to the firm's success.

59.     Indeed, Barr's partners, Meehan and Elmlinger, failed to apprise FIH of Barr's potential to ruin the firm and failed to correct misrepresentations made to FIH about Barr's financial responsibility.

60.     On January 20, 2014, Barr emailed FIH, copying defendants Meehan, Ward, and Elmlinger.  In the email, Barr solicited input from FIH, a potential investor who the defendants were courting to make a major investment, asking if FIH was comfortable if the Foundation partners could "make the monthly Jan[uary] salary draw and conduct normal business travel."  In making that request, Barr was implicitly representing to FIH that Foundation did indeed have funds with which to make that distribution and that Barr's request to draw his salary was fiscally responsible and in keeping with sound management of the company.  At the time, any such representation was false.

61.     Defendants Meehan, Elmlinger, and Ward observed silently as Barr sought authorization to make more irresponsible draws of cash that Meehan, Elmlinger and Ward knew that Foundation did not have and which Meehan, Elmlinger, and Ward knew was part and parcel of Barr's pattern of frivolously, irresponsibly, and destructively spending Foundation's money. Indeed, immediately following this January 20, 2014 email exchange with FIH, Meehan privately emailed Barr, copying Elmlinger and Ward, and chastised his request to draw funds given that "[Foundation] do[es] not have enough free cash to pay partner draws … ."

62.     But the corrective information only stayed among the Foundation partners. Indeed, Meehan, Elmlinger, and Ward failed to relay this information to FIH, nor did they seek to correct the inaccurate and deceiving information presented by Barr indicating that Foundation did have the funds to support partner salary draws and that Barr was responsibly spending Foundation's funds.  And, importantly, neither Meehan, Elmlinger, nor Ward used the email exchange as an opportunity to explain to FIH what they had known and discussed amongst themselves for months – that Barr was using Foundation's financial resources to fund his own extravagant lifestyle, and that Barr's actions threatened Foundation's very viability.  Instead, they allowed the material misstatement about Foundation's capital base and Barr's financial irresponsibility to go uncorrected, to FIH's detriment.

63.     Had Meehan, Elmlinger, and Ward not omitted this material information about Barr's spending disease in light of Foundation's depleted funds, FIH would not have made its investment.

64.     Elmlinger and Meehan made another misrepresentation to FIH which belied the threat that they knew Barr posed to Foundation's ability to make successful investments – and, in fact, to Foundation's very existence.  Specifically, at a dinner in a Greenwich, Connecticut restaurant on February 23, 2014, Meehan and Elmlinger told FIH's representative:  "You're

looking at the control room.  Nothing happens without us."  In this context, Meehan and Elmlinger were referring to their proclaimed ability to control Barr's propensity towards untruthfulness, irresponsible spending, and impulsiveness, which was not disclosed or known to FIH.

65.     They also promised, "We will not spend your money foolishly."  This statement was materially false when made, given that Meehan and Elmlinger were aware at the time that Foundation had no viable acquisition prospects; that Barr was running the company's resources dry; and that there was no leadership capable of leading Foundation – and FIH's investment – to success.

66.     As will be seen below, not only were these statements false when made, Meehan and Elmlinger were then so convinced of their falsity that they had hatched their own plan – a scheme within a scheme – to oust Barr from Foundation after FIH had been induced to invest.

67.     These statements by Meehan and Elmlinger were made just days prior to FIH completing the transaction to invest a substantial amount of capital in Foundation.

68.     Finally, on or about January 15, 2014, FIH's representative saw a news headline reporting that Barr had lost $1 million in a deep sea treasure hunting fraud.  Concerned about the implication as to Barr's investing prudence, FIH inquired from Barr whether it was in fact true. In an email response on January 16, 2014, Barr claimed that his investment loss was only $200,000.

69.     That was false; and, in fact, Barr possibly lost even more money than the news headline reported.

70.     By falsely assuring FIH that he had only lost $200,000, Barr gave a false representation as to his own financial prudence and financial condition.  FIH relied upon Barr's

representation that his loss was limited and, based upon these misrepresentations, FIH dismissed its concerns regarding Barr's investment concentration in such a speculative proposition.

71.     Ultimately, in reliance upon the aforementioned representations of imminent successful investments, Foundation's present capacity to close on such targets, and Barr's non-threat to Foundation's success, FIH agreed to invest in Foundation.

72.     The final deal reached between FIH and Foundation was formalized on February 28, 2014.  The final transaction entailed:  (1) FIH's direct purchase from Foundation of an interest in Foundation for $3M; (2) FIH's direct purchase from Foundation of a previous investor's interest in Foundation for a planned $4.2M, of which $2.1M was paid; (3) FIH's purchase of another previous investor's interest for $1.15M; and (4) FIH's purchase of some of Barr's interest in Foundation for $0.5M.

### C.     The Truth Comes Out About Foundation's Viability

73.     Three weeks after the ink dried on these agreements, FIH started to learn that the representations made by Foundation during the course of negotiations and which induced FIH's investment were materially untrue when made.  These misrepresentations were made with the intention of inducing FIH to invest in the failing company – which was on the verge of collapse, but for the infusion of cash from FIH.  With the threat of liquidation looming, Foundation's partners misrepresented the company's prospects to induce FIH to invest its money and allow the firm to stay alive.

74.     As FIH learned after its investment was made, the representations by Foundation and the individual defendants that Foundation was capable of closing four deals by June were patently false when made by the individual defendants in the Foundation marketing materials circulated on November 18, 2013; December 3, 2013; and December 19, 2013.  Indeed, at the time Foundation, through Barr and Meehan, was representing it had "real" and "immediate"

deals, the individual defendants, Foundation's partners, knew full well that the firm did not have the capacity to close on four deals within several months when, as of January and February 2014, there was not more than one "live" deal with actual potential for fruition.

76. Barr's and Meehan's representations about the targets that were "real" and "immediate" during the period of FIH's courtship materially misrepresented the progress of these deals. Indeed, with respect to at least two of the deals Barr and Meehan had characterized as "real" and "immediate," as of the time that email was sent, Foundation had not yet even had an introductory call or meeting with those potential targets. Other targets touted as "real" and "immediate" to FIH had not progressed beyond the point of preliminary emails or phone calls – let alone any definitive term sheets signed. All this information concerning the lack of movement on Foundation's deals was known to the individual defendants at the time the misrepresentations were made. Thus, the progress report given to FIH was false and knowingly and purposefully so. There were no "real" and "immediate" deals; and the statement that four deals could close by June was preposterous given the present facts at the time the statements were made.

76. None of the individual defendants, Foundation's partners, could possibly have reasonably believed – nor did they reasonably believe – that Foundation had the potential to close four deals by June when such statements were made to FIH months prior.

77. Nor did any of the individual defendants apprise FIH that the deals touted by Barr and Meehan as "real" and "immediate" had become non-viable as January and February 2014 drew to a close. FIH reasonably relied on this material omission, as it had no reason to believe that the acquisition prospects discussed in Barr's and Meehan's representations were no longer true.

78.     However, the truth was that Foundation's partners and employees had long been concerned about the lack of movement on the pipeline of potential acquisitions of GP minority interest investments in hedge funds.

79.     On March 27, 2014 – just a few weeks after FIH made its investment – an analyst at Foundation emailed Barr and Meehan:

> Per the attachment, you can see our pipeline [of hedge fund GP minority interest investments] beyond [redacted] is pretty crappy. …  Other than that, we have nothing.  For the benefit of those who did not attend the [investment management firm's] meeting yesterday, they were keen to understand our current pipeline which we committed to them we'd work on filling. … ***Let me state what I have been stating for months, the sorry state of the M&A pipeline is the single biggest problem in the firm***.  Based on the timing before the firm runs out of cash, this issue ***may not even be fixable at this point*** without some indication from GP backers that the runway might be extended." (emphasis added)

80.     The individual defendants, Foundation's partners, therefore were well aware – for at least months prior to FIH's investment – of the lack of promising hedge fund GP minority interest targets in its immediate future; its representations to FIH to the contrary were false when made.

81.     Moreover, despite Barr's frequent boasts about his relationships in the hedge fund community and contacts with potential targets, and despite such statements being made to FIH, Meehan, Elmlinger, and Ward did not believe he had the type of network he was broadcasting. As Meehan, Elmlinger, and Ward knew, Barr, in the absence of real relationships with the right parties as per his representations, relied largely on cold-calls to industry contacts to source deals.

82.     Meehan, Elmlinger, and Ward therefore knew that Foundation's true hedge fund GP minority interest investment pipeline was not what was being represented to FIH in the November 18, 2013; December 3, 2013; and December 19, 2013 forecasts, in Barr's December 30, 2013 email, and in Barr's and Meehan's January 22, 2014 and February 3, 2014 emails, and

that Foundation did not have the infrastructure, connections, or the relationships to close on four hedge fund GP minority interest investments in only a matter of months.

83.     Indeed, Foundation's deal pipeline dated March 3, 2014 – a few days after the FIH closing – showed only one "live" deal.  Tellingly, three of the six deals Barr and Meehan had touted as "real" and "immediate" in December 2013 and January 2014 were on the "dead projects" portion of the March 3, 2014 deal pipeline.  Importantly, as these potential hedge fund GP minority interest investments began to lose traction and eventually die off, Foundation and the individual defendants failed to apprise FIH of the downward progress of these transactions – even though FIH was relying on this information in deciding whether to make its investment in Foundation.

84.     Yet despite this knowledge, the individual defendants continued to make these material misrepresentations to FIH on which FIH relied and omitted this material information from FIH that would have altered FIH's investment decisions.

85.     By May of 2014, according to that month's deal pipeline, the number of "live" deals increased by one to a total of two.

86.     No deals closed by June 2014 – despite the representations of Foundation and the individual defendants to the contrary, and no deals have closed to-date.

87.     FIH relied upon Barr's and Meehan's representations that Foundation had "real" and "immediate" deals in the pipeline and that it was *capable* of sourcing and closing on four hedge fund GP minority interest deals by June 2014.  The individual defendants failed to inform FIH of Foundation's true deal pipeline and that its stated potential for closing such deals was inaccurate.  These misrepresentations were made by the individual defendants to induce FIH's investment to salvage a flailing company and to subsidize Barr's spending habits.

88.     FIH would not have made its substantial investment in Foundation had it known that its prospects for a successful hedge fund GP minority interest investment were dismal and unlikely – the opposite of what had been represented in Foundation's marketing materials and in statements by the individual defendants.

**D.      The Truth Is Revealed About Barr**

89.     Foundation also conducted another fraud through Barr's partners, Meehan and Elmlinger.  Publicly, these individual defendants stood behind Barr, allowing and joining in the dissemination of the Foundation marketing materials to laud his accomplishments and allowing Barr to represent himself as the brains behind the investment operation.  Indeed, Barr was "managing partner" of Foundation and the Preliminary Due Diligence Materials prepared by Foundation and emailed to FIH noted that Barr "will take on the primary leadership roles for the firm's Investment Strategy, Investor Relations, and Fund Distribution."  These representations about Barr's accomplishments, leadership, and potential were made both orally and in the marketing materials circulated by Foundation to FIH on November 18, 2013.

90.     While Meehan and Elmlinger acknowledged to FIH that Barr had a difficult personality, they represented categorically that he was always kept in check.

91.     Specifically, on February 23, 2014 – days before FIH's investment closed – Meehan and Elmlinger met with FIH's representative at a restaurant in Greenwich, Connecticut, and orally assured FIH that Barr was not at all a threat to the firm.  In their words, "You're looking at the control room. Nothing happens without us."  Meehan and Elmlinger were representing that Barr was not in a position to interfere with the prudent management of Foundation.

92.     However, these material representations were untrue when made and Meehan and Elmlinger were aware of the falsity at the time of the material misrepresentations.  During the

time that the FIH negotiations were taking place and the due diligence materials were espousing the firm's professionalism and experience, Meehan and Elmlinger viewed Barr as a liability rather than as an asset.

93.     Indeed, by this time, Meehan and Elmlinger had already concocted a scheme to rope in FIH's investment and then use the leverage of the new investor to oust Barr from the firm.  The plan necessitated keeping from FIH the truth about Barr and the very real threat he posed to the viability and success of Foundation, which his partners knew for many months, and at least during the period in which FIH was negotiating an investment in Foundation.

94.     The misrepresentations and omissions by Meehan and Elmlinger took several forms.

95.     ***First***, Meehan and Elmlinger, for a long time, had concerns about Barr's financial recklessness and the potential for this recklessness to unravel the firm.  Specifically, prior to FIH's investment, Meehan and Elmlinger were regularly internally complaining about Barr's irresponsible and irrational spending habits, including but not limited to his use of corporate credit accounts for his own extravagant spending, his frequent requests for advances on his partner salary draw, and the potential financial impact of his pending divorce on the company's financial stability.

96.     As Meehan and Elmlinger knew, Barr's abuse of the corporate credit card had serious ramifications for Foundation.  Indeed, on December 3, 2013, as documents were being sent to FIH for review, Foundation's office manager emailed Meehan and Elmlinger to let them know that their corporate American Express cards were declined for a mere $11 purchase as a result of Barr's spending and failure to pay.  The firm's corporate credit cards were suspended several other times during the course of 2013-2014 as a result of Barr's irresponsible spending.

97.     Barr himself notified Meehan, Elmlinger, and Ward of the potential toll his spending could take on the firm.  On September 25, 2013, Barr wrote to Meehan, Elmlinger, and Ward:  "I am unable to pay the mortgages or personal AMEX bill this month.  I believe that our corporate cards are linked to my personal acct and they probably will be shut off.  In addition, my credit rating is part of due diligence conducted by our LP's."

98.     Barr also frequently took advances on his partner salary, depleting corporate funds that were necessary to continue operations in light of the lack of outside financial support for Foundation.  Meehan, Elmlinger, and Ward were aware of these frequent advances.

99.     Indeed, already in September 2013, Elmlinger and Meehan discussed over email the extent of Barr's overspending, prompting Elmlinger to email:  "I demand that a reply be sent to him stating that the partnership will no longer enable his spending disease. He makes … more than any other partner, but he has no money because he spends it like a f---ing drunk.  …  I have f---ing had it with this f---ing guy."

100.     Meehan, Elmlinger, and Ward failed to tell FIH about their concerns regarding Barr's financial instability prior to FIH's investment in February 2014, and Meehan and Elmlinger purposefully omitted this critical information when they met with FIH days prior to the investment.

101.     Indeed, Meehan, Elmlinger, and Ward intentionally and consciously failed to relay this material information even when a representation to the contrary was made to FIH.

102.     Indeed, on January 20, 2014, Barr emailed FIH, copying defendants Meehan, Ward, and Elmlinger.  In the email, Barr asked FIH if the Foundation partners could "make the monthly Jan[uary] salary draw and conduct normal business travel."   In making that request, Barr was implicitly representing to FIH that Foundation did indeed have funds with which to make that distribution and that Barr's request to draw his salary was fiscally responsible and in

keeping with sound management of the company.  At the time, any such representation was false.

103.    Defendants Meehan, Elmlinger, and Ward observed silently as Barr sought authorization to make more irresponsible draws of cash that Meehan, Elmlinger and Ward knew that Foundation did not have and which Meehan, Elmlinger, and Ward knew was part and parcel of Barr's pattern of frivolously, irresponsibly, and destructively spending Foundation's money. Indeed, immediately following this email exchange with FIH, Meehan privately emailed Barr, copying Elmlinger and Ward, and chastised his request to draw funds given that "[Foundation] do[es] not have enough free cash to pay partner draws … ."

104.    But the corrective information only stayed among the Foundation partners. Indeed, Meehan, Elmlinger, and Ward failed to relay this information to FIH, nor did they seek to correct the inaccurate and deceiving information presented by Barr indicating that Foundation did have the funds to support partner salary draws and that Barr was responsibly spending Foundation's funds.  And, importantly, neither Meehan, Elmlinger, nor Ward used the email exchange as an opportunity to explain to FIH what they had known and discussed amongst themselves for months – that Barr was using Foundation's financial resources to fund his own extravagant lifestyle, and that Barr's actions threatened Foundation's very viability.  Instead, they allowed the material misstatement about Barr's financial irresponsibility to go uncorrected, to FIH's detriment.

105.    Had Meehan, Elmlinger, and Ward not omitted this material information about Barr's spending disease in light of Foundation's depleted funds, FIH would not have made its investment.  Indeed, had FIH been told that Barr – Foundation's leader and managing partner – had a "spending disease" – which Meehan and Elmlinger had discussed between themselves in

September of 2013 and failed to inform FIH – that was threatening the company's existence, it would not have made its investment.

106.    Moreover, Meehan and Elmlinger were aware of Barr's financial imprudence with his personal funds and history with speculative investment endeavors.  Specifically, they were aware that Barr lost more than a nominal amount of money in the emerald treasure fraud, calling it a "major … sinkhole of cash for him" in Project Soothsayer.  Whereas Barr represented to FIH that his loss was only $200,000, FIH later learned that Barr had listed a $1.875 million note receivable from the emerald fraud on his personal financial statement as part of a mortgage refinancing effort.

107.    Meehan was also aware of the potentially financially destructive implication of the litigation surrounding the emerald treasure fraud for Foundation's viability.  In a November 15, 2012 email, Barr told Meehan that the emerald fraud litigation was "spinning out of control" and that he was at risk of "go[ing] bankrupt from legal fees to protect all of [Foundation and its partners'] interests."

108.    Barr's financial instability, and the individual defendants' knowledge and concerns regarding such, were not communicated to FIH prior to its investment in February 2014, and Meehan and Elmlinger omitted this critical information when they met with FIH days prior to the investment and represented that Barr was not an obstacle to Foundation's success. FIH would never have invested with Foundation had it known that its principal and Chief Investment Officer had a significant blow up in his personal financial statement and lost more than nine times on the emerald fraud than he originally represented to FIH prior to its closing.

109.    **_Second_**, there had been long-standing personal divisions among the Foundation partners that threatened the viability of Foundation's business mission.

110.    The Preliminary Due Diligence Materials that were prepared by Foundation and emailed to FIH on November 18, 2013 stated that "Mr. Barr and Mr. Meehan have known each other for 16 years, meeting through family relationships in 1997" and that "[b]oth have worked closely together since the concept for Foundation [] was created in 2007."

111.    But these materials were inaccurate, and indeed, none of the individual defendants corrected the misinformation in the materials drafted by Foundation and provided to FIH to induce their investment.

112.    Specifically, during the time Foundation was courting FIH, defendants Barr and Meehan made clear between themselves that they could not continue working together because of ongoing family issues.

113.    Barr and Meehan were married to sisters, and Barr's pending divorce put a tremendous strain on the working relationship between Barr and Meehan.

114.    On September 25, 2013, at the same time that FIH was being introduced to Foundation, Barr wrote to Meehan, Elmlinger, and Ward: "I am truly sorry but I am not sure I can work with Joe going forward.  Because of my divorce, I am unable to sell any equity in [Foundation] without [Barr's estranged wife]'s permission."

115.    On October 1, 2013, prior to the first meeting between FIH and Foundation, Barr emailed Meehan saying, "I know you dislike me intensely and there is no trust."

116.    And finally, on February 3, 2014 – just a couple of weeks before FIH made its investment – Barr emailed Meehan, copying Elmlinger and Ward:  "Joe, we are officially broken from each other."

117.    The Foundation partners did not communicate to FIH that the top two managers of the firm had severe personal conflicts that had paralyzed the company's ability to do business. Nor did any of the individual defendants correct the misinformation in the marketing materials

provided to FIH that represented that Barr and Meehan worked together for many years without a hint of conflict.  Indeed, they intentionally omitted this material information.  Had this information about conflict at the top levels of leadership been communicated to FIH, it would not have made its investment.

118.    ***Third***, Meehan, Elmlinger, and Ward had long internally expressed concerns about Barr's lack of truthfulness in his pursuit of capital for Foundation's operations as well as hedge fund GP minority interest investments.  During the time that Foundation was pursuing an investment by FIH, and with the knowledge of the other individual defendants, Barr repeatedly told the investment and hedge fund community that Foundation had secured – in fact, "closed on" – $2 billion in equity.  But this was not true, as only $1 billion was via a non-binding letter of intent to provide capital on a contingent basis from the investment management firm.  The second $1 billion "commitment" by another entity was merely an "agreement to agree," as Meehan noted in a July 3, 2013 email to Foundation's corporate counsel, adding that he had "doubts as to their ability to deliver such capital."  Indeed, Meehan later referred to this potential second $1 billion as "illusory."

119.    Barr made this false representation to the press in October 2013, resulting in a threat by Foundation's legal counsel to resign if no retraction were printed.  Barr was adamantly opposed to making such a retraction, and only agreed to a correction after strong pressure by his Foundation partners.

120.    These material misstatements to potential investors, targets, and to the press highlighted Barr's impulsiveness, lack of professionalism, and lack of truthfulness.

121.    The Foundation partners' concerns regarding Barr's false communications about Foundation's committed capital to potential investors, hedge fund targets, and the press were not relayed to FIH prior to its investment in February 2014.  Instead, Meehan and Elmlinger made an

oral representation to FIH on February 23, 2014 to the exact contrary – stating that Barr was under control and that he did not have the capacity to destroy Foundation.

122.   Meehan, Elmlinger, and Ward kept all of this material information from FIH during the course of their courtship, despite pointed questions about Barr, despite representations made to the contrary, and despite the very real threat that Barr posed to the company.

123.   Had FIH been told the truth about Barr and his potential to ruin Foundation, FIH would not have made its investment.

124.   As soon as FIH made its investment at the end of February 2014, the first phase of the plan was completed.

125.   Part two of the plan required Meehan and Elmlinger enlisting FIH's assistance in removing Barr from the company.

126.   Thus, on March 21 and 23, 2014 – just about three weeks after FIH's investment of significant capital into Foundation – Meehan and Elmlinger started to reveal to FIH's representative over the phone the truth about Barr and his potential to collapse Foundation.

127.   Days after this phone call, Meehan and Elmlinger provided to FIH a 12-page, single-spaced document entitled "Project Soothsayer."  This document appeared to be an effort to gather together in one place all of the negative things that the Foundation partners and employees believed about Barr's leadership and capacity to destroy Foundation, some of which were discussed on the phone with FIH on March 21 and 23.

128.   In Project Soothsayer, Foundation's managers made, among others, the following admissions:

- Barr "is actively destroying value for [Foundations] members, due to his rampant financial difficulties, his functional inability to tell the truth at any juncture, his rude and dismissive attitude towards his colleagues, and his desire to be the only point of contact with potential investments or investors."

- "As a general rule, recent and long-term experience confirms [Barr] is a spendthrift, burning through cash exceptionally quickly. … History demonstrates that he rapidly burns through cash … and when pressed hard enough by financial distress he will do a distressed deal."

- Barr "has no respect for NDAs; constantly violates them despite pleas from staff to respect them."

- "During pipeline meetings, [Barr] has previously insisted on taking responsibility for reaching out to all manner of [hedge fund] targets, however he rarely follows up. Often he notes that he knows someone and will therefore make a call – several times we have caught him stating that a call was made and a meeting will be set up, and no call was in fact made. … [Foundation] suffers [Barr] constantly ignoring staff/deal team agreed-upon approach to targets."

- Barr "has a strong tendency to desire to use corporate accounts for personal matters when his cash draws low."

- Foundation partners' morale was low as a result of Barr's long-term history with the firm.  Specifically, notes that Meehan "sees no potential for change in [Barr]'s behavior, or anything but degradation of [Meehan's] reputation from working with [Barr]." The document indicated Elmlinger "[d]oes not see success in short or long term with [Barr] continuing with the firm" and "[d]eeply concerned about reputation."[Foundation analysts] said to "dislike[] lack of professionalism/honesty in [Barr]."

- Barr "lies to prospective investors and hedge fund partners."

- Barr was said to have "few to none, nothing critical/irreplaceable in the way of stable of alternative investment industry leader contacts." He was said to have no fundraising ability.

- Barr was said to have a "functional inability to tell the truth" including claims of suffering from cancer, having a dying mother and attending international meetings that were non-existent.

129.    Project Soothsayer was meticulously put together with Roman numerals setting

forth each of Barr's liabilities, with multiple bullets beneath providing concrete examples of

such.  Included were a compilation of numerous internal emails provided by Meehan and

Elmlinger going back over a two year period which gave well-organized evidence for the first

time of a control standstill and leadership vacuum as well as showing the poisonous internal working relationships.  It was an effort that clearly took a substantial amount of time to finalize.

130.    This sudden revelation by defendants Meehan and Elmlinger of Barr's true character was allegedly precipitated by an incident on March 21, 2014.  Barr, Elmlinger, and a Foundation analyst were at the London offices of a potential target.  In the morning session, Barr was asked by the hedge fund target how much committed capital Foundation had.  As he had before, Barr answered that Foundation had $1 billion in committed capital and $1 billion in co-investments.  He was also asked how many investors.  He answered that there were four investors, including sovereign wealth fund relationships.  These statements were materially false.

131.    During an intermission between the morning and afternoon sessions with the potential target, Elmlinger and the Foundation analyst threatened to resign from Foundation if Barr did not answer truthfully; after a screaming match, Barr agreed to clarify his response to the potential target.

132.    During the afternoon meetings, Barr did clarify his response with a minority owner of the target but the majority owner of the target did not join the afternoon meetings.  Thus it is unclear whether Barr was able to fully expunge the earlier materially false answer.

133.    Meehan and Elmlinger claimed that the incident in London demonstrated that Barr needed to be removed promptly from Foundation.  They also claimed that, prior to FIH's investment, it appeared Barr could be managed, but that – in the mere three weeks since – it appeared he could not.

134.    However, Barr had previously made such misrepresentations about Foundation's capital commitments – including in, at least, October 2013 – and he had also previously exhibited irrational, unprofessional, and impulsive behavior that threatened Foundation.

135.    It was therefore a false assertion by Meehan and Elmlinger that the one incident in London in fact triggered the sudden, aggressive, concerted action in support of an urgent removal of Barr.

136.    It was also a false assertion by Meehan and Elmlinger that Project Soothsayer – in all of its fine-detailed, well-documented, professionally executed glory – was drafted only after FIH's investment.  Indeed, nearly every one of the incidents revealed in Project Soothsayer long pre- dated the London incident and, most importantly, FIH's investment.

137.    Instead, Project Soothsayer was premeditated; Meehan and Elmlinger had long planned it, knowing full well the toxic effect of Barr on Foundation's prospects which they had, together with Barr, hidden from FIH.  All the while, Meehan and Elmlinger had their own plan in mind to not only fraudulently induce FIH to invest in Foundation, a plan which they jointly executed with Barr and Ward, but then to execute their own separate scheme – a scheme within a scheme – to suddenly reveal the truth about Barr to FIH to enlist FIH in their effort to oust Barr.

138.    The seeds of Project Soothsayer were planted long before the London incident and it is clear that Meehan and Elmlinger were waiting for just the right moment, and the right trigger, to use FIH's leverage to pressure Barr and to entice FIH to buy Barr out to protect its investment, as they had planned for months.  Using the pretext of the London incident, Meehan and Elmlinger revealed the truth about Barr, claiming this "truth" was a recent development – while, in fact, the revelations about Barr had been true for at least the time during which FIH was being courted by Foundation and Project Soothsayer was already in an advanced phase.

139.    Indeed, on July 3, 2013 – eight months prior to Project Soothsayer – Elmlinger emailed Meehan:  "Dean will ruin this firm.  [The investment management firm] will soon realize that Dean isn't capable of delivering on anything and will walk away from us."

140.    After receiving Project Soothsayer, FIH's representative inquired from Meehan why the information contained in the document had not been shared with FIH prior to its investment.  In response, Meehan stated that until an investment was completed, he did not believe he was under any duty to relay all of the details surrounding the investment.

141.    Once they finally provided FIH with Project Soothsayer under the pretext of the London incident, Meehan and Elmlinger's scheme within a scheme was brought to fruition. Indeed, upon learning the truth that had been deliberately hidden from it, and with its significant investment in Foundation now at stake, FIH began to do exactly what Meehan and Elmlinger intended with their scheme:  take action and become active in bringing Foundation back on course, principally by limiting Barr's irrational, unprofessional, and impulsive behavior and authority.  FIH's efforts in furtherance of Meehan's and Elmlinger's plan included initiating and participating in meetings with Foundation's management and authoring memoranda proposing structural changes to the company, efforts designed to take power and decision-making authority from Barr and to refocus the firm's efforts on hedge fund GP minority interest investment acquisitions.

142.    These efforts were exactly what Meehan and Elmlinger had in mind when they enacted their scheme within a scheme.  As Meehan asked of FIH in an email dated May 30, 2014, "We can get this business righted and we will depend on [you] to help us do that."

143.    On June 23, 2014, following a meeting between FIH and Foundation's management, FIH sent out a memorandum of understanding containing items that Foundation investors wanted to see addressed in the next 30 days.  These items included: shifting the firm's primary focus to closing deals; equitizing the junior deal team staff; transitioning Barr and Meehan from their current roles; reassessing the compensation structure; transitioning leadership; and negotiating a down round with existing investors.

144.    Barr responded that – despite participating in the meeting and verbally agreeing to the terms – he was unable to accept the terms of the memorandum of understanding.

145.    For the next several months, Barr continued on his course of depleting the firm's resources, while still no acquisitions have been made.

**E.    Request for Rescission**

146.    On August 14, 2014, FIH emailed Barr and Meehan seeking rescission of FIH's investment and reimbursement for legal fees incurred.  The email noted that, "based on what FIH has learned about the underlying facts regarding [Foundation] in just six months since its investment, FIH would never have made its investment had it known the true facts at the time of its investment."

147.    In a response dated August 15, 2014, Meehan denied FIH's request for rescission.

148.    That same date, Foundation sent an email to its members notifying them that, given the lack of capital, the responsible path would be to wind down the firm.

149.    Barr has refused to agree to a winding down, instead insisting that – despite failing to close any hedge fund GP minority interest investments in over two years – such an acquisition would be made shortly.

150.    During this time, while Barr was meant to be saving Foundation from almost certain liquidation, he was travelling to Italy and wiring himself $11,000.

151.    Also during this time, Elmlinger, Meehan, and others resigned from Foundation.

152.    Upon information and belief, another investor has purchased equity in Foundation.

153.    FIH had been supplied financial information from Foundation, but the last such report was provided in August 2014 and no information has been provided by Foundation since.

## COUNT I - VIOLATION OF § 10(b) of the SECURITIES EXCHANGE ACT OF 1934

154.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

155.    FIH's interest in Foundation is an "investment contract" and is therefore governed by the federal securities laws.  FIH invested a sum of money with Foundation in a common enterprise, and FIH's profits were to come solely from the efforts of others.

156.    Defendants made misrepresentations of fact to FIH with the intention of inducing FIH to invest in Foundation.

157.    Foundation and the individual defendants made the following material misrepresentations of fact in marketing materials they drafted and emails they circulated to FIH, as set forth previously:

- that Foundation had an extensive network and close working relationship with leading hedge fund industry personnel;
- that Foundation had four "possible transactions in the works," and that at least two of these hedge fund GP minority interest investments were very promising and imminent;
- that Foundation's "pipeline continues to expand with real, immediate deals";
- that Foundation had the capacity to "close on three or four transactions each year" and that, as of the time the statement was made, Foundation was capable of closing on four hedge fund GP minority interest purchase transactions by June 30, 2014;
- that Barr's partners were "the control room" and were keeping Barr in check;
- that Barr only lost $200,000 in the emerald scheme; and
- that Barr and Meehan worked well together without personal conflict.

158.    Foundation and the individual defendants failed to tell FIH when potential hedge fund GP minority interest investments touted as "real" and "immediate" began to lose traction. Indeed, Foundation and its partners failed to correct this material characterization of the deals when it was no longer accurate.

159.    Foundation and the individual defendants also failed to correct inaccurate information stated by Barr in a January 20, 2014 email to FIH, copying the individual defendants, in which Barr sought FIH's permission to draw down partner salaries.  The individual defendants consciously failed to inform FIH that the email was inaccurate in that a)

Barr was seeking the money to fund an extravagant lifestyle as was his pattern with prior

siphoning of corporate resources; and b) Foundation had no cash for spending.  This was a

material omission.

160.     The individual defendants other than Barr also omitted the following material

information from FIH prior to its investment:

- that Barr had few to no alternative investment industry leader contacts;
- that they had long been concerned about Barr's financial recklessness and the potential for this recklessness to unravel Foundation;
- that they had long-standing concerns about Barr's lack of truthfulness in his pursuit of capital for Foundation operations as well as hedge fund GP minority interest acquisitions;
- that Barr consistently violated NDAs;
- that Barr often did not follow up on deal sourcing calls or leads;
- that Barr constantly ignored agreed-upon approaches to targets by the firm;
- that Foundation's employees did not believe the firm could succeed with Barr involved; and
- that Barr had a "functional inability to tell the truth."

161.     Thus, Defendants failed to provide FIH with accurate information and

misrepresented Foundation's ability to ever actually close the deals it represented it would make.

162.      Defendants acted with scienter and knew that these statements were false when

made.  Indeed, Foundation's own internal documents make clear that there were no "real" and

"immediate" deals during the time FIH was being courted.  Defendants also knew that

Foundation lacked the expertise and network to close deals, certainly not four deals by June

2014.

163.     Moreover, the individual defendants other than Barr knew that he was a threat to

the company's existence.  Internal emails demonstrate they were aware of his financial

recklessness, his lies, his lack of contacts, and his broken relationship with his partner Meehan –

and, indeed, the individual defendants frequently discussed these issues.

164.     Most egregiously, Meehan and Elmlinger compiled a painstakingly-organized

dossier of Barr's transgressions and poor character traits, which they premeditated during the

time FIH was being courted and provided to FIH a mere three weeks after their investment was made.

165.    These misrepresentations and omissions were made with scienter and intent:  by Barr, to fund his extravagant lifestyle, and by his partners, to get the leverage of a new investor to oust their managing partner who they knew for a long time posed a threat to the firm's existence.

166.    FIH reasonably relied on defendants' misrepresentations and omissions in deciding to invest in Foundation.  Had it been told the truth about Foundation's pipeline and about Barr – and, essentially, the truth about whether Foundation was ever capable of sourcing the deals it represented it would make – FIH would never have invested in Foundation.

167.    FIH's investment in Foundation is now worthless as there have been no acquisitions.

168.    As a result of Defendants' material misrepresentations and omissions, FIH has suffered a loss in the amount of its investment with Foundation, which has not seen any returns.

## COUNT II – INTENTIONAL MISREPRESENTATION

169.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

170.    Defendants had a pecuniary interest in FIH's investment in Foundation and expected to profit from the provision of information to FIH.  As such, Defendants had a duty to provide accurate information to potential investors such as FIH.

171.    Defendants made material misrepresentations of fact to FIH with the intention of inducing FIH to invest in Foundation.

172.    Foundation and the individual defendants made the following material misrepresentations of fact in marketing materials they drafted and emails they circulated to FIH, as set forth previously:

- that Foundation had an extensive network and close working relationship with leading hedge fund industry personnel;
- that Foundation had four "possible transactions in the works," and that at least two of these hedge fund GP minority interest investments were very promising and imminent;
- that Foundation's "pipeline continues to expand with real, immediate deals";
- that Foundation had the capacity to "close on three or four transactions each year" and that, as of the time the statement was made, Foundation was capable of closing on four hedge fund GP minority interest purchase transactions by June 30, 2014;
- that Barr's partners were "the control room" and were keeping Barr in check;
- that Barr only lost $200,000 in the emerald scheme; and
- that Barr and Meehan worked well together without personal conflict.

173.    Foundation and the individual defendants failed to tell FIH when potential hedge fund GP minority interest investments touted as "real" and "immediate" began to lose traction. Indeed, Foundation and its partners failed to correct this material characterization of the deals when it was no longer accurate.

174.    Foundation and the individual defendants also failed to correct inaccurate information stated by Barr in a January 20, 2014 email to FIH, copying the individual defendants, in which Barr sought FIH's permission to draw down partner salaries.  The individual defendants consciously failed to inform FIH that the email was inaccurate in that a) Barr was seeking the money to fund an extravagant lifestyle as was his pattern with prior siphoning of corporate resources; and b) Foundation had no cash for spending.  This was a material omission.

175.    The individual defendants other than Barr also omitted the following material information from FIH prior to its investment:

- that Barr had few to no alternative investment industry leader contacts;
- that they had long been concerned about Barr's financial recklessness and the potential for this recklessness to unravel Foundation;
- that they had long-standing concerns about Barr's lack of truthfulness in his pursuit of capital for Foundation operations as well as hedge fund GP minority interest acquisitions;
- that Barr consistently violated NDAs;
- that Barr often did not follow up on deal sourcing calls or leads;

- that Barr constantly ignored agreed-upon approaches to targets by the firm;
- that Foundation's employees did not believe the firm could succeed with Barr involved; and
- that Barr had a "functional inability to tell the truth."

176.    Thus, Defendants failed to provide FIH with accurate information and misrepresented Foundation's ability to ever actually close the deals it represented it would make.

177.    Defendants knew that these statements were false when made.  Indeed, Foundation's own internal documents make clear that there were no "real" and "immediate" deals during the time FIH was being courted.  Defendants also knew that Foundation lacked the expertise and network to close deals, certainly not four deals by June 2014.

178.    Moreover, the individual defendants other than Barr knew that he was a threat to the company's existence.  Internal emails demonstrate they were aware of his financial recklessness, his lies, his lack of contacts, and his broken relationship with his partner Meehan – and, indeed, the individual defendants frequently discussed these issues.

179.    Most egregiously, Meehan and Elmlinger compiled a painstakingly-organized dossier of Barr's transgressions and poor character traits, which they premeditated during the time FIH was being courted and provided to FIH a mere three weeks after their investment was made.

180.    These misrepresentations and omissions were made with intent:  by Barr, to fund his extravagant lifestyle, and by his partners, to get the leverage of a new investor to oust their managing partner who they knew for a long time posed a threat to the firm's existence.

181.    FIH relied on defendants' misrepresentations and omissions in deciding to invest in Foundation.  Had it been told the truth about Foundation's pipeline and about Barr – and, essentially, the truth about whether Foundation was ever capable of sourcing the deals it represented it would make – FIH would never have invested in Foundation.

182.    FIH has suffered damages, including but not limited to, the amount of its investment in Foundation and its attorneys' fees.

## COUNT III – FRAUDULENT INDUCEMENT

183.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

184.    Defendants had a pecuniary interest in FIH's investment in Foundation and expected to profit from the provision of information to FIH.  As such, Defendants had a duty to provide accurate information to potential investors such as FIH.

185.    Defendants made misrepresentations of fact to FIH with the intention of inducing FIH to invest in Foundation.

186.    Foundation and its partners misrepresented the activity of Foundation's deal pipeline and Foundation's capability of sourcing deals, specifically its ability to close on four deals by June 30, 2014.

187.    Defendants other than Barr omitted material information about Barr – including his financial recklessness, his propensity to lie, his lack of contacts in the hedge fund space, and his messy divorce – and the very real threat these issues posed to Foundation's very viability, let alone success.

188.    Thus, Defendants failed to provide FIH with accurate information and misrepresented Foundation's ability to ever actually close the deals it represented it would make.

189.     Defendants knew that these statements were false when made.  Indeed, Foundation's own internal documents make clear that there were no "real" and "immediate" deals during the time FIH was being courted.  Defendants also knew that Foundation lacked the expertise and network to close deals, certainly not four deals by June 2014.

190.    Moreover, the individual defendants other than Barr knew that he was a threat to the company's existence.  Internal emails demonstrate they were aware of his financial

recklessness, his lies, his lack of contacts, and his broken relationship with his partner Meehan – and, indeed, the individual defendants frequently discussed these issues.

191.    Most egregiously, Meehan and Elmlinger compiled a painstakingly-organized dossier of Barr's transgressions and poor character traits, which they premeditated during the time FIH was being courted and provided to FIH a mere three weeks after their investment was made.

192.    These misrepresentations and omissions were made with intent:  by Barr, to fund his extravagant lifestyle, and by his partners, to get the leverage of a new investor to oust their managing partner who they knew for a long time posed a threat to the firm's existence.

193.    FIH relied on Defendants' misrepresentations and omissions in deciding to invest in Foundation.  Had it been told the truth about Foundation's pipeline and about Barr – and, essentially, the truth about whether Foundation was ever capable of sourcing the deals it represented it would make – FIH would never have invested in Foundation.

194.    FIH has suffered damages, including but not limited to, the amount of its investment in Foundation and its attorneys' fees.

## COUNT IV - NEGLIGENT MISREPRESENTATION

195.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

196.    Defendants had a pecuniary interest in FIH's investment in Foundation and expected to profit from the provision of information to FIH.  As such, Defendants had a duty to provide accurate information to potential investors such as FIH.

197.    Defendants made misrepresentations of fact to FIH with the intention of inducing FIH to invest in Foundation.

198.    Foundation and the individual defendants made the following material

misrepresentations of fact in marketing materials they drafted and emails they circulated to FIH,

as set forth previously:

- that Foundation had an extensive network and close working relationship with leading hedge fund industry personnel;
- that Foundation had four "possible transactions in the works," and that at least two of these hedge fund GP minority interest investments were very promising and imminent;
- that Foundation's "pipeline continues to expand with real, immediate deals";
- that Foundation had the capacity to "close on three or four transactions each year" and that, as of the time the statement was made, Foundation was capable of closing on four hedge fund GP minority interest purchase transactions by June 30, 2014;
- that Barr's partners were "the control room" and were keeping Barr in check;
- that Barr only lost $200,000 in the emerald scheme; and
- that Barr and Meehan worked well together without personal conflict.

199.    Foundation and the individual defendants failed to tell FIH when potential hedge

fund GP minority interest investments touted as "real" and "immediate" began to lose traction.

Indeed, Foundation and its partners failed to correct this material characterization of the deals

when it was no longer accurate.

200.    Foundation and the individual defendants also failed to correct inaccurate

information stated by Barr in a January 20, 2014 email to FIH, copying the individual

defendants, in which Barr sought FIH's permission to draw down partner salaries.  The

individual defendants consciously failed to inform FIH that the email was inaccurate in that a)

Barr was seeking the money to fund an extravagant lifestyle as was his pattern with prior

siphoning of corporate resources; and b) Foundation had no cash for spending.  This was a

material omission.

201.    The individual defendants other than Barr also omitted the following material

information from FIH prior to its investment:

- that Barr had few to no alternative investment industry leader contacts;
- that they had long been concerned about Barr's financial recklessness and the potential for this recklessness to unravel Foundation;

- that they had long-standing concerns about Barr's lack of truthfulness in his pursuit of capital for Foundation operations as well as hedge fund GP minority interest acquisitions;
- that Barr consistently violated NDAs;
- that Barr often did not follow up on deal sourcing calls or leads;
- that Barr constantly ignored agreed-upon approaches to targets by the firm;
- that Foundation's employees did not believe the firm could succeed with Barr involved; and
- that Barr had a "functional inability to tell the truth."

202.    Thus, Defendants failed to provide FIH with accurate information and misrepresented Foundation's ability to ever actually close the deals it represented it would make.

203.    Defendants failed to exercise reasonable care in making these statements and omitting this material information.  Indeed, Foundation's own internal documents make clear that there were no "real" and "immediate" deals during the time FIH was being courted.

204.    Moreover, the individual defendants other than Barr failed to exercise reasonable care in conveying to FIH that Barr was not a threat to the company's existence.  Internal emails demonstrate they were aware of his financial recklessness, his lies, his lack of contacts, and his broken relationship with his partner Meehan – and, indeed, the individual defendants frequently discussed these issues.

205.    Most egregiously, Meehan and Elmlinger compiled a painstakingly-organized dossier of Barr's transgressions and poor character traits, which they premeditated during the time FIH was being courted and provided to FIH a mere three weeks after their investment was made.

206.    Defendants failed to exercise reasonable care in communicating this information to FIH.

207.    FIH relied on this information in deciding to invest in Foundation.  Had it been told the truth about Foundation's pipeline and about Barr – and, essentially, the truth about

whether Foundation was ever capable of sourcing the deals it represented it would make – FIH would never have invested in Foundation.

208.    FIH has suffered damages, including but not limited to, the amount of its investment in Foundation and its attorneys' fees.

## COUNT V – UNJUST ENRICHMENT

209.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

210.    Foundation – and, as a result, its partners – was enriched as a result of FIH's infusion of cash.  Conversely, FIH was impoverished as a result of its investment in Foundation.

211.    Foundation and its partners appreciated this benefit.

212.    Given the materially false representations and promises made by Foundation's partners – who knew of the falsity of their statements, or who at minimum recklessly disregarded the truth of their statements – which induced FIH to make its investment, it would be inequitable for Foundation to retain the benefit.


WHEREFORE, Plaintiff demands:  (a) judgment in an amount to be determined at trial, plus applicable interest, and including its reasonable attorneys' fees; (b) rescission of its investment; and (c) such other and further relief as the Court may deem just and proper.

Dated: May 22, 2015

COZEN O'CONNOR


By:    /s/ Michael Savino
        Michael Savino
        45 Broadway
        New York, NY 10006
        (212) 908-1233
        Fax: (646) 461-2045
        msavino@cozen.com

Brian P. Flaherty
1900 Market Street
Philadelphia, PA 19103
(215) 665-4647
bflaherty@cozen.com

Tamar S. Wise
277 Park Avenue
New York, NY 10172
(212) 883-4924
twise@cozen.com