UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| FIH, LLC,<br>　　　　*Plaintiff*,<br>　　　　　*v.*<br>FOUNDATION CAPITAL PARTNERS LLC, f/k/a<br>FOUNDATION MANAGING MEMBER LLC;<br>DEAN BARR; JOSEPH MEEHAN; and JOSEPH<br>ELMLINGER,<br>　　　　*Defendants*. | Civil No. 3:15cv785 (JBA)<br><br><br><br><br>March 30, 2016 |

**RULING ON DEFENDANTS' MOTIONS TO DISMISS**

This is an action brought by Plaintiff FIH, LLC against Defendants Foundation Capital Partners, LLC ("Foundation"), Dean Barr, Joseph Meehan, Thomas Ward, and Joseph Elmlinger, alleging: violations of § 10(b) of the Security Exchange Act, 15 U.S.C. § 78j(b) (Count I); violations of the Connecticut Uniform Securities Act ("CUSA"), Conn. Gen. Stat. §§ 36b-29(a), (c) (Count II); intentional misrepresentation (Count III); fraudulent inducement (Count IV); negligent misrepresentation (Count V); and unjust enrichment (Count VI), all arising out of FIH's investment in Foundation on the basis of representations by the individual defendants that FIH now claims to have been false or misleading. Defendants Barr [Doc. # 46], Ward [Doc. # 47], Meehan [Doc. # 51], and Elmlinger [Doc. # 49] each move to dismiss. Oral argument was held on February 9, 2016. For the following reasons, Defendants' motions are granted in part and denied in part.

# Table of Contents

I.   **Facts Alleged** ........................................................................................................... **4**

   A.   Defendants' Alleged Representations .................................................................. 5

      1.   Barr's Skills, Experience and Contacts ........................................................ 5

      2.   Barr and Meehan's Relationship .................................................................. 7

      3.   The Pipeline and Expectations regarding Performance ............................. 7

      4.   Barr's Personal Spending ............................................................................. 9

   B.   FIH's Investment ................................................................................................. 10

   C.   Project Activity Logs ......................................................................................... 10

   D.   Project Soothsayer and Emails ......................................................................... 11

   E.   Evidence of Misrepresentations ........................................................................ 12

      1.   Barr's Skills, Experience and Contacts ...................................................... 12

      2.   Barr and Meehan's Relationship ................................................................ 14

      3.   The Pipeline and Expectations regarding Performance ........................... 15

      4.   Barr's Personal Spending ........................................................................... 16

   F.   Request for Rescission ....................................................................................... 18

II.  **Discussion** ............................................................................................................ **19**

   A.   Securities and Exchange Act § 10(b) (Count I) ............................................... 20

      1.   Liability for Misrepresentations ................................................................. 22

         a.   Due Diligence Materials, Portfolio Model, General Partner Forecast ........ 22

         b.   Other Statements ................................................................................. 26

      2.   Materially False/Misleading ....................................................................... 27

         a.   Barr's Skills, Experience and Contacts ............................................... 28

         b.   The Pipeline and Expectations Regarding Performance ..................... 32

            i.    Misrepresentations ........................................................................ 33

            ii.   Omissions ....................................................................................... 37

            iii.  Materiality of Misrepresentations and Omissions ....................... 41

         c.   Barr and Meehan's Relationship ........................................................ 47

         d.   Barr's Personal Spending ................................................................... 50

            i.    Salary Draw .................................................................................. 50

ii.     Emerald Investment ................................................................ 51

iii.    In the Control Room .............................................................. 52

3.   Reasonable Reliance ........................................................................ 54

4.   Scienter ............................................................................................ 55

a.   Pipeline Continues to Expand & Pipeline has Become Increasingly Active 58

b.   Project Apex ............................................................................. 58

c.   Nothing FIH Needed to Know .............................................. 58

d.   No Threat to Barr and Meehan's Ability to Work Together ........................ 60

5.   Loss Causation ............................................................................... 60

B.   State Law Claims ....................................................................................... 63

1.   CUSA, Conn. Gen. Stat. §§ 36b-29(a) and (c) (Count II) ................................... 64

2.   Intentional and Negligent Misrepresentation and Fraudulent Inducement (Counts III, IV & V) .................................................................... 65

3.   Unjust Enrichment (Count VI) ..................................................... 66

**III. Conclusion** ............................................................................................. **68**

I.    **Facts Alleged[1]**

Plaintiff alleges the following facts in its Amended Complaint [Doc. # 43]. Foundation was founded in 2009 by Defendants Dean Barr and Joseph Meehan as a start-up company. (Am. Compl. ¶ 29.) The company's "business plan was to make three to four yearly minority investments of up to 25% in the management companies of large, well-established hedge funds." (*Id.* ¶ 28.) Foundation "asserted to potential investors that it expected to raise $4,000,000,000 to pursue this type of investment and that it was to yield substantial returns." (*Id.*)

Dean Barr served as the managing partner and managing principal of Foundation (*id.* ¶ 20); Joseph Meehan was a partner, managing principal and the Chief Operating Officer (*id.* ¶ 21); Thomas Ward was a partner, principal, manager, and Head of Distribution (*id.* ¶ 22); and Joseph Elmlinger was a partner, principal, and Head of Risk Structuring (*id.* ¶ 23).

---

[1] The exhibits referenced here are attached to either the Amended Complaint or one of Defendants' motions to dismiss and referenced in the Amended Complaint. *See Holloway v. King*, 161 F. App'x 122, 124 (2d Cir. 2005) ("[A] complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.' 'Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.'" (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002)) (internal citations omitted)). These include Barr's Exhibits D, E, F, G, H, I and part of Exhibit B, and Meehan's Exhibits B, C, and D. Barr's Exhibits A (the Subscription Agreement), C, J, and those parts of Exhibit B not mentioned or relied upon in the Amended Complaint, however, are not properly attached and will not be considered by the Court. Likewise, Meehan's Exhibit A (which is identical to Barr's Exhibit A) and part of Meehan's Exhibit E (which is identical to Barr's Exhibit B) are neither mentioned nor relied upon in the Amended Complaint and will not be considered by the Court.

In September 2013, FIH, an investment company, was introduced to Foundation. (*Id.* ¶ 37.) "The initial call between the representatives of FIH and Foundation took place in October 2013." (*Id.*) Over the next five months, "Foundation, through the individual defendants, engaged in extensive communications with representatives of FIH to persuade them to make a substantial investment in Foundation. (*Id.* ¶ 38.) Among these communications were: (1) Preliminary Due Diligence Materials "drafted and/or approved by the individual defendants," prepared as of September 2013 and February 2014 (*id.* ¶ 40); (2) phone calls, emails and meetings; (3) a Portfolio Model (*id.* ¶ 77); and (4) a General Partner Forecast (*id.* ¶ 78; *see* Forecast, Ex. D to Barr Mot. to Dismiss). In these communications, Defendants made a number of representations to Plaintiff that Plaintiff now alleges were false or misleading. These representations are outlined below.

### A. Defendants' Alleged Representations

#### 1. Barr's Skills, Experience and Contacts

Many of the representations alleged to have been made by Defendants to FIH concerned Barr's experience, skills, and contacts in the investment industry. These statements include the following:

- "The principals . . . have deep experience launching and managing investment businesses. Collectively, the team has over 100 years of experience in the alternative investment industry, having built/managed a number of successful asset management businesses, managed nearly $1 trillion in assets, and participated in dozens of growth capital investments. The principals believe that these experiences in successfully building alternative investment firms will enable [Foundation] to enjoy a strong start and long term success." (Due Diligence Sept. 2013 at 6; Due Diligence Feb. 2014 at 6).

- "[Foundation's] team maintains extensive relationships with leading managers, prime brokers and operations/administrative servicing professionals that will

assist the firm with deal sourcing and execution." (Due Diligence Sept. 2013 at 26; Due Diligence Feb. 2014 at 26.)

- "The Investment Manager plans to source deals directly through personal relationships and direct contact with targeted leading managers in the alternative investment industry. The firm's partners maintain close working relationships with prime brokerage firms, investment banks, key funds-of-funds, and strategic limited partners who represent some of the world's largest investors in hedge funds. . . . The firm will use the extensive experience and relationships Mr. Barr cultivated at Citi Alternative Investments . . . . [Foundation] will use his background and experience in its discussions surrounding investment opportunities [with] Large Hedge Fund Managers." (Due Diligence Sept. 2013 at 26; Due Diligence Feb. 2014 at 26.)

The Due Diligence Materials additionally asserted that "[a] third party diligence group was retained to conduct professional and personal background checks on the managing principals of the General Partner," and its findings "validated the work history and achievements of Mr. Barr and Mr. Meehan." (Due Diligence Sept. 2013 at 14; Due Diligence Feb. 2014 at 14.) Furthermore, the Materials stated, the third party found "no negative legal or personal judgments involving these principals." (Due Diligence Sept. 2013 at 14; Due Diligence Feb. 2014 at 14.) Barr similarly asserted on December 4, 2013,[2] during a meeting at which all of the individual defendants were present, that there was nothing "FIH needed to know about [his] background or personality" and no other matters concerning him that FIH should know about before proceeding with an investment. (Am. Compl. ¶ 91.)

---

[2] The Amended Complaint actually states the date as December 4, 2014. This appears to be a typographical error.

### 2.  Barr and Meehan's Relationship

Several of Defendants' alleged representations to FIH concerned Barr's relationship with Meehan. The Due Diligence Materials for example, stated that "Mr. Barr and Mr. Meehan have known each other for 16 years, meeting through family relationships in 1997," and "[b]oth have worked closely together since the concept for Foundation Capital Partners was created in 2007." (Due Diligence Sept. 2013 at 13; Due Diligence Feb. 2014 at 13.) The Materials additionally asserted that the partners did "not believe they ha[d] any potential conflicts of interest with [Foundation]." (Due Diligence Sept. 2013 at 14; Due Diligence Feb. 2014 at 14.) In the lead-up to Barr's divorce from Meehan's wife's sister, Barr and Meehan each represented to FIH, in separate phone calls on December 5, 2013, that "their relationship as brothers in law" posed no "threat to their ability to work together." (Am. Compl. ¶¶ 83–84.)

### 3.  The Pipeline and Expectations regarding Performance

FIH also alleges that Defendants made a number of representations to it concerning investments in Foundation's pipeline and Defendants' expectations about Foundation's performance. These include the following statements:

- As of September 2013:
  - o  The Due Diligence Materials indicated that fifteen projects were in Foundation's pipeline, "including those with which the firm is in active discussions" (Projects Delta, Lake, California, and Corvette, and Funds Nos. 5–15). (Due Diligence Sept. 2013 at 27.)

- December 2, 2013:
  - o  Barr circulated to FIH a document "drafted and/or approved by the individual defendants," entitled "[Foundation] Portfolio Model," which showed that "Foundation would close on four hedge fund GP minority interest transactions by June 30, 2014." (Am. Compl. ¶ 77.)

- o  The Portfolio Model "indicated Projects Lake and Granite would close by March of 2014 and Projects California and Corvette by June 2014." (*Id.*)

- December 19, 2013:
  - o  Director of Mergers and Acquisitions, Hall O'Donnell emailed to FIH, copying Defendants Barr, Meehan, and Elmlinger, a document entitled "Project Foundation General Partner Forecast," which "was drafted and/or approved by the individual defendants." (*Id.* ¶ 78.) The document showed that Foundation "was in a position to close on four deals [Projects Lake, Granite, California, and Corvette] by June 30, 2014." (*Id.*; *see* Forecast at 8.)

- December 30, 2013:
  - o  In an email to FIH, Barr stated: "Starting Jan 5th, we have four possible transactions in the works" (Dec. 30 Email, Ex. E to Barr Mot. to Dismiss [Doc. # 46]), referring to Projects Bronco, Corvette, Lake, and Centaur (Am. Compl. ¶ 72).

- January 22, 2014:
  - o  In an email to FIH, on which Meehan was copied, Barr reported: "We had a comprehensive call with a $5 bn London based Hedge Fund" (Project Apex) and "[w]e have a 'green light' to pursue a deal. . . . I believe we can move expeditiously on this deal." (Jan. 22, 2014 Email, Ex. F to Barr Mot. to Dismiss; Am. Compl. ¶ 73.)

- As of February 2014:
  - o  In an email to FIH, on which Meehan was copied, Barr stated: "We have some reasonably good intel that suggests that [the] offer [for Project Pilot] would be given serious consideration. Our pipeline continues to expand with real, immediate deals." (Feb. 3, 2014 Email, Ex. G to Barr Mot. to Dismiss; Am. Compl. ¶ 74.)
  - o  The Due Diligence Materials represented: "[Foundation] expects to close on three to four transactions each year." (Due Diligence Feb. 2014 at 4; *see also* Due Diligence Sept. 2013 at 4.)
  - o  According to the Due Diligence Materials, "the current representative [Foundation] pipeline . . . has become increasingly active in recent months . . . ." (Due Diligence Feb. 2014 at 27; *see also* Due Diligence Sept. 2013 at 27.)

- The Due Diligence Materials showed fourteen projects in the pipeline,[3] "including those with which the firm is in active discussions" (Projects Lake, Apex, Corvette, Granite, Breakout, Pilot, Centaur, Pound, Tensor, Mainstay, Yale, Halo, Gun, and Bronco). (Due Diligence Feb. 2014 at 27.)
- The Due Diligence Materials represented that non-disclosure agreements ("NDAs") were signed in Projects Apex, Granite, Lake, and Centaur. (*Id.*)

### 4. Barr's Personal Spending

Finally, a number of Defendants' representations pertained to Barr's spending habits and their likely effect, if any, on Foundation.

In January 2014, FIH read a news article which stated that Barr had lost a $1 million investment in a deep sea treasure hunting fraud. (Am. Compl. ¶ 103.) "Concerned about Barr's judgment, FIH inquired of Barr whether the story was true." (*Id.*) In an email dated January 16, 2014, Barr responded that his "investment was $200,000," and "[t]he $1 million number represents other investors in the hoax." (Jan. 16 Email, Ex. I to Barr Mot. to Dismiss.)

Several days later, on January 20, 2014, Barr emailed FIH, copying Defendants Meehan, Ward, and Elmlinger, to ask if FIH was "comfortable with allowing the Partners to make the monthly Jan. salary draw and conduct normal business travel as needed." (Jan. 20 Email, Ex. B to Barr Mot. to Dismiss; Am. Compl. ¶ 93.) According to FIH, "[i]n making that request, Barr effectively was representing to FIH that Barr's request to draw his salary was fiscally responsible and in the company's best interests." (Am. Compl. ¶ 93.)

---

[3] Plaintiff claims the pipeline included fifteen projects. In fact, though, there are fourteen projects on the list. (*See* Due Diligence Materials Feb. 2014.)

On February 20, 2014, "at a dinner in a Greenwich, Connecticut restaurant . . . Meehan and Elmlinger assured FIH's representative that there were strong spending controls in place," stating: "You're looking at the control room. Nothing happens without us" and "[w]e will not spend your money foolishly." (*Id.* ¶¶ 99–101.)

**B. FIH's Investment**

FIH ultimately invested $6.75 million in Foundation. (*Id.* ¶ 3.) The investment was made in four phases, the last of which took place on February 27, 2014. (*Id.* ¶ 109.) "The final transaction entailed: (1) FIH's direct purchase from Foundation of an interest in Foundation for $3 [m]illion; (2) FIH's direct purchase from Foundation of a previous investor's interest in Foundation for a planned $4.2 [m]illion, of which $2.1 [m]illion was paid; (3) FIH's purchase of another previous investor's interest for $1.15 [m]illion; and (4) FIH's purchase of some of Barr's interest in Foundation for $500,000." (*Id.*)

After FIH invested in Foundation, however, it obtained information from several sources indicating that some of the representations that had been made by Defendants to FIH were untrue. These sources included: (1) Project Activity Logs; (2) Project Soothsayer; and (3) Emails from Meehan and Elmlinger. Each of these sources is described below.

**C. Project Activity Logs**

On March 4, 2014, FIH received copies of internal Foundation documents entitled "Project Activity Logs." (*Id.* ¶¶ 143, 144.) The Logs "listed hedge fund targets in Foundation's pipeline under three categories: Live Deals, Prospects, and Dead Projects." (*Id.* ¶ 143.) "For each hedge fund target, the Project Activity Log was updated to reflect the progress in columns named 'recent activity/notes,' 'next steps' and 'process

milestones.'" (*Id.*) "The Project Activity Logs served as an internal diary of the progress made by Foundation on each of the targets to date and also catalogued the historical progress with each target to date." (*Id.*) "Thus, each Project Activity Log version built upon the previous version and added additional information but did not delete prior progress notes." (*Id.*) The Logs "were distributed to Foundation's employees—including the individual defendants—for discussion at weekly meetings to discuss movement on the pipeline as demonstrated in the Project Activity Logs." (*Id.*) The Log FIH received on March 4, 2014 was dated March 3, 2014, and it "included historical information on all of Foundation's prospects up to that date." (*Id.* ¶ 144.)

### D.  Project Soothsayer and Emails

On March 14, 2014, ten days after FIH received the Project Activity Logs, Meehan and Elmlinger contacted FIH and made "oral statements . . . to the effect that Barr was dishonest, incompetent, and a disaster to Foundation who must be removed if Foundation was to survive." (*Id.* ¶ 115.) They promised to provide FIH with a written "briefing" explaining why Barr needed to be removed from the company. (*Id.*) On March 21, 2014, Meehan emailed FIH, copying Elmlinger, stating: "I am finishing my stab at the previously mentioned briefing. Elm[linger] has landed, and I have debriefed him. He will take a thorough read and will add and edit where necessary." (*Id.* ¶ 116.)

On March 28, 2014, FIH received a package bearing the return address of Joseph Elmlinger which contained "183 pages of emails printed out from both Meehan's and Elmlinger's Microsoft Outlook accounts," "covering a period from February 19, 2012 to March 26, 2014," which supported Meehan's and Elmlinger's allegations about Barr's character and performance. (*Id.* ¶¶ 121, 124; *see* Soothsayer Emails, Ex. D to Am. Compl.;

Mar. 26–27 Emails, Ex. E to Am. Compl.) On April 1, 2014, FIH additionally received the written "briefing" promised by Meehan and Elmlinger. (*Id.* ¶ 119.) Entitled "Project Soothsayer," the document "spelled out in detail," for ten pages, "the writers' belief in the fundamental dishonesty, lack of experience, business contacts and appallingly poor business and personal judgment of Barr and detail[s] those qualities' disastrous effect on Foundation's performance in the past and its prospects for the future." (*Id.* ¶¶ 122–23; *see* Project Soothsayer, Ex. C to Am. Compl.)

### E.   Evidence of Misrepresentations

Project Soothsayer, the package of emails delivered to FIH by Meehan/Elmlinger, and the Project Activity Logs included a number of statements that FIH claims demonstrate the falsity of Defendants' prior assertions to FIH regarding Barr's skills, experience, and contacts; Barr and Meehan's relationship; the pipeline and Defendants' expectations regarding Foundation's performance; and Barr's personal spending. These representations are enumerated below.

#### 1.   Barr's Skills, Experience and Contacts

In emails exchanged with one another on July 17, 2013, Meehan revealed to Elmlinger that he viewed Barr as an "amateur," and Elmlinger stated that he did not believe Barr was "capable of delivering on anything" and that Barr was going to "ruin th[e] firm." (Soothsayer Emails at 2.) In Project Soothsayer, they lamented that Barr had no fundraising abilities at all, and that he "demonstrates a reckless disregard for confidentiality" agreements (Project Soothsayer at 10), which they feared would prevent Foundation from closing deals (*id.* at 3).

Another common refrain in Project Soothsayer was Meehan and Elmlinger's belief that Barr had "[e]xceptionally poor" judgment. (*Id.* at 2.) In this regard, they noted:

> [Barr] [m]akes exceedingly rash decisions without consideration of the opinions of [Foundation] staff, or the consequences. [He] [r]efuses to follow pre-agreed plans for negotiations . . . . He rarely conducts a thorough investigation and analysis of facts and almost never consults his colleagues for their opinions. . . . He is drawn to the easy money solution and rarely asks questions.

(*Id.* at 2, 9.)

Relatedly, Meehan and Elmlinger recalled that in September 2013:

> [Barr told a] reporter that Foundation had $2.3 billion of LP capital raised and expected to raise another $2 billion in the next 6–12 months [which was not true]. . . . By speaking with the reporter and lying to him about Foundation, [Barr] put the firm at risk of violating securities laws. . . . It was an embarrassing moment for the firm that further undermined our credibility in the marketplace.

(*Id.* at 9–10.)

Project Soothsayer also put great emphasis on what Meehan and Elmlinger term Barr's "functional inability to tell [the] truth." (*Id.* at 4). Meehan and Elmlinger complained that Barr "lies to prospective investors and hedge fund partners" (*id.* at 10), and that he lies about scheduling meetings with potential investors (*id.* at 4), once going so far as to produce a fake email purporting to discuss a commitment by a potential investor (Soothsayer emails at 3). They added that "[o]ften [Barr] notes that he knows [a potential investor] and will therefore make a call—several times we have caught him stating that a call was made and a meeting will be set up, and no call was in fact made." (Project Soothsayer at 3–4.) According to Meehan and Elmlinger, Barr's lies had become so frequent that "most people assume that whatever [he] says is not true." (*Id.* at 10.)

13

Moreover, on at least one occasion, Barr's lies to prospective investors "could have had a catastrophic impact on the firm's ability to close a transaction." (*Id.* at 10–11.)

Finally, and critically, Project Soothsayer asserted that Barr's "[s]table of [a]lternative [i]nvestment [i]ndustry [l]eader [c]ontacts" included few to no contacts, and no critical or irreplaceable contacts. (*Id.* at 2.) Meehan and Elmlinger observed that although "[Barr] claims to personally know just about every founder of every major hedge fund[,] [i]n fact, it seems that he knows very few of them." (*Id.* at 9; *see also id.* at 3 ("[Barr makes] comments like – 'I know (hedge fund owner/banker/potential investor) really well'; this is *never* the case (e.g., a meeting attended by [Barr] & [Elmlinger] with John Angelo. [Barr] told team that he knew Angelo well; Angelo had no idea who he was."); *id.* at 9 ("[Barr] has overstated the extent of his relationship with (and ability to get a meeting with) the founders of, amongst others: Appaloosa, Angelo Gordon, Carlson Capital, Elliot Management, Greenlight, Hillhouse, Perry Capital, and Two Sigma.").) Indeed, they believed that Barr's departure from Foundation was not likely to cause any investors or firms (with one exception) to opt not to work with Foundation. (*Id.* at 7). They concluded that because "[Barr] is regarded, where he is known, as having a somewhat tarnished reputation . . . [w]e are of the opinion that the market would see [Barr's removal] as 'addition by subtraction.'" (*Id.*)

### 2. Barr and Meehan's Relationship

A series of emails from September 2013 to February 2014 tracks the deterioration of Barr and Meehan's relationship. On September 25, 2013, in an email from Barr to Elmlinger and Ward and copied to Meehan, entitled "working with Joe M," Barr wrote: "I am truly sorry but I am not sure I can work with Joe going forward." (Soothsayer Emails

at 9). A week later, on October 1, 2013, Barr emailed Meehan: "I know you dislike me intensely and there is no trust." (Am. Compl. ¶ 170.) Finally, on February 3, 2014, Barr emailed Meehan, copying Elmlinger and Ward: "Joe, we are officially broken from each other." (*Id.* ¶ 171.) This sentiment was echoed by Meehan in Project Soothsayer, which stated: "[Meehan] is [u]nlikely to stay under [the] current model. [He] [s]ees no potential for change in [Barr]'s behavior, or anything but degradation of [Meehan's] reputation from working with [Barr] without a fundamental change in [Barr's] role/responsibilities." (Project Soothsayer at 5.)

### 3. The Pipeline and Expectations regarding Performance

In Project Soothsayer and in their emails, Meehan and Elmlinger repeatedly emphasized the importance of the pipeline. As Meehan told Hall O'Donnell on March 27, 2014, "getting a solid pipeline is critical to the long term success of the firm." (Mar. 26–27 Emails at 2). Moreover, they recognized that they "need[ed] a number of deals in the pipeline to get a chance at closing even one." (Project Soothsayer at 3).

But, they worried about Barr's prominent role in soliciting investors for the pipeline. They noted that during pipeline meetings, "Barr insisted on taking responsibility for reaching out to all manner of [hedge fund] targets" (*id.* at 3), including "the vast majority of target hedge funds on the pipeline list" (*id.* at 9), but he "rarely follow[ed] up" (*id.* at 3), and had "made contact with very few" of the targets (*id.* at 9). As a result, Meehan and Elmlinger concluded that "[t]he transaction pipeline presented on a no-names basis in the investor pitchbook strains credibility." (*Id.* at 9.)

Hall O'Donnell reached a similar conclusion in his March 26, 2014 email to Barr, Elmlinger, Meehan, and Ward, writing: "Per the attachment, you can see our pipeline

beyond Apex is pretty crappy. I consider Project Lake to be about one short step ahead of square one. Other than that, we have nothing." (Mar. 26–27 Emails at 4.) Barr responded: "I know our situation too." (*Id.*)

On March 27, 2015, Hall reiterated the point to Meehan:

Let me state what I have been stating for months, the sorry state of the M & A pipeline is the single biggest problem in the firm. Based on the timing before the firm runs out of cash, this issue may not even be fixable at this point without some indication from [General Partner] backers that the runway might be extended.

(Mar. 26–27 Emails at 2–3.)

Indeed, the March 3, 2014 Project Activity Logs revealed that Project Apex, of which Barr was in charge (Am. Compl. ¶ 162), was the "only . . . target in the 'Live Deals' category . . . . And even that target had only progressed to the point of 'ongoing [due diligence] dialogue'" (*id.* ¶ 146). Further, of the forty targets listed in the pipeline at that time, "only five had even progressed to the point of introductory meetings; of those, two had gone stale before Foundation ever met with FIH. The rest of the targets listed in the 'Prospects' category had 'no [recent] activity' or were still waiting for the initial call or introduction to be made. . . ." (*Id.*)

### 4.  Barr's Personal Spending

Project Soothsayer and Defendants' emails also reveal a great deal about Barr's personal spending habits, and Meehan and Elmlinger's concerns about the effect those habits could have on Foundation. Elmlinger and Meehan commented:

- "As a general rule, recent and long-term experience confirms [Barr] is a spendthrift, burning through cash exceptionally quickly . . . ." (Project Soothsayer at 2.)

16

- "History demonstrates that [Barr] rapidly burns through cash . . . and when pressed hard enough by financial distress he will do a distressed deal." (*Id.*)

- "[Barr] spends an extraordinary amount of money. . . . When he runs out of money, he threatens to declare bankruptcy (and ruin the firm) if he is not allowed to sell more [Foundation] equity." (*Id.* at 10.)

- "[Barr] has a strong tendency to desire to use corporate accounts for personal matters when his cash draws low. Despite this, we have rigorously reviewed expenses, and prevented unauthorized use of corporate assets for personal gain." (*Id.* at 4.)

- "[Barr] has, in all likelihood, not accounted for the capital gains on his many sales of [Foundation] equity. . . . Obviously, IRS issues for [Barr] would have a terrible effect on [Foundation]." (*Id.* at 5.)

- "[Barr] is actively destroying value for [Foundation's] members due [in part] to his rampant financial difficulties." (*Id.* at 2.)

Among the examples of Barr's irresponsible spending listed in Project Soothsayer was Barr's foray into "emerald treasure hunting," which became "a major, but not total, sinkhole of cash for him." (*Id.* at 3.) In that respect, Barr worried in a November 15, 2012 email to Meehan that "the emerald fraud litigation was 'spinning out of control' and . . . he was at risk of 'go[ing] bankrupt from legal fees to protect all of [Foundation and its partners'] interests.'" (Am. Compl. ¶ 188.) Indeed, FIH learned after investing in Foundation that "Barr had listed a $1.875 million note receivable from the emerald fraud on his personal financial statement as part of a mortgage refinancing effort." (*Id.* ¶ 187.)

Barr's spending was a frequent source of tension between Defendants, as revealed by their emails. In a September 23, 2013 email, for example, Meehan chastised Barr for using the corporate credit card for personal expenses, writing: "I just looked at the September corporate Amex and you have a $14,700+ charge on our corporate credit card.

You need to switch that [to] your personal credit card right away or write a check for the total amount of personal charges from the Corporate Amex, which is close to $17,000." (Soothsayer Emails at 8.) When Barr responded, "Joe, I can't cover it right now," Elmlinger, to whom Meehan had forwarded the email, angrily declared that "the partnership [would] no longer enable [Barr's] spending disease." (*Id.* at 7.)

Two days later, Barr emailed Elmlinger and Ward, copying Meehan: "I am unable to pay the mortgages or personal amex bill this month. I believe that our corporate cards are linked to my personal acct and they probably will be shut off. In addition, my credit rating is part of due diligence conducted by our LP's. . . . Sorry, but this is now a Partnership issue and unavoidable." (*Id.* at 9.) Indeed, on several occasions "during the course of 2013–2014," "[t]he firm's corporate credit card were suspended . . . as a result of Barr's irresponsible spending," including on December 3, 2013, when the firm's corporate Amex card was declined for a mere eleven dollar purchase. (Am. Compl. ¶ 180.)

### F.   Request for Rescission

On August 14, 2014, five months after it had received Project Soothsayer, FIH emailed Barr and Meehan "seeking rescission of FIH's Investment and reimbursement for legal fees incurred." (*Id.* ¶ 200.) Meehan denied FIH's request the following day. (*Id.* ¶ 201.) "That same date, Foundation sent an email to its members notifying them that, given the lack of capital, the responsible path would be to wind down the firm." (*Id.* ¶ 202.) "Shortly afterwards, Elmlinger, Meehan, and others resigned from Foundation." (*Id.* ¶ 203.)

## II.    Discussion[4]

FIH alleges that Defendants made material misrepresentations and omissions to FIH in order to induce it to invest in Foundation; that in reliance on these representations, FIH did invest; and as a result of its reliance on Defendants' representations, FIH lost money.

---

[4] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plaintiffs alleging fraud must satisfy Rule 9(b)'s "heightened pleading" standard, *AllGood Entm't, Inc. v. Dileo Entm't & Touring, Inc.*, 726 F. Supp. 2d 307, 322 (S.D.N.Y. 2010), which requires the plaintiff to "state with particularity the circumstances constituting fraud," *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054–55 (9th Cir. 2011) (internal quotation marks and brackets omitted).

Plaintiffs alleging violations of § 10(b) of the Securities Exchange Act must, pursuant to the Private Securities Litigation Reform Act ("PSLRA"), also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(2). Thus, to survive a motion to dismiss under the PSLRA, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000).

### A. Securities and Exchange Act § 10(b) (Count I)

To state a claim for securities fraud under section 10(b)[5] of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5,[6] 17 C.F.R. § 240.10b–5(b), a plaintiff must plead that the defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *S.E.C. v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)). Thus, "[i]n a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss;

---

[5] Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).

[6] Rule 10b–5, implementing Section 10(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (2013).

and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008); *see IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (same).

"A statement or omission is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *IBEW*, 783 F.3d at 389 (internal quotation marks and citations omitted). "In other words, for the misstatement to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 389–90 (internal quotation marks and alterations omitted). Thus, "[o]n a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *IBEW*, 783 F.3d at 390 (internal quotation marks omitted).

Statements of opinion may be deemed misleading if the alleged omission demonstrates that the speaker "lacked the basis for making the statements that a reasonable investor would expect." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S.Ct. 1318, 1333 (2015).[7] A reasonable investor is entitled to expect

---

[7]    Although *Omnicare* concerns § 11 of the Securities Act (relating to misstatements and omissions in registration statements), "courts have presumed that its holding also applies to claims brought under § 10(b) of the Exchange Act." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, No. 14-CV-3251 (JPO), 2016 WL 634079, at *9 n.8 (S.D.N.Y. Feb. 17, 2016) (citing *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 726 (S.D.N.Y. 2015)); *see also Tongue*, 2016 WL 851797, at *7–12 (applying *Omnicare* to claims brought under § 10(b)); *Perrigo Co. PLC v. Mylan N.V.*, No. 15 CIV. 7341 (NRB), 2015 WL 9916726, at *9 n.5 (S.D.N.Y. Oct. 29, 2015) ("While the Supreme Court's

"not just that the [speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker's] possession at the time." *Id.* at 1329. Thus, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting facts he supplied were untrue.'" *Tongue v. Sanofi*, No. 15-588-CV, 2016 WL 851797, at *7 (2d Cir. Mar. 4, 2016) (quoting *Omnicare*, 135 S.Ct. at 1327). "An opinion statement, however, is not necessarily misleading when [the speaker] knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 135 S.Ct. at 1329. "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why [a speaker] may frame a statement as an opinion, thus conveying uncertainty." *Id.*

Defendants move to dismiss the claims against them on the grounds that: (1) they are not liable for the misrepresentations and omissions attributed to them; (2) FIH did not adequately plead that the alleged misrepresentations were in fact false or misleading; (3) the alleged misrepresentations were not material; (4) it was not reasonable for FIH to have relied on the alleged misrepresentations; (5) FIH failed to adequately plead that the defendants had the required scienter to violate § 10(b); and (6) FIH did not plead loss causation.

### 1.   Liability for Misrepresentations

#### a.   Due Diligence Materials, Portfolio Model, General Partner Forecast

As a preliminary matter, Ward, Elmlinger, and Meehan contend that Plaintiff's complaint should be dismissed because Defendants are not liable for the statements in the

---

decision in *Omnicare* dealt with claims under Section 11 of the Securities Act of 1933, its reasoning has been applied to claims brought under Section 10(b) of the Exchange Act.").

Due Diligence Materials, Portfolio Model, and General Partner Forecast solely by virtue of their positions at Foundation.[8] (*See* Ward Mem. Supp. Mot. to Dismiss [Doc. # 47-1] at 6, 10–11, 20–21; Elmlinger Mem. Supp. Mot. to Dismiss [Doc. #50] at 10 n.4; Elmlinger Reply [Doc. # 61] at 3 n.3, 5; Meehan Mem. Supp. Mot. to Dismiss [Doc. # 52] at 16.) In so arguing, Defendants rely on the Supreme Court's decision in *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011), which held that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. . . . One who prepares or publishes a statement on behalf of another is not its maker." *Id.* at 2302. On this basis, the Supreme Court concluded that a third party mutual fund investment adviser could not be held liable for "making" statements in its clients' investment fund prospectuses, at the clients' direction. *Id.*

Although *Janus* did not directly hold that corporate insiders cannot be held liable as the "makers" of statements in group-published documents,[9] a few district courts in this

---

[8] Elmlinger additionally argued in his Reply brief and at oral argument that he cannot be held liable for statements in the Due Diligence Materials because his "membership interest in Foundation was only 2.105% management percentage" and he "did not even have a swing vote." (Elmlinger Reply at 4.) However, these arguments are based on the Subscription Agreement which, as already noted, will not be considered in relation to these motions to dismiss, as it was neither attached to the Amended Complaint, referenced in the Amended Complaint, nor obviously relied on by Plaintiff in drafting the Amended Complaint.

[9] Under the "group pleading doctrine," group-published documents "such as statements in prospectuses, registration statements, annual reports, and press releases are attributable to individuals with direct involvement in the everyday business of the company, who either were or acted like corporate insiders." *In re Barrick Gold Sec. Litig.*,

Circuit have held that such a holding is implicit in the decision. *See, e.g., Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 221 (E.D.N.Y. 2013) ("[O]nly those officers whose signatures appear on misleading statements may be liable as the 'makers' of those statements." (internal quotation marks omitted)); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012) (same); *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *10 (S.D.N.Y. Sept. 28, 2012) ("[A] theory of liability premised on treating corporate insiders as a group cannot survive a plain reading of the *Janus* decision.").

However, the majority of courts in the Second Circuit have held otherwise. As Judge Jed Rakoff explained in *City of Pontiac General Employees Retirement System v. Lockheed Martin Corporation*, 875 F. Supp. 2d 359 (S.D.N.Y. 2012):

> . . . *Janus Capital* . . . addressed only whether *third parties* can be held liable for statements made by their clients. Its logic rested on the distinction between secondary liability and primary liability and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability. It is not inconsistent with *Janus Capital* to presume that multiple people in a single corporation have the joint authority to "make" an SEC filing, such that a misstatement has more than one "maker."
>
> Moreover, as to the PSLRA's requirement that a plaintiff plead securities fraud with specificity as to each defendant, there is no tension between requiring a plaintiff to allege specific facts for individual defendants and presuming that multiple corporate officers may work as a group to produce particular documents. It is for this reason that . . . most judges in this District have continued to conclude that group pleading is alive and well.

---

No. 13 Civ. 3851 (SAS), 2015 WL 3486045, at *2 (S.D.N.Y. Jun. 2, 2015) (internal quotation marks and brackets omitted).

*Id.* at 374 (internal citations omitted); *see also In re Barrick Gold Sec. Litig.*, 2015 WL 3486045, at *2 (same); *Levy v. Maggiore*, 48 F. Supp. 3d 428, 449 n.16 (E.D.N.Y. 2014) (same); *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 477 n.16 (S.D.N.Y. 2013) (same); *In re Pfizer Inc. Sec. Litig.*, 936 F. Supp. 2d 252, 268–69 (S.D.N.Y. 2013) (same). This Court agrees.

Plaintiff has adequately pled that Defendants are each liable as "makers" of the Due Diligence Materials, the Portfolio Model, and the General Partner Forecast under the group pleading doctrine. The Amended Complaint alleges that Defendants were corporate insiders "intimately involved with [Foundation's] day to day activities," and this is borne out by the job descriptions of each Defendant included in the Due Diligence Materials and the Amended Complaint. (Am. Compl. ¶ 42; *see* Due Diligence Feb. 2014 at 8; Due Diligence Sept. 2013 at 8; Am. Compl. ¶¶ 20–23, 41, 44–45, 48–50.) Further, the Due Diligence Materials themselves state that they were "prepared by" Foundation, and they direct questions about the Materials to "the principals," identified as including each of the defendants. (Due Diligence Feb. 2014 at ii, iv, 8; Due Diligence Sept. 2013 at ii, iv, 8; *see also* Am. Compl. ¶¶ 20–23.) These allegations suffice, for pleading purposes, to state a claim against Defendants as the "makers" of the Due Diligence Materials, the Portfolio Model, and the General Partner Forecast. *See In re Barrick Gold Sec. Litig.*, 2015 WL 3486045, at *2 ("Here, plaintiffs have pleaded that Potter, Kinver, and Gonzales, as high-level officers, were corporate insiders involved in the everyday business of the company, and that the statements were made in group-published documents, such as press releases and annual reports. For pleading purposes, they have adequately alleged that these defendants were the 'makers' of the statements.").

### b.  Other Statements

Elmlinger and Meehan additionally contend that several statements attributed to both of them are not sufficiently specific because it is not clear which of the two of them made the statements, nor to whom the statements were made. (Elmlinger Mem. Supp. at 8–9; Meehan Mem. Supp. at 17.) The disputed statements are as follows:

> [A]t a dinner in a Greenwich, Connecticut restaurant on February 20, 2014, Meehan and Elmlinger assured FIH's representative that there were strong spending controls in place. They stated at that time: "You're looking at the control room. Nothing happens without us."
>
> Over the course of the dinner, both Meehan and Elmlinger repeated that they were in the "control room." In this context, Meehan and Elmlinger were referring to their proclaimed ability to control what they knew to be Barr's propensity towards spending, and impulsiveness, which was not disclosed or known to FIH. Essentially, Elmlinger and Meehan told FIH that Barr did not pose a threat to Foundation.
>
> In another reference to controls at the same meeting, Elmlinger and Meehan stated, "We will not spend your money foolishly." What they intended to convey to FIH was that they had control of the purse strings and that there were adequate controls at Foundation to ensure that the money invested by FIH would be used to further the Investment objectives, and not on Barr's personal spending or other wasteful spending.

(Am. Compl. ¶¶ 99–101.)

As Plaintiff notes, the Amended Complaint does not lump Elmlinger and Meehan together, but rather alleges that each "repeated" "[o]ver the course of the dinner" that they were in the "control room" and that they would "not spend [FIH's] money foolishly." There is nothing in the PSLRA that prohibits a plaintiff from claiming that two individuals made the same statements. As to who the listener was, Defendants cite no

authority for the proposition that a complaint that refers to the listener as a representative of a corporate plaintiff, rather than using an individual's name, is inadequate as a matter of law. The requirement that a complaint state "who heard the statement" exists for the purpose of enabling a court "to determine if Plaintiff could have relied on any of the purported misstatements." *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 540 (S.D.N.Y. 2014). Because this purpose can be met where the complaint alleges that the listener was a representative of the corporate plaintiff, Plaintiff's allegations here are not insufficiently specific.

### 2.   Materially False/Misleading

Defendants argue that FIH's claims should be dismissed because FIH has not adequately alleged that they are liable for making materially false or misleading statements. FIH's allegations of misrepresentations by Defendants can be grouped into four categories: (1) misrepresentations about Barr's skills, experiences, and contacts; (2) misrepresentations regarding Barr and Meehan's relationship; (3) misrepresentations regarding the pipeline and Defendants' expectations regarding Foundation's performance; and (4) misrepresentations regarding Barr's personal spending habits and their effect on Foundation.

### a.   Barr's Skills, Experience and Contacts

Plaintiff claims the following statements about Barr's skills, experience, and contacts were false or misleading:

| Statement | Speaker |
|---|---|
| Defendants' prior "experiences in successfully building alternative investment firms will enable [Foundation] to enjoy a strong start and long term success."[10] | All Defs. |
| "[Defendants'] extensive relationships with leading managers, prime brokers and operations/administrative servicing professionals . . . will assist the firm with deal sourcing and execution."[11] | All Defs. |
| Defendants will "source deals directly through personal relationships and direct contact with targeted leading managers in the alternative investment industry."[12] | All Defs. |
| Foundation will use Barr's "extensive experience and relationships . . . cultivated at Citi Alternative Investments . . . in its discussions surrounding investment opportunities [with] Large Hedge Fund Managers."[13] | All Defs. |
| There is nothing "FIH needed to know about Barr's background or personality" and no other matters concerning him that FIH should know about before proceeding with an investment.[14] | Barr (all Defs. were present) |
| "A third party diligence group was retained to conduct professional and personal background checks on the managing principals of the General Partner," and found "no negative legal or personal judgments involving [Barr]."[15] | All Defs. |

---

[10] (Due Diligence Sept. 2013 at 6; Due Diligence Feb. 2014 at 6.)

[11] (Due Diligence Sept. 2013 at 26; Due Diligence Feb. 2014 at 26.)

[12] (Due Diligence Sept. 2013 at 26; Due Diligence Feb. 2014 at 26.)

[13] (*Id.*)

[14] (Am. Compl. ¶ 91.)

[15] (Due Diligence Sept. 2013 at 14; Due Diligence Feb. 2014 at 14.)

Plaintiff alleges these statements were false or misleading based on the following:

- Meehan, whom the Due Diligence Materials represent as having known Barr for sixteen years and worked closely with him since 2007, believed Barr was an "amateur"[16];

- Elmlinger, who had worked with Barr since 2005, did not believe Barr was "capable of delivering on anything" and that Barr was going to "ruin th[e] firm"[17];

- Meehan and Elmlinger believed that Barr had no fundraising abilities at all, and that he "demonstrates a reckless disregard for confidentiality" agreements,[18] which they feared would prevent Foundation from closing deals[19];

- Meehan and Elmlinger thought Barr had "[e]xceptionally poor" judgment, which they demonstrated with at least one concrete example[20];

- Meehan and Elmlinger stated that Barr had a "functional inability to tell [the] truth," and supported this conclusion with at least one concrete example[21]; and

- Meehan and Elmlinger stated that based on their experience working with Barr, he had few to no contacts in the alternative investment industry, and they offered multiple examples of Barr claiming to know someone he did not in fact know.[22]

Defendants contend that Plaintiff's claim regarding Barr's skills, experience, and contacts is not actionable because "[t]he alleged material omissions—that Defendants failed to disclose each and every Barr transgression—are akin to a failure to disclose mismanagement," and "claims of mismanagement and failures to disclose such

---

[16] (Soothsayer Emails at 2.)

[17] (*Id.*)

[18] (Project Soothsayer at 10)

[19] (*Id.* at 3.)

[20] (*Id.* at 2, 9–10.)

[21] (*Id.* at 4, 10–11.)

[22] (*Id.* at 2, 3, 9)

mismanagement do not state claims for securities fraud." (Meehan Mem. Supp. at 29; *see* Meehan Reply [Doc. # 60] at 7–8; Ward Mem. Supp. at 9; Barr Mem. Supp. Mot. to Dismiss [Doc. # 46-1] at 25; Elmlinger Mem. Supp. at 16 n.7.)

In support of this argument, Meehan cites the Supreme Court's decision in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977), where the Court held that the Securities and Exchange Act was not intended to prohibit conduct not involving manipulation or deception, such as claims that "shareholders were treated unfairly by a fiduciary." *Id.* at 477. "Following *Santa Fe*, courts repeatedly have found that allegations constituting nothing more than assertions of general mismanagement, or nondisclosure of mismanagement, cannot support claims under § 10(b) of the Exchange Act . . . ." *In re Donna Karan Int'l Sec. Litig.*, No. 97cv2011 (CBA), 1998 WL 637547, at *9 (E.D.N.Y. Aug. 14, 1998); *see Poptech, L.P. v. Stewardship v. Advisors LLC*, 849 F. Supp. 2d 249, 268 (D. Conn. 2012) ("Claims of mismanagement and failures to disclose such mismanagement do not state claims for fraud.").

The majority of Plaintiff's claims about Barr's skills, experience, and contacts, "which expressly assail the conduct, judgment, and abilities" of Foundation's management, "fall within the scope of the *Santa Fe* rule," and as such are not actionable under the Securities and Exchange Act. *In re Donna Karan Int'l Sec. Litig.*, 1998 WL 637547, at *10; *see id.* at *6, 10 (finding inactionable under *Santa Fe* claims that Donna Karan International failed to disclose Karan's poor management skills and poor judgment).[23]

---

[23] "[A] contrary finding with regard to the alleged material omissions concerning [Foundation's] management—allegations that essentially assert that [Foundation] should

However, as Plaintiff notes, "'the mere fact that . . . conduct . . . arguably constitutes mismanagement will not preclude a claim . . . if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement.'" *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) (quoting *In re Donna Karan Int'l Sec.* Litig., 1998 WL 637547, at \*10). Because Barr's statement that there was nothing "FIH needed to know about [his] background or personality" and no other matters concerning him that FIH should know about before proceeding with an investment (Am. Compl. ¶ 91) was "wholly inconsistent with" what Plaintiff has alleged to have been "known existing mismanagement," it is actionable.[24]

Therefore, Plaintiff's claims regarding Barr's skills, experience, and contacts are dismissed, except with respect to Barr's statement that there was nothing "FIH needed to know about [his] background or personality" and no other matters concerning him that FIH should know about before proceeding with an investment. (Am. Compl. ¶ 91.)

---

have disclosed that [Barr], the company's [co-]founder and [managing partner], was an impulsive, stubborn, and incompetent manager—also would run afoul of the accepted view that the securities laws do not require corporate management 'to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner.'" *In re Donna Karan Int'l Sec. Litig.*, 1998 WL 637547, at \*10 (quoting *Ballan v. Wilfred American Educ. Corp.,* 720 F. Supp. 241, 249 (E.D.N.Y. 1989)).

[24] The claims against the other Defendants, who did not make the statement (that that there was nothing "FIH needed to know about Barr's background or personality" and no other matters concerning him that FIH should know about before proceeding with an investment), however, are dismissed. *See Rose*, 2014 WL 7389900, at \*5; *Oneida Sav. Bank*, 2014 WL 4678046, at \*12; *Ho*, 887 F. Supp. 2d at 572 n.13.

### b.  The Pipeline and Expectations Regarding Performance

Plaintiff alleges that the following statements are misrepresentations or created a

duty to disclose on the part of Defendants:

| Statement | Speaker |
|---|---|
| As of September 2013, fifteen projects were in Foundation's pipeline, "including those with which the firm is in active discussions"[25] | All Defs. |
| As of February 2014, fourteen projects were in Foundation's pipeline,[26] "including those with which the firm is in active discussions"[27] | All Defs. |
| Foundation's Portfolio Model shows that "Foundation would close on four hedge fund GP minority interest transactions by June 30, 2014" (Projects Lake and Granite would close by March 2014 and Projects California and Corvette would close by June 2014)[28] | All Defs. |
| General Partner Forecast shows four projects were projected to close by June 2014 (Projects Lake and Granite would close by March 2014 and Projects California and Corvette would close by June 2014)[29] | All Defs. |
| "Starting Jan 5th, we have four possible transactions in the works" (Projects Bronco, Corvette, Lake, and Centaur)[30] | Barr |
| "We had a comprehensive call with a $5 bn London based Hedge Fund [Project Apex] this morning. We have a 'green light' to pursue a deal. The good news is that we have already gone over terms such as reps and warranties, put triggers etc. that normally take place during the term sheet negotiation and definitive agreement stage. We are receiving financials and the contract with Deutsche Bank today or tomorrow. I believe we can move expeditiously on this deal."[31] | Barr |

---

[25] (Due Diligence Sept. 2013 at 27.)

[26] Plaintiff claims the pipeline included fifteen projects. In fact, though, there are fourteen projects on the list. (*See* Due Diligence Materials Feb. 2014.)

[27] (Due Diligence Feb. 2014 at 27.)

[28] (Am. Compl. ¶ 77.)

[29] (Am. Compl. ¶ 78; *see* Forecast at 8.)

[30] (Dec. 30 Email; Am. Compl. ¶ 72.)

[31] (Jan. 22 Email; Am. Compl. ¶ 73.)

| | |
|---|---|
| "Just thought you'd like to see a draft of the Petershill Letter of Intent that is under review at Fortress. Should the transaction occur, it would be a large deal ($600 m). We have some reasonably good intel that suggests that this offer would be given serious consideration. Our pipeline continues to expand with real, immediate deals."[32] | Barr |
| "[Foundation] expects to close on three to four transactions each year."[33] | All Defs. |
| "[T]he current representative [Foundation] pipeline . . . has become increasingly active in recent months"[34] | All Defs. |
| Non-disclosure agreements ("NDAs") were signed in Projects Apex, Granite, Lake, and Centaur[35] as of February 2014 | All Defs. |

### i.  Misrepresentations

Defendants assert that the alleged misrepresentations (listed above) in Barr's emails and in the Due Diligence Materials about the pipeline and Defendants' expectations about Foundation's performance were not false or misleading. The Court agrees with respect to most, but not all of the claimed misrepresentations.

In ¶ 148 of the Amended Complaint, Plaintiff lists five representations made to FIH, alongside the "truth" with regard to each representation, but the "truths" in this chart do not explain why Plaintiff believes the representations to be false.

The first representation, that the "current representative [Foundation] pipeline" has fourteen projects including Projects Pilot, Centaur, Pound, and Bronco, comes from the Due Diligence Materials stated to have been "prepared as of February 2014." (Due Diligence Feb. 2014 at ii.) Next to this representation, Plaintiff notes that the March 3,

---

[32] (Feb. 3 Email; Am. Compl. ¶ 74.)

[33] (Due Diligence Feb. 2014 at 4; Due Diligence Sept. 2013 at 4.)

[34] (Due Diligence Feb. 2014 at 27; Due Diligence Sept. 2013 at 27.)

[35] (Due Diligence Feb. 2014 at 27.)

2014 Project Activity Log showed Project Bronco to be non-viable as of January 29, 2014, Project Centaur to be non-viable as of February 7, 2014, Project Pound to be non-viable as of February 10, 2014, and Project Pilot to be non-viable as of February 24, 2014. (Am. Compl. ¶ 148.) This does not, however, suffice to demonstrate any falsity with respect to Projects Centaur, Pound, and Pilot, which were viable "as of" February 2014, when the Due Diligence Materials were prepared.

The second representation Plaintiff alleges to be false is a statement in the February 2014 Due Diligence Materials that a non-disclosure agreement had been signed in Projects Bronco and Lake. (Am. Compl. ¶ 148.) However, the February 2014 Due Diligence Materials do not state that a non-disclosure agreement had been signed for Project Bronco. (*See* Due Diligence Feb. 2014 at 27.)

Next, Plaintiff alleges that Barr's representation in his December 30, 2013 email that Projects Bronco, Pilot, and Centaur were "in the works," was false, based on the fact that Project Bronco was non-viable as of January 29, 2014, Project Centaur was non-viable as of February 7, 2014, and Project Pilot was non-viable as of February 24, 2014. (Am. Compl. ¶ 14.) These allegations are inadequate for two reasons. First, Barr did not mention Project Pilot in his December 30 email. (*See id.* ¶ 72.) Second, the inference Plaintiff asks the Court to draw regarding the truth of Barr's statements about Bronco and Centaur is not reasonable; just because the projects became non-viable in late January and early February 2014 does not mean that they were not "in the works" at the end of December 2013.

Plaintiff also claims that Barr's representation that Project Bronco was "in the works" was false because "Foundation did not have an introductory call or meeting with

34

Project Bronco until January 7, 2014." (*Id.* ¶ 148.) But, in light of the fact that Barr's full statement in the email was "[s]tarting Jan 5th, we have four possible transactions in the works," he can hardly be said to have made a material misrepresentation solely because the introductory call did not occur until January 7. (Dec. 30 Email.)

Plaintiff additionally alleges that Barr's statement that Projects Lake and Corvette were "in the works" was false because "[a]s of that date, Projects Corvette and Lake had not progressed beyond the point of preliminary emails or phone calls – let alone any definitive term sheets signed" and "Project Corvette was put on hold until May 2014." (Am. Compl. ¶ 148.) Again, just because the projects had not progressed beyond preliminary stages, does not mean that they were not "possible projects" "in the works." (Dec. 30 Email.)

Plaintiff also asserts that Barr's February 3, 2014 statement to FIH that "[o]ur pipeline continues to expand with real, immediate deals" (Feb. 3, 2014 Email) was false. Barr responds that the statement was not false, as is clear from the December 19, 2013 Forecast, which shows that "Barr had advanced four new targets (Bronco, Centaur, Apex and Pilot)." (Barr Reply at 6.) However, as Plaintiff noted at oral argument, Barr's statement runs up against Hall O'Donnell's March 26 and 27 emails in which he reiterated what he had "been stating for months," namely "the sorry state" of the pipeline, and the fact that only one project in the pipeline appeared promising (*see* Mar. 26–27 Emails at 2–4). A reasonable inference can be drawn from O'Donnell's statement that Barr's early February 2014 assertion that the pipeline was continuing to expand with "real, immediate deals" was false when made.

For the same reason, the statements in the Due Diligence Materials that

"[Foundation] expects to close on three to four transactions each year" (Due Diligence Feb. 2014 at 4); and that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months"[36] (*id.* at 27) has been sufficiently pled to be false.

Finally, Plaintiff claims that the following representations are false: (a) the representation in the Portfolio Model, circulated to FIH by Barr on December 2, 2013 that "Foundation would close on four hedge fund GP minority interest transactions by June 30, 2014" (Am. Compl. ¶ 77); and (b) the representation in the General Partner Forecast emailed to FIH by Hall O'Donnell on December 19, 2013, that Foundation "was in a position to close on four deals by June 30, 2014" (*id.* ¶ 78). (*See* Opp'n at 19.) But, Plaintiff puts forth no facts from which it can plausibly be inferred that these statements were untrue when made. (*See* Ward Mem. Supp. at 20.) That by late March 2014 Hall O'Donnell had been stating for months that the pipeline was "pretty crappy" provides no reasonable basis for inferring that the same was true in early and mid-December.

That leaves Plaintiff with five potentially viable claims of false statements by Defendants: (1) the statement in the Due Diligence Materials that Project Bronco was in the pipeline as of February 2014 (Due Diligence Feb. 2014 at 27), though in fact, Project Bronco was deemed non-viable as of January 29, 2014 (Am. Compl. ¶ 148); (2) the statement in the Due Diligence Materials that a non-disclosure agreement had been signed for Project Lake as of February 2014 (Due Diligence Feb. 2014 at 27), though the

---

[36] In its reiteration of this statement in ¶ 148 of the Amended Complaint, Plaintiff incorrectly quotes the Due Diligence Materials as stating that all of the projects in the pipeline were "increasingly active."

March 3, 2014 Project Activity Log showed otherwise[37] (Am. Compl. ¶ 148); (3) Barr's February 3, 2014 statement to FIH that "[o]ur pipeline continues to expand with real, immediate deals" (Feb. 3, 2014 Email), though by March 2014 O'Donnell claimed to have been telling Defendants for months that the pipeline was in a "sorry state" (Mar. 26–27 Emails at 2–4); (4) the statement in the Due Diligence Materials that "[Foundation] expects to close on three to four transactions each year" (Due Diligence Feb. 2014 at 4), in spite of O'Donnell's March 2014 statements (Mar. 26–27 Emails at 2–4); and (5) the statement in the Due Diligence Materials that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months" (*id.* at 27), in spite of O'Donnell's March 2014 statements (Mar. 26–27 Emails at 2–4).

### ii.  Omissions

Plaintiff contends that Defendants are also liable for material omissions about the pipeline. Specifically, Plaintiff asserts that Defendants had a duty to update FIH as the projects mentioned in Defendants' emails to FIH and in the Due Diligence Materials became non-viable. (Opp'n at 26–28.) Plaintiff argues, for instance, that Defendants should have "follow[ed] up with FIH to correct the statement" in Barr's December 30, 2013 email that "certain projects were 'in the works'" and that Defendants should have "apprise[d] FIH when deals touted as 'current' on Foundation's pipeline became non-

---

[37] Barr, misconstruing the purpose of a motion to dismiss, attaches an exhibit to his motion to dismiss purporting to show that Foundation in fact did enter into a non-disclosure agreement for Project Lake. (*See* Ex. J to Barr Mot. to Dismiss.) However, unlike in the summary judgment context, at the motion to dismiss stage, factual allegations in a complaint are "accepted as true." *Iqbal*, 556 U.S. at 678. As such, the Court will not consider the improperly attached Exhibit J at this stage.

viable." (*Id.* at 26, 28.)

With respect to Barr's email statements, Elmlinger and Ward respond that they cannot be held liable for a failure to update because they were not the individuals who made the initial statements that required updating. (*See* Ward Mem. Supp. at 7; Elmlinger Mem. Supp. at 12.) FIH conceded at oral argument that this is a correct statement of the law. For this reason, only Barr may be held liable for omissions arising out of his emails.

Meehan, Elmlinger, and Ward further contend that even with respect to the Due Diligence Materials, Portfolio Model, and General Partner Forecast (group-published documents for which they are legally liable) they had no duty to update FIH. (*See* Elmlinger Mem. Supp. at 12–13; Ward Mem. Supp. at 12; Meehan Mem. Supp. at 30.) FIH argues to the contrary. (*See* Opp'n at 26, 28.)

"A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event." *In re Int'l Bus. Machines Corp.* ["*IBM*"] *Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) (internal quotation marks omitted); *see In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) (same). "However, there is no duty to update vague statements of optimism or expressions of opinion." *In re IBM Sec. Litig.*, 163 F.3d at 110. "There is also no need to update when the original statement was not forward looking and does not contain some factual representation that remains 'alive' in the minds of investors as a continuing representation, or if the original statements are not material." *Id.* (internal citations omitted).

Thus, the Second Circuit found no duty to update: where the original statements "suggest[ed] only the hope of a[] company, embarking on talks with multiple partners,

that the talks would go well," rather than a statement by a defendant that "he thought deals would be struck by a certain date," *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); and where the original statements were "general comments, such as the company '*should* deliver income growth consistent with its historically superior performance' and 'we are optimistic about 1993,'" which reflected "hope, adequately tinged with caution," *San Leandro Emerg. Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996).

However, a duty to update was found: where a company stated: "[we] hope to have an amendment . . . within the next few weeks"; "[w]e believe we have an agreement in principle"; and "[w]e're very confident we should have this amendment signed in the not too distant future," and then failed to update investors when it became clear that an amendment agreement would not be signed, *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 263–64 (2d Cir. 2010); and where a company announced a schedule for the commencement of a construction project but failed to update investors when it became aware that the schedule was unrealistic, *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 308 (S.D.N.Y. 2013).

Some of the statements at issue here are "'the sort of definite positive projection[s]' that the Second Circuit has found 'require[] later correction when intervening events render [them] misleading'" *id.* (quoting *Ill. State Bd. of Inv.*, 369 F. App'x at 263 n.2), while others are merely "vague, forward-looking expressions of optimism," *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 292 (S.D.N.Y. 1999), "which are not sufficiently concrete, specific or material to impose a duty to update," *In re IBM Sec. Litig.*, 163 F.3d at 110.

The following statements fall into the latter, non-actionable category: (1) As of September 2013, fifteen projects were in Foundation's pipeline, "including those with which the firm is in active discussions" (Due Diligence Sept. 2013 at 27); (2) As of February 2014, fourteen projects were in Foundation's pipeline, "including those with which the firm is in active discussions" (Due Diligence Feb. 2014 at 27); (3) "Starting Jan 5th, we have four possible transactions in the works" (Projects Bronco, Corvette, Lake, and Centaur) (Dec. 30 Email; Am. Compl. ¶ 72); and (4) Non-disclosure agreements ("NDAs") were signed in Projects Apex, Granite, Lake, and Centaur as of February 2014 (Due Diligence Feb. 2014 at 27).

Statements that did create a duty to update include: (1) the Portfolio Model and General Partner Forecast's projections that "Foundation would close on four hedge fund GP minority interest transactions by June 30, 2014" (Projects Lake and Granite would close by March 2014 and Projects California and Corvette would close by June 2014) (Am. Compl. ¶ 77; *see* Forecast at 8); and (2) Barr's January 22, 2014 statement that: "We had a comprehensive call with a $5 bn London based Hedge Fund [Project Apex] this morning. We have a 'green light' to pursue a deal. The good news is that we have already gone over terms such as reps and warranties, put triggers etc. that normally take place during the term sheet negotiation and definitive agreement stage. We are receiving financials and the contract with Deutsche Bank today or tomorrow. I believe we can move expeditiously on this deal" (Jan. 22, 2014 Email).

The first of these statements became misleading by mid-to-late February 2014, by which time it must have been apparent to Defendants that Projects Lake and Granite would not close by March 2014. Indeed, the March 3, 2014 Project Activity Log listed

neither Project Lake nor Granite as a "live deal" (*see* Am. Compl. ¶¶ 146, 162) and even by March 26, 2014 Project Lake was only "about one short step ahead of square one" while Project Granite does not appear to have progressed at all (*see* Mar. 26–27 Emails at 4 ("[O]ur pipeline beyond Apex is pretty crappy. I consider Project Lake to be about one short step ahead of square one. Other than that, we have nothing.")).

The second statement became misleading by late February because by March 3, 2014, more than a month after Barr made the original statement, the project "had only progressed to the point of ongoing [due diligence] dialogue." (Am. Compl. ¶¶ 146, 162.)

### iii. Materiality of Misrepresentations and Omissions

Even where a statement constitutes a misrepresentation or omission, however, it is not actionable if it is not material.

Of the five misrepresentations Plaintiff adequately pled,[38] two are not material on their face: Plaintiff's belief that (a) one possible project, about which it knew nothing (including the real name of the potential investor), was viable as of February 2014, and

---

[38] (1) The statement in the Due Diligence Materials that Project Bronco was in the pipeline as of February 2014 (Due Diligence Feb. 2014 at 27), though in fact, Project Bronco was deemed non-viable as of January 29, 2014 (Am. Compl. ¶ 148); (2) the statement in the Due Diligence Materials that a non-disclosure agreement had been signed for Project Lake as of February 2014 (Due Diligence Feb. 2014 at 27), though the March 3, 2014 Project Activity Log showed otherwise (Am. Compl. ¶ 148); (3) Barr's February 3, 2014 statement to FIH that "[o]ur pipeline continues to expand with real, immediate deals" (Feb. 3, 2014 Email), though by March 2014 O'Donnell claimed to have been telling Defendants for months that the pipeline was in a "sorry state" (Mar. 26–27 Emails at 2–4); (4) the statement in the Due Diligence Materials that "[Foundation] expects to close on three to four transactions each year" (Due Diligence Feb. 2014 at 4); and (5) the statement in the Due Diligence Materials that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months" (*id.* at 27), in spite of O'Donnell's March 2014 statements (Mar. 26–27 Emails at 2–4).

that (b) Foundation had signed a non-disclosure agreement in another possible project about which FIH knew nothing, was not likely to have altered Plaintiff's decision about whether to invest in Foundation. (*See* Meehan Mem. Supp. at 28.) Indeed, these two representations were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *IBEW*, 783 F.3d at 390. They are therefore non-actionable, and Plaintiff's claim is dismissed as to them.

However, the same cannot be said of the third, fourth, and fifth alleged misrepresentations or the two alleged omissions,[39] which bear on Foundation's likelihood of success.

Defendants nonetheless argue that the alleged misrepresentation in the Due Diligence Materials that Foundation "expects to close on three to four transactions each year" is immaterial because it is protected by the "bespeaks caution" doctrine, the PSLRA's "safe harbor" provision, or is non-actionable puffery.[40] (*See* Meehan Mem. Supp.

---

[39] (1) the Portfolio Model and General Partner Forecast's projections that "Foundation would close on four hedge fund GP minority interest transactions by June 30, 2014" (Projects Lake and Granite would close by March 2014 and Projects California and Corvette would close by June 2014) (Am. Compl. ¶ 77; *see* Forecast at 8); and (2) Barr's January 22, 2014 statement that: "We had a comprehensive call with a $5 bn London based Hedge Fund [Project Apex] this morning. We have a 'green light' to pursue a deal. The good news is that we have already gone over terms such as reps and warranties, put triggers etc. that normally take place during the term sheet negotiation and definitive agreement stage. We are receiving financials and the contract with Deutsche Bank today or tomorrow. I believe we can move expeditiously on this deal" (Jan. 22, 2014 Email).

[40] Elmlinger and Ward additionally rely on a disclaimer in the Subscription Agreement to argue that all of their statements to Plaintiff were protected by the "bespeaks caution" doctrine. (*See* Elmlinger Mem. Supp. at 18; Ward Mem. Supp. at 20.)

at 19–20, 24–25; Ward Mem. Supp. at 8–9; Barr Mem. Supp. at 20–23; Elmlinger Mem. Supp. at 15–16; Elmlinger Reply at 4.)

Under the "bespeaks caution" doctrine, "certain forward-looking statements" are deemed "'immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.'" *Ill. State Bd. of Inv.*, 369 F. App'x at 263 (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)). "When there is cautionary language in the disclosure, the Court analyzes the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled." *Rombach*, 355 F.3d at 173 (internal quotation marks omitted). "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Id.* (internal quotation marks omitted).

The PSLRA's "safe harbor" provision similarly provides that an issuer "shall not be liable with respect to any forward-looking statement . . . if and to the extent that . . . the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial. . . ." 15 U.S.C. §§ 77z-2(a) & (c)(1), 78u-5(a) & (c)(1).

---

As previously noted, however, the Subscription Agreement will not be considered at this stage.

Relatedly, the Second Circuit has held that mere puffery or statements of corporate optimism are not actionable because "[c]ompanies must be permitted to operate with a hopeful outlook: People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business they manage." *Rombach*, 355 F.3d at 174 (internal quotation marks omitted).

Defendants contend that the statement in the Due Diligence Materials[41] "at best constitute[s] [a] statement[] of optimism and corporate confidence." (Ward Mem. Supp. at 8.) Moreover, "[t]he express language 'expects to close' undermines FIH's position that this statement is a material statement of fact." (*Id.*)

Defendants additionally note that the Due Diligence Materials includes the following cautionary language:

> The information in this document has been provided by Foundation, does not purport to be comprehensive, has not been independently verified and should not be relied on as a promise or representation as to the future. . . . In particular . . . no representations . . . are given as to (i) the achievement or reasonableness of, and no reliance should be placed on, any projections, estimates, opinions, forecasts, prospects, returns or targets contained herein; or ii) the accuracy and completeness of any information contained in this document, any other written or oral information provided in connection therewith or any data which such information generates. Any projections, estimates, opinions, forecasts, targets, prospects and returns contained herein are not a reliable indicator of future performance and are based on various assumptions concerning anticipated results which may or may not prove to be correct.

---

[41] To the extent Defendants argue that other of the remaining alleged misrepresentations are non-actionable statements of optimism, the Court disagrees because they are not forward-looking statements.

(Due Diligence Sept. 2013 at ii; Due Diligence Feb. 2014 at ii.)

Plaintiff responds that this disclaimer is ineffective because it is not "specific to the misrepresentations alleged by FIH" and does "not track the misrepresentations alleged by FIH," but is instead a "classic, general, boilerplate disclaimer." (Opp'n at 45.)

Plaintiff is clearly correct that the language in the Due Diligence Materials is boilerplate, and that such language does not suffice to insulate a defendant from a claim of fraud. *See Halperin*, 295 F.3d at 359 ("Cautionary language in securities offerings is just about universal. Thus, the key question a district court must decide when determining whether to grant a motion to dismiss a securities fraud complaint is whether plaintiffs have overcome the existence of such language. Plaintiffs may do this by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss.").

Nonetheless, no reasonable investor reading the statement in the context of the Due Diligence Materials "could have been misled into thinking that the risk that materialized and resulted in [FIH's] loss"—namely, the risk of poor management—"did not actually exist." *Id.* A defendant "is not liable for securities fraud simply because the investment did not turn out as the investor hoped." *Id.* at 361. For this reason, Plaintiff's claim is dismissed as to the Due Diligence Materials' statement that Foundation "expects to close on three to four transactions each year."

Turning to the materiality of the alleged omissions, Barr contends that his statement regarding Project Apex ("I believe we can move expeditiously on this deal") was not material because no reasonable investor would have relied on "these brief comments about targets when it closed on its investment" when it had "a full right to

perform due diligence and to make inquiries." (Barr Mem. Supp. at 23.) The Court disagrees. Barr's statement, which made it sound like Project Apex, a deal involving a "$5 bn London based Hedge Fund" would close in the near future, was not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *IBEW*, 783 F.3d at 390 (internal quotation marks omitted).

With respect to the Portfolio Model and General Partner Forecast's projections that "Foundation would close on four hedge fund GP minority interest transactions by June 30, 2014," however, the Court is persuaded by Barr's argument that the statements were not material omissions because Foundation updated FIH about the projects in the Portfolio Model and Forecast, such that continued reliance on them was not reasonable. (*See* Barr Reply at 6.) The Forecast and Portfolio Model, which FIH received in December 2013, projects that four deals would close by June 2014: Projects Lake, Granite, California, and Corvette. (Am. Compl. ¶¶ 77–78; *see* Forecast at 8.) However, the Due Diligence Materials that FIH received thereafter, which were accurate "as of" February 2014, show that no progress had been made on Project Corvette, and Project California was not even in the pipeline anymore. (*See* Due Diligence Feb. 2014 at 27.) In light of this information, it was not reasonable for FIH to continue to rely on the clearly outdated Forecast and Portfolio Model in deciding whether to invest in Foundation in late February 2014. Plaintiff's claim regarding the Portfolio Model and Forecast are therefore dismissed.

In sum, Plaintiff's claim that Defendants materially misrepresented or omitted facts about the pipeline and Foundation's prospects is dismissed except as to: (1) Barr's statement that "[o]ur pipeline continues to expand with real, immediate deals" (Feb. 3, 2014 Email); (2) the statement in the February Due Diligence Materials that "the current

representative [Foundation] pipeline . . . has become increasingly active in recent months (Due Diligence Feb. 2014 at 27); and (3) Barr's statement that "[w]e have a 'green light' to pursue a deal [with Project Apex]. . . . I believe we can move expeditiously on this deal" (Jan. 22, 2014 Email; Am. Compl. ¶ 73).

### c.  Barr and Meehan's Relationship

Barr, Elmlinger, and Meehan assert that Plaintiff has failed to put forth facts from which it can be inferred that Defendants' representations about Barr and Meehan's relationship were false. (Elmlinger Mem. Supp. at 13; Meehan Mem. Supp. at 27; Meehan Reply at 5; Barr Reply [Doc. # 58] at 8.) Plaintiff claims that Defendants made the following misrepresentations:

| Statement | Speaker |
|---|---|
| "Mr. Barr and Mr. Meehan have known each other for 16 years, meeting through family relationships in 1997," and "[b]oth have worked closely together since the concept for Foundation Capital Partners was created in 2007."[42] | All Defs. |
| The partners do "not believe they have any potential conflicts of interest with [Foundation]."[43] | All Defs. |
| Dec. 5, 2013: Barr and Meehan's "relationship as brothers in law" poses no "threat to their ability to work together."[44] | Barr, Meehan |

Plaintiff alleges that the above statements were false because:

- Barr informed Elmlinger, Ward, and Meehan on September 25, 2013 that he was "not sure" he could "work with [Meehan] going forward"[45];

---

[42] (Due Diligence Sept. 2013 at 13; Due Diligence Feb. 2014 at 13.)

[43] (Due Diligence Sept. 2013 at 14; Due Diligence Feb. 2014 at 14.)

[44] (Am. Compl. ¶¶ 83–84.)

[45] (Soothsayer Emails at 9.)

- Barr emailed Meehan on October 1, 2013: "I know you dislike me intensely and there is no trust"[46];

- On February 3, 2014, Barr told Meehan, Elmlinger, and Ward that he and Meehan were "officially broken from each other"[47]; and

- Meehan stated in Project Soothsayer that he was "[u]nlikely to stay under [the] current model" because he saw "no potential for change in [Barr]'s behavior, or anything but degradation of [Meehan's] reputation from working with [Barr]."[48]

It is apparent that the Amended Complaint inadequately alleges that the first two claimed misrepresentations are false. Plaintiff does not assert that Barr and Meehan have not known each other for sixteen years, nor that they have not worked closely together since Foundation was created in 2007. Further, as Barr and Meehan note, the representation in the Due Diligence Materials that the partners had no potential conflicts of interest with Foundation "relates to business activities that conflict with the business interests of Foundation," and "[n]o reasonable investor would interpret the term to include Barr's divorce from Meehan's sister-in-law." (Meehan Reply at 5; *see* Barr Reply at 9.)

As to the third alleged misrepresentation, Plaintiff does not claim that the statement was made by Ward or Elmlinger, and therefore to the extent Plaintiff seeks to hold them liable, Plaintiff's claim fails. *See Rose v. Rahfco Mgmt. Grp., LLC,* No. 13 CV 5804 (VB), 2014 WL 7389900, at *5 (S.D.N.Y. Dec. 15, 2014) ("If a party does not 'make' any statements under Section 10b or Rule 10b–5, it cannot be liable under an omission

---

[46] (Am. Compl. ¶ 170.)

[47] (*Id.* ¶ 171.)

[48] (Project Soothsayer at 5.)

theory."); *Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*, No. 5:13-CV-746 (MAD) (ATB), 2014 WL 4678046, at *12 (N.D.N.Y. Sept. 18, 2014) ("[A holding] that high-ranking company officials can be held liable for failing to correct statements made in their presence and known to be false . . . would be in tension with the Supreme Court's decision in *Janus* . . . that only the person who 'makes' the misstatement is ultimately liable for a section 10(b) violation."); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012) ("Holding Park liable for Guo's alleged false statements based on a failure to correct, or omission, would be in tension with the Supreme Court's recent decision [in *Janus*]. . . . Since each party is liable only for their own misstatements, *Janus* implies that each party is only liable for their own omissions as well.")

Barr asserts that the claim should be dismissed as to him as well because his December 2013 statement was not a misrepresentation. Specifically, Barr contends that as of December 5, 2013, he still believed that he could work professionally with Meehan, and "[t]here is absolutely nothing to suggest that Barr's opinion as of that date was to the contrary." (Barr Reply at 8.) That argument is, however, belied by Barr's September 25, 2013 email in which he admitted that he was "not sure" he could "work with [Meehan] going forward" (Soothsayer Emails at 9), and his October 1, 2013 email to Meehan in which he stated: "I know you dislike me intensely and there is no trust." (Am. Compl. ¶ 170).

Meehan contends that the claim should be dismissed as to him because "no reasonable investor relies on pro forma statements regarding the relationship between members of a company" (Meehan Mem. Supp. at 26), but Meehan does not address his

oral statement to FIH that his relationship with Barr posed no "threat to their ability to work together," which was not a "pro forma statement."

As to materiality, the Court cannot conclude that the misstatement, concerning the relationship between the two founding partners and key principals of a company, was "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance," *IBEW*, 783 F.3d at 390 (internal quotation marks omitted). Dismissal on the grounds of failure to allege falsity or materiality is therefore not appropriate.

In sum, Plaintiff's claim that Defendants misrepresented Barr and Meehan's relationship are dismissed as to Elmlinger and Ward, and as to Barr and Meehan with regard to the statements in the Due Diligence Materials, but not with regard to their December 2013 statement that their "relationship as brothers in law" posed no "threat to their ability to work together."

### d.  Barr's Personal Spending

Finally, Defendants contend that Plaintiff's allegations regarding Barr's spending habits should be dismissed because he did not make material misrepresentations. Each of the alleged misrepresentations is discussed below.

### i.  Salary Draw

FIH alleges that Barr's January 20, 2014 request for his January salary draw was "effectively" a misrepresentation "to FIH that Barr's request to draw his salary was fiscally responsible and in the company's best interests." (Am. Compl. ¶ 93.) Plaintiff claims that all of the defendants are liable for this misrepresentation because Ward, Elmlinger, and

Meehan failed to inform FIH that Barr's request for a salary draw was "part and parcel of . . . Barr's spending disease." (Opp'n at 29.)

However, as Barr argues,[49] on its face, the email is clear; it cannot plausibly be read as a representation of fact regarding whether Barr's request was fiscally responsible and in the company's best interest. (Barr Mem. Supp. at 14; *see also* Barr Reply at 9.) Moreover, as discussed earlier, individuals may not be held liable for statements they did not "make." *See Rose*, 2014 WL 7389900, at *5; *Oneida Sav. Bank*, 2014 WL 4678046, at *12; *Ho*, 887 F. Supp. 2d at 572 n.13.

### ii. Emerald Investment

FIH next asserts that Barr misrepresented to FIH the extent of his loss in the emerald investment, alleging that his "investment was $200,000" (Jan. 16 Email; Am. Compl. ¶ 103), when in fact he "listed a $1.875 million note receivable from the emerald fraud on his personal financial statement as part of a mortgage refinancing effort" (*id.* ¶ 187). Barr, in response, distinguishes his "investment" from his "loss," arguing that the fact that "he might subsequently recover $1.875 million from parties who had defrauded him does not make his January 16, 2014 e-mail false or misleading, because that email in

---

[49] Barr goes on to argue that emails exchanged between Defendants and FIH that were in the same email chain—but not the same email—as the salary draw request, demonstrate that FIH knew that Foundation was short on funds. However, these emails, which were not attached to the complaint nor relied upon by FIH in the complaint, are not properly attached to Barr's opposition and will not be considered by the Court. (*See* Barr Mem. Supp. at 14–15; Ex. B to Barr Mot. to Dismiss.) Likewise, Barr's argument that it is "highly misleading for Plaintiff to suggest it had no idea about Barr's spending needs and the financial pressure he was under from his divorce" because "Barr was very upfront about his divorce with [FIH]" relies on an email between FIH and Barr neither attached to nor relied upon in the complaint, and thus will not be considered by the Court. (Barr Mem. Supp. at 15; *see* Ex. C to Barr Mot. to Dismiss.)

no way references his claims against the emerald fraud perpetrators and their allies." (Barr Mem. Supp. at 25; *see also* Barr Reply at 7–8.) Because, as Barr argues, the amount he recovered from the litigation might not be the same as the amount of his loss, the fact that he recovered nearly two million dollars from the litigation does not, on its face, show that his statement that he invested $200,000 was false.[50]

### iii. In the Control Room

Finally, FIH contends that Defendants are liable for Elmlinger and Meehan's statements at a February 20, 2014 dinner that they were "the control room"; that "nothing happens without [them]"; and they "will not spend [FIH's] money foolishly." (Am. Compl. ¶¶ 99–101.) But, FIH offers no facts from which a reasonable juror could conclude that these statements were false and known to be false when made.[51] Accordingly, this claim is dismissed as to all Defendants.

In sum, all of Plaintiff's claims of misrepresentations about Barr's personal spending are dismissed except for Plaintiff's claim regarding Barr's December 4, 2013 statement that there was nothing "FIH needed to know about [his] background or

---

[50] Barr additionally argues that his statement was not material and that Plaintiff has not sufficiently pled reliance and loss causation. (*See* Barr Mem. Supp. at 26.) The Court does not reach these arguments.

[51] Elmlinger additionally argues that FIH could not have relied on these statements because they were made after FIH invested. (Elmlinger Mem. Supp. at 18; Elmlinger Reply at 8.) This allegation, which relies on the date of the initial investment listed in the Subscription Agreement (February 11, 2013), finds no support in the Amended Complaint, which states that FIH completed its investment on February 27, 2013, and does not indicate the date on which FIH initiated the first phase of investment. (*See* Am. Compl. ¶ 109.) Because, as discussed above, the Subscription Agreement will not be considered at this juncture, Elmlinger's argument is not appropriately considered at the motion to dismiss stage.

personality" and no other matters concerning him that FIH should know about before proceeding with an investment.

The following alleged misrepresentations or omissions remain under consideration as the Court moves to the next step of its analysis:

| Statement | Speaker |
|---|---|
| "We had a comprehensive call with a $5 bn London based Hedge Fund [Project Apex] this morning. We have a 'green light' to pursue a deal. The good news is that we have already gone over terms such as reps and warranties, put triggers etc. that normally take place during the term sheet negotiation and definitive agreement stage. We are receiving financials and the contract with Deutsche Bank today or tomorrow. I believe we can move expeditiously on this deal."[52] | Barr |
| "Just thought you'd like to see a draft of the Petershill Letter of Intent that is under review at Fortress. Should the transaction occur, it would be a large deal ($600 m). We have some reasonably good intel that suggests that this offer would be given serious consideration. Our pipeline continues to expand with real, immediate deals."[53] | Barr |
| "[T]he current representative [Foundation] pipeline . . . has become increasingly active in recent months"[54] | All Defs. |
| Barr and Meehan's "relationship as brothers in law" poses no "threat to their ability to work together."[55] | Barr, Meehan |
| There is nothing "FIH needed to know about Barr's background or personality" and no other matters concerning him that FIH should know about before proceeding with an investment.[56] | Barr |

---

[52] (Jan. 22 Email; Am. Compl. ¶ 73.)

[53] (Feb. 3 Email; Am. Compl. ¶ 74.)

[54] (Due Diligence Feb. 2014 at 27; Due Diligence Sept. 2013 at 27.)

[55] (Am. Compl. ¶¶ 83–84.)

[56] (*Id.* ¶ 91.)

### 3. Reasonable Reliance

Defendants next contend that FIH's claims should be dismissed for failure to allege that FIH reasonably relied on Defendants' claimed misrepresentations. "A plaintiff claiming securities fraud under Section 10(b) and Rule 10b–5 must . . . establish that it reasonably relied on the defendant's alleged misrepresentations . . . ." *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 469 (S.D.N.Y. 2013) (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003)); *see Stoneridge Inv. Partners, LLC*, 552 U.S. at 159 ("Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."). "'In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.'" *Van Dongen*, 951 F. Supp. 2d at 469 (quoting *Emergent Capital Inv. Mgmt.*, 343 F.3d at 195).

Elmlinger, Meehan and Barr argue that FIH's claimed reliance was not reasonable because the misrepresentations and omissions alleged are too general for a reasonable investor to have relied upon. (*See* Elmlinger Mem. Supp. at 9, 18; Meehan Mem. Supp. at 22–23, 26; Barr Mem. Supp. at 20.) Meehan adds: "Any reasonable investor relying on statements such as [those in the Due Diligence Materials] as material terms forming the basis of a significant multi-million dollar investment, would have sought out the necessary details to confirm, for example, the actual identities of the targets, the status of the negotiations, and the elements of the transactions." (Meehan Mem. Supp. at 23.) Plaintiff responds only that "there is no record of facts" here "upon which the Court

could plausibly determine" whether Plaintiff's claim of reliance was reasonable. (Opp'n at 43.)

The Court is not persuaded by Defendants' arguments. The remaining alleged misrepresentations and omissions are not so general that a reasonable investor would not have relied upon them, and at least for purposes of a motion to dismiss, Plaintiff has adequately alleged reliance.[57]

### 4. Scienter

To plead scienter in a securities fraud claim, a plaintiff's complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "[T]o qualify as 'strong,' an 'inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). The Supreme Court has defined the "required state of mind" as "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 319). In addition, the Second Circuit has held that "recklessness is a sufficiently culpable mental

---

[57] Further, with respect to the alleged omission, though not cited by Plaintiff, the Supreme Court's determination that there is "a rebuttable presumption of reliance" where liability for an omission is alleged, appears determinative here. *See Stoneridge Inv. Partners, LLC*, 552 U.S. at 159 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)); *see also In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d at 162 (S.D.N.Y. 2012) (citing *Affiliated Ute*, 406 U.S. at 153–54). Where, as here, an omission is claimed, "[a]ll that is necessary" to show reliance "is that the facts withheld [were] material." *Affiliated Ute*, 406 U.S. at 153–54.

state in the securities fraud context." *Id.* (citing *Novak*, 216 F.3d at 308–09). Thus, "[t]he requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

"At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *Id.* (quoting *Novak*, 216 F.3d at 311.)

Plaintiff here puts forth two theories of scienter: (1) strong circumstantial evidence of conscious misbehavior or recklessness, demonstrated by the fact that Defendants "knew facts or had access to information suggesting that their public statements were not accurate"; and (2) motive and opportunity (as to Defendants Elmlinger, Barr, and Meehan). (*See* Opp'n at 46–49.) Because the Court finds merit in the first theory, it does not reach the second.

"[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308. Under such circumstances

> defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation. Thus, for example, the pleading standard was met where the plaintiffs alleged that

the defendants made or authorized statements that sales to China would be "an important new source of revenue" when they knew or should have known that Chinese import restrictions in place at the time would severely limit such sales. Similarly, the pleading standard was met where the plaintiffs alleged that the defendants released to the investing public several highly positive predictions about the marketing prospects of a computer system to record hotel guests' long-distance telephone calls when they knew or should have known several facts about the system and its consumers that revealed "grave uncertainties and problems concerning future sales of" the system.

*Id.* (internal citations omitted).

Here, as discussed below, Plaintiff has adequately alleged facts from which a strong inference could reasonably be drawn that Defendants knew their statements to FIH were false or misleading.[58] Each statement or omission not already dismissed is analyzed below.

---

[58] Ward appears to argue that mere knowledge of falsity does "not rise to the level of deliberate illegal behavior or highly unreasonable conduct or an extreme departure from the standards of ordinary care." (Ward Mem. Supp. at 14.) In so arguing, Ward purports to rely on *Sinay v. CNOOC Ltd.*, No. 12 CIV. 1513 (KBF), 2013 WL 1890291, at *7 (S.D.N.Y. May 6, 2013) and *Harris v. AmTrust Fin. Servs., Inc.*, No. 14-CV-736 (VEC), 2015 WL 5707235, at *12 (S.D.N.Y. Sept. 29, 2015), but neither case stands for the proposition for which Ward cites it. Rather, both *Sinay* and *Harris* recognize that a plaintiff may plead scienter on the basis that defendants "knew facts or had access to information contradicting their public statements." *See Sinay*, 2013 WL 1890291, at *7 ("Plaintiffs argue that CNOOC's safety investigations must have revealed to CNOOC that its oil rigs were being operated in an unsafe manner. Such allegations require that plaintiffs specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements." (internal quotation marks omitted)); *Harris*, 2015 WL 5707235, at *12 ("In order adequately to plead scienter on the basis that defendants knew facts or had access to information suggesting that their public statements were not accurate, plaintiffs must specifically identify the reports or statements containing this information." (internal quotation marks omitted)).

### a.   Pipeline Continues to Expand & Pipeline has Become Increasingly Active

Plaintiff has adequately alleged that Defendants knew the statement in the Due Diligence Materials that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months" (Due Diligence Feb. 2014 at 27) was false, and that Barr knew the statement that "[o]ur pipeline continues to expand with real, immediate deals" (Feb. 3, 2014 Email) was false. A strong inference of knowledge can be drawn from (a) the March 26 and 27, 2014 emails in which O'Donnell asserted that he had been telling Defendants for months that the "pipeline beyond Apex," was "pretty crappy," "Project Lake [was] about one short step ahead of square one," and "[o]ther than that, we have nothing"; and (b) Meehan and Elmlinger's March 2014 statement in Project Soothsayer that "[t]he transaction pipeline presented on a no-names basis in the investor pitchbook strains credibility."

### b.   Project Apex

Plaintiff has also adequately pled that Barr knew his statement that Project Apex was moving "expeditiously" was false when he made it. A strong inference of knowledge can be drawn from Barr's knowledge of the Project Activity Log, which stated that as of March 3, 2014, Project Apex "had only progressed to the point of ongoing [due diligence] dialogue." (Am. Compl. ¶¶ 146, 162.)

### c.   Nothing FIH Needed to Know

Plaintiff has additionally adequately alleged scienter with respect to Barr's December 4, 2013 statement that there was nothing "FIH needed to know about [his]

background or personality" and no other matters concerning him that FIH should know about before proceeding with an investment, with the following allegations:

- Barr "required a two-month advance on his partner draw till year end (Oct – Dec 2013); prior to that, he had been paid in advance most months since [Foundation] started paying salaries and draws in Sept 2012" (Project Soothsayer at 3);

- "[Barr] maintains a very expensive 3-bedroom apartment in Stamford which he has furnished expensively (see mention of the $15,000 rug). He travels frequently and spends lavishly. He does not seem to have any ability to budget his expenses and, as a result, runs out of money every few months. When he runs out of money, he threatens to declare bankruptcy (and ruin the firm) if he is not allowed to see more [Foundation] equity" (*id.* at 10);

- In September 2013, Meehan emailed Barr about charging nearly $17,000 of personal expenses on Foundation's corporate credit card, to which Barr replied that he did not have the funds to cover his bill (Soothsayer Emails at 7–8);

- Several days later in September 2013, Barr stated that he was unable to pay his mortgage or personal credit card bill for the month and since the corporate credit cards were "linked to [his] personal acct . . . they probably [would] be shut off" (*id.* at 9);

- On several occasions "during the course of 2013–2014," "[t]he firm's corporate credit card were suspended . . . as a result of Barr's irresponsible spending," including on December 3, 2013, when the firm's corporate Amex card was declined for a mere $11 purchase (Am. Compl. ¶ 180);

- Barr "demonstrate[d] a reckless disregard for confidentiality" agreements (Project Soothsayer at 10);

- Barr frequently lied to his co-workers and potential investors (*id.* at 3–4, 9–11; Am. Compl. ¶ 134; Soothsayer Emails at 3); and

- Barr's contacts in the alternative investment industry were not as extensive as he led others to believe (*id.* at 2, 3, 9; Am. Compl. ¶ 134; Soothsayer Emails at 3).

A strong inference can be drawn from these alleged facts that Barr knew about his lavish spending habits and its impact on Foundation, his poor judgment, tendency to lie, and weak contact network.

### d.   No Threat to Barr and Meehan's Ability to Work Together

Finally, Plaintiff has alleged sufficient facts from which a strong inference of scienter can be drawn with respect to Barr and Meehan's December 5, 2013 statement that their "relationship as brothers in law" posed no "threat to their ability to work together." Barr's statements in September and October 2013 that he was not sure he could work with Meehan going forward, that he knew Meehan disliked him "intensely," and there was "no trust" between them lay an adequate foundation for inferring scienter.

### 5.   Loss Causation

Loss causation is "'the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'"[59] *GE Inv'rs v. Gen. Elec. Co.*, 447 F. App'x 229, 231 (2d Cir. 2011) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)). It is "related to the tort law concept of proximate cause: it 'is intended to fix a legal limit on a person's responsibility even for wrongful acts,' and it requires that the plaintiff's loss be foreseeable." *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 337 (S.D.N.Y. 2012) (quoting *Lentell*, 396 F.3d at 174). A defendant's misstatement "is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by

---

[59] Transaction causation, by contrast, "is akin to reliance, and requires only an allegation that but for the claimed misrepresentation or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Lentell*, 396 F.3d at 172 (internal quotation marks omitted).

the misrepresentations and omissions alleged by a disappointed investor." *Lentell*, 396
F.3d at 173. "Thus to establish loss causation, a plaintiff must allege . . . that the *subject* of
the fraudulent statement or omission was the cause of the actual loss suffered . . . ." *Id.*
(internal quotation marks omitted).

Here, FIH's theory of loss causation is that

> FIH's loss was a result of the demise of Foundation, which demise was a
> function of the truths that the defendants misrepresented and hid from
> FIH, i.e., that Barr was a spendthrift with no industry contacts and a
> "functional inability to tell the truth," that there was a standstill at the
> leadership level because of internal hatred, that Foundation's pipeline had
> no movement and no real prospects, and that Foundation did not have the
> capacity to close on the number of deals it promised to investors. In
> essence . . . defendants misrepresented to FIH that Foundation had a
> viable business—and it was this lack of viable business that caused plaintiff
> to suffer its loss.

(Opp'n at 49–50.)

Ward, Elmlinger, and Meehan's response is three-fold. They argue that (1) FIH's
theory does not allege loss causation but rather transaction causation because Plaintiff
argues essentially that it would not have made the investment but for the
misrepresentations (*see* Ward Mem. Supp. at 15; Elmlinger Mem. Supp. at 22); (2) by
admitting that the loss was caused by market forces, FIH undermines its claim of loss
causation (*see* Meehan Mem. Supp. at 36; Elmlinger Reply at 9); and (3) by waiting six
months after it learned the truth about the misrepresentations to seek rescission, FIH
undermined its claim of loss causation (*see* Meehan Mem. Supp. at 37; Elmlinger Mem.
Supp. at 22; Elmlinger Reply at 9–10).

61

These arguments however, appear to run counter to the Second Circuit's reasoning in *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001). The plaintiffs in *Suez* invested three million dollars in SAM Group, in reliance on a due diligence report provided to them by SAM Group about J. Christopher Mallick, its founder, principal executive, and controlling shareholder. *Id*. at 93, 94. Although the report stated that no bankruptcy filings by, or civil suits against, Mallick were found, in fact Mallick had filed for bankruptcy, three civil suits were pending against him, three tax liens were filed against him, and several lawsuits had been decided against him. *Id*. at 94. "Within seven weeks of plaintiffs' investment, SAM Group suffered a cash flow crisis from which it did not recover." *Id*.

The plaintiffs attributed "that failure to Mallick's lack of 'sound business, financial management and organizational skills, sound judgment, character, honesty, commitment and diligence.'" *Id*. The Second Circuit held that the plaintiffs had adequately alleged loss causation under two related theories: (1) "the plaintiffs suffered a loss at the time of purchase since the value of the securities was less than that represented by defendants"[60]; and (2) "Mallick's concealed lack of managerial ability induced SAM Group's failure" because SAM Group "was involved in highly sophisticated financial transactions in which the expertise of a skilled executive officer was essential." *Id*. at 98.

---

[60] The court reasoned that the defendants' misrepresentations were relevant to the "investment quality of SAM Group securities, as the defendants allegedly concealed a lack of skills and expertise on the part of the company's principal that, if revealed, would directly affect the plaintiffs' valuation of their investment in the company." *Suez*, 250 F.3d at 98.

As in *Suez*, a "liberal reading of the complaint" in this case "reveals allegations that the misrepresentations" and omissions made by Defendants "led [P]laintiff[] to appraise the value of [Foundation] securities incorrectly by assuming the competency of" Barr, Foundation's Managing Partner, the ability of the principals to work together, and the existence of more viable deals in the pipeline than were in fact present. *Id*. at 96. Thus, Plaintiff (1) "suffered a loss at the time of purchase since the value of the securities was less than that represented by defendants," *id*. at 98; and (2) Barr's "concealed lack of managerial ability," skills, and contacts "induced [Foundation's] failure," *id*. at 98, because Foundation's "business model was solely comprised of making investments in . . . hedge fund GP minority interests" (Am. Compl. ¶ 47) and therefore Barr's "ability to generate leads in the industry" (*id*. ¶¶ 46–47) and to "[develop] a solid pipeline" (Mar. 26–27 Emails at 2) "was integral to the success of Foundation" (Am. Compl. ¶ 47). These allegations are sufficient to survive a motion to dismiss on the ground of failure to sufficiently plead loss causation.

### B.  State Law Claims

Only Elmlinger and Ward put forward grounds for the dismissal of Plaintiff's state law claims should Plaintiff's federal law claim succeed. Their arguments, which largely mirror their claims with regard to the federal claim, are discussed below.

### 1. CUSA, Conn. Gen. Stat. §§ 36b-29(a) and (c) (Count II)[61]

Section 36b-29(a)(2) of CUSA gives buyers a right of action against:

> Any person who . . . [1] offers or sells or materially assists any person who offers or sells a security [2] by means of any untrue statement of a material fact or any omission to state a material fact . . . [3] who knew or in the exercise of reasonable care should have known of the untruth or omission, [4] the buyer not knowing the untruth or omission. . . .

C.G.S. § 36b-29(a)(2). Subsection (c) extends liability to "[e]very person who directly or indirectly controls a person liable under subsection[] (a)." *Id.* § 36b-29(c).

Ward contends that the CUSA claim against him should be dismissed because: (1) FIH does not allege that "Ward was involved, in any respect, in making any explicit representations about Foundation or its financial health or its capacity to close deals or the deals in the pipeline"; and (2) Plaintiff has not sufficiently alleged that Ward made any "untrue statements of material fact or omission." (Ward Mem. Supp. at 17.) Elmlinger argues that for all of the reasons he put forward in support of dismissal of the federal securities claim, the CUSA claim against him should be dismissed.

However, for the reasons discussed in subsection (A) above, Plaintiff has adequately alleged that Ward and Elmlinger are liable for the statement in the February Due Diligence Materials that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months. (Due Diligence Feb. 2014 at 27.) Plaintiff's CUSA claims are therefore dismissed as to Ward and Elmlinger to the same extent as its

---

[61] The parties agreed at oral argument that if a statement is "material" for purposes of the federal Securities and Exchange Act, it is also material for purposes of CUSA.

federal claims.[62]

### 2.  Intentional and Negligent Misrepresentation and Fraudulent Inducement (Counts III, IV & V)

In Connecticut, a plaintiff claiming fraudulent inducement or intentional misrepresentation must allege: "(1) [t]hat a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Peterson v. McAndrew*, 160 Conn. App. 180, 204 (2015) (internal quotation marks omitted). "'[A]n action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result.'" *Id.* (quoting *Nazami v. Patrons Mutual Ins. Co.*, 280 Conn. 619, 626 (2006)).

Ward contends that Counts III, IV, and V should be dismissed as to him because the allegations in the Amended Complaint are not sufficiently specific to satisfy Rule 9(b) (*see* Ward Mem. Supp. at 18–22), and Plaintiff has failed to adequately plead material statements or omissions made by Ward or reasonable reliance (*see id.* at 23). Elmlinger likewise claims that Plaintiff has failed to allege that Elmlinger made an untrue statement with the requisite intent or that FIH reasonably relied on such a statement and that such statements caused FIH to suffer a loss. (Elmlinger Mem. Supp. at 25.)

---

[62] Plaintiff claims that the federal and state securities acts differ as to scienter (state law does not require a showing of scienter). But, since the scienter analysis does not eliminate any of the federal claims, this difference is of no consequence for resolution of Defendants' motions.

These claims fail as to Ward and Elmlinger's representations in the Due Diligence Materials for the same reasons enumerated with respect to Plaintiff's federal law claim. Therefore, Plaintiff's intentional and negligent misrepresentation and fraudulent inducement claims are dismissed as to Ward and Elmlinger to the same extent as its federal claims.

### 3.   Unjust Enrichment (Count VI)

Unjust enrichment is a cause of action in equity that "applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract." *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006). To state a claim of unjust enrichment in Connecticut, a plaintiff must plausibly allege "(1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Id.*

Ward and Elmlinger argue that Count VI should be dismissed because Plaintiff has not adequately alleged that they personally received any benefit from Plaintiff's investment, that they unjustly failed to repay Plaintiff, or that such failure was to FIH's detriment. (*See* Ward Mem. Supp. at 223; Elmlinger Mem. Supp. at 26.)

These arguments are not persuasive. Unlike Section 10(b), an unjust enrichment claim does not require a plaintiff to allege that it received some benefit that was not common to other corporate officers. Rather, under Connecticut law, "unjust enrichment [i]s a very broad and flexible equitable doctrine," applied when it would be "contrary to equity and good conscience for the defendant to retain a benefit which has come to him

at the expense of the plaintiff." *Ramondetta v. Amenta*, 97 Conn. App. 151, 166 (2006) (internal quotation marks omitted).

Here, Plaintiff has alleged that Defendants unjustly and fraudulently induced it to invest in Foundation (Am. Compl. ¶¶ 2–5); that had FIH not invested, "Foundation would have had to wind up its business and liquidate" (*id.* ¶¶ 32, 34); that Defendants were partners and principals of Foundation (*id.* ¶ 50; *see* Due Diligence Sept. 2013 at 6; Due Diligence Feb. 2014 at 6); that FIH purchased "some of Barr's interest in Foundation for $500,000" (Am. Compl. ¶ 109); that after FIH's investment, Foundation had enough capital to continue to operate for another six months (*see id.* ¶ 202); and that "FIH was impoverished as a result of its Investment in Foundation (*id.* ¶ 297). Together, these allegations suffice to plead that Defendants (principals of Foundation, who by virtue of their positions, benefited from the continued operation of Foundation), and Barr (whose interest FIH purchased directly) in particular, benefited from FIH's investment, that FIH unjustly did not receive the benefit of its investment, and that FIH suffered a loss as a result. Therefore, Count VI is not dismissed.

III.    **Conclusion**

For the foregoing reasons, Defendants' motions to dismiss [Doc. ## 46, 47, 49, 51] are GRANTED in part and DENIED in part as follows:

1.  Ward's Motion to Dismiss [Doc. # 47] is DENIED as to Count VI, and as to Counts I to V with respect to the statement in the February Due Diligence Materials that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months."

2.  Elmlinger's Motion to Dismiss [Doc. # 49] is DENIED as to Count VI, and as to Counts I to V with respect to the statement in the February Due Diligence Materials that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months."

3.  Barr's Motion to Dismiss [Doc. # 46] is DENIED as to Count I with respect to:

    a.  The statement in the February Due Diligence Materials that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months";

    b.  Barr's alleged failure to update FIH regarding his statement that Foundation had a green light to pursue Project Apex and he believed Foundation could "move expeditiously on this deal";

    c.  Barr's statement that "[o]ur pipeline continues to expand with real, immediate deals";

    d.  Barr's statement that there was nothing "FIH needed to know about [his] background or personality" and no other matters concerning him

68

that FIH should know about before proceeding with an investment; and

    e.  Barr's statement that his relationship with Meehan posed no threat to his ability to work with Meehan.

4. Meehan's Motion to Dismiss [Doc. # 51] is DENIED as to Count I with respect to:

    a.  The statement in the February Due Diligence Materials that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months"; and

    b.  His alleged misrepresentation that his relationship with Barr posed no threat to his ability to work with Barr.

5. Defendants' motions to dismiss are GRANTED as to all other claims.

Thus, the following claims remain for adjudication:

1. Count I:

    a.  against all Defendants with respect to the statement in the February Due Diligence Materials that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months";

    b.  against Barr and Meehan with respect to their statement that their relationship with one another posed no threat to their ability to work together; and

    c.  against Barr with respect to: his alleged failure to update FIH regarding his statement that Foundation had a green light to pursue Project Apex and he believed Foundation could "move expeditiously on this deal"; his

statement that "[o]ur pipeline continues to expand with real, immediate deals"; and his statement that there was nothing "FIH needed to know about [his] background or personality" and no other matters concerning him that FIH should know about before proceeding with an investment.

2.   Counts II to V against Barr and Meehan with respect to all claims; and

3.   Count VI against all Defendants.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of March 2016.