UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------------------------------------------x

FIH, LLC,

                Plaintiff,

          -against-

FOUNDATION CAPITAL PARTNERS LLC,
F/K/A FOUNDATION MANAGING MEMBER
LLC; DEAN BARR; JOSEPH MEEHAN;
THOMAS WARD; and JOSEPH ELMLINGER,

                Defendants.

-----------------------------------------------------------------x

Civil No. 3:15-cv-00785 (JBA)

**SECOND AMENDED
COMPLAINT**

**JURY TRIAL REQUESTED**

MAY 5, 2016

       Plaintiff files this Second Amended Complaint, as directed by the Court, to revise the counts herein to state clearly the specific claims that survive the motions to dismiss filed by the individual defendants.  In doing so, plaintiff is not voluntarily dropping the specific claims it made that were dismissed by the Court in its March, 30, 2016 Ruling on Defendants' Motions to Dismiss.  Plaintiff specifically reserves the right to continue to assert those claims and potentially others as well against all defendants in accordance with all applicable law and rules of procedure, including but not limited to, by seeking leave to amend its pleadings following discovery to assert one or more of the currently dismissed claims or other claims; or by appealing the dismissal of those claims to the extent there is an appeal of the Court's March 30, 2016 Ruling following entry of final judgment.  *See P. Stolz Family Partnership L.P. v. Daum¸* 355 F. 3d 92, 96 (2d Cir. 2004).

# I.      INTRODUCTION

      1.     This action arises out of a failed business whose plan was to make large scale investments in hedge fund general partner ("GP") interests and reap substantial profits.

2.     The business – defendant Foundation Capital Partners LLC, f/k/a Foundation Managing Member, LLC ("Foundation") – was terminally flawed and therefore never achieved its business purpose.  But while these terminal flaws were known to Foundation's partners and insiders, these partners and insiders – the individual defendants herein – continued to solicit investors without disclosing these flaws.  Rather, the individual defendants told investors that Foundation had a viable business plan and that it was poised to succeed because it was closing in on a long list of target hedge funds and because it had the management and leadership capable of closing those deals.

3.     One of these investors was plaintiff, FIH (FIH was not formed until the investment was made, and its members will be referred to herein as "FIH").  In reliance upon Foundation's and the individual defendants' representations, FIH purchased $6.75 million worth of interests in Foundation (the "Investment").

4.     The individual defendants entirely misrepresented Foundation's prospects and management.  While there were many specific misrepresentations, the most significant misrepresentation was that Foundation was a viable business at all.  Foundation and all of the individual defendants represented that Foundation was capable with its then-existing management of making three to four investments a year in hedge fund GP interests.  That representation was false – and not one of the defendants believed it to be true.

5.     At the very same time the individual defendants were making these representations to FIH, they each had actual knowledge that Foundation was fundamentally incapable of succeeding.  Each defendant knew that Foundation had not been making any progress towards closing on hedge fund GP targets.  And they each knew why this was so and why this would not change:  Foundation's managing partner and head of investments, defendant Dean Barr ("Barr"), was grossly incompetent and financially irresponsible; lacked the necessary

contacts in the targeted industry to have any chance of developing the business in the manner planned; and, perhaps worst of all, had exhibited to virtually every employee at Foundation what the other insiders themselves called a "functional inability to tell the truth."  Moreover, Foundation's leadership was at an incurable standstill because Barr and defendant Joseph Meehan ("Meehan"), the two founders of Foundation, were brothers-in-law, married to sisters, and one of the marriages was failing – creating a dysfunctional rift and animus between these two senior members of Foundation.

6.      Each of the individual defendants made material misrepresentations and omissions to induce FIH's investment, but they had different agendas.

7.      Barr knew Foundation was failing, but his objective was to keep Foundation afloat to maintain his access to corporate cash which had, up to this point, funded a profligate lifestyle to which he had become accustomed.

8.      Meehan and defendant Joseph Elmlinger ("Elmlinger") had their own agenda. They had long believed that Barr was so fundamentally dishonest and so lacking in the necessary business contacts and skills to contribute to Foundation that it could not succeed with him involved.  But they needed an investor – FIH – so that they could use the investor's cash and/or leverage to oust Barr by whatever means possible.

9.      In fact, Meehan and Elmlinger were so committed to using FIH to get rid of Barr that they had secretly compiled a lengthy, well-documented dossier on the failings of Foundation and Barr, which they entitled "PROJECT SOOTHSAYER."  The dossier was to be provided to FIH only *after* its Investment was made so as to give FIH little choice at that point but to buy Barr out.

10.      PROJECT SOOTHSAYER documented Meehan's and Elmlinger's long-held beliefs that Barr was "actively destroying value for [the firm's] members due to his rampant

financial difficulties, his functional inability to tell the truth, his rude and dismissive attitude towards his colleagues and his desire to be the only point of contact with potential investments or investors."  According to PROJECT SOOTHSAYER, four of the six critical professionals in Foundation were ready to leave if Barr were not forced out.

11.     The above facts about Barr as documented in PROJECT SOOTHSAYER were known to Barr and defendant Thomas Ward ("Ward") as well prior to FIH's investment.

12.     And yet, Foundation and the individual defendants still solicited new investors, including FIH, and failed to disclose what they knew to be the truth about Foundation and Barr.

13.     If the first mate on the sinking Titanic had hailed a passing ship and somehow enticed its passengers to board the Titanic with descriptions of its elegant staterooms and the power of its engines; but once aboard, told the newcomers of the iceberg, that the captain was a liar, lacked any expertise about seamanship, was unaware of the hole in the ship, and was having caviar in the main dining room; presented a dossier of materials to prove the foregoing; told the newcomers that the situation was so bad they were about to leave in a lifeboat; and then asked the newcomers to join the mutiny against the captain, he'd have acted no differently than the authors of PROJECT SOOTHSAYER.

14.     Ultimately, the defendants were successful in inducing FIH to invest in Foundation.  The defendants subsequently provided PROJECT SOOTHSAYER to FIH, according to plan, a mere several weeks after its Investment was finalized, revealing the longstanding truths that had been fraudulently concealed from FIH during its courtship.

15.     But Foundation was a failed enterprise and never stood a chance.  The fundamental flaws in Foundation that each of the defendants had hidden from FIH – i.e., its dismal deal pipeline, Barr's lack of contacts in the industry, the deep and irreparable hatred

between the partners, the failure of leadership, and the lack of faith in the firm's managing partner and head of investments – were ultimately the undoing of Foundation.

16.     Eventually, the group that was plotting to depose Barr began to leave Foundation, convinced that its failure was imminent.  Foundation closed up shop not long after, having never made a single investment in a hedge fund GP interest – or even coming close to doing so.

17.     Left behind, however, was FIH, a deceived investor whose $6.75 million investment, given under fraudulent pretenses, was never returned – despite repeated demands.

## II.     PARTIES

18.     Plaintiff is FIH, LLC, a Delaware limited liability company.

19.     Defendant Foundation Capital Partners LLC, f/k/a Foundation Managing Member LLC, is a Delaware limited liability company registered to do business in Connecticut.

20.     Defendant Dean Barr was, until some point in 2015, the managing partner and managing principal of Foundation.  Barr is a citizen of Connecticut.

21.     Defendant Joseph Meehan was, until November 20, 2014, a partner, managing principal, and the Chief Operating Officer of Foundation.  Meehan is a citizen of Connecticut.

22.     Defendant Thomas Ward was, until some point in 2015, a partner, principal, manager, and Head of Distribution of Foundation.  Ward is a citizen of Connecticut.

23.     Defendant Joseph Elmlinger was a partner, principal, and Head of Risk and Structuring at Foundation until September 5, 2014.  Elmlinger is a citizen of Connecticut.

## III.     JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because plaintiff asserts a claim for violation of the federal securities laws.

25.     This Court has personal jurisdiction over the defendants because they are residents of Connecticut and have done business in Connecticut.

26.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because the defendants are all residents of the state of Connecticut.

27.     Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because as substantial part of the events giving rise to the Plaintiff's claims occurred in this district.

## IV.    STATEMENT OF FACTS

### A.     Foundation Capital Partners ("Foundation")

28.     Foundation, a Delaware limited liability company, is a private equity vehicle whose business plan was to make three to four yearly minority investments of up to 25% in the management companies of large, well-established hedge funds.  It asserted to potential investors that it expected to raise $4,000,000,000 to pursue this type of investment and that it was to yield substantial returns.

29.     Foundation was founded in 2009 by defendants Barr and Meehan as a start-up.  It represented to potential investors that its managers were highly experienced, well-connected professionals who had worked together well and were committed to the success of this new venture.

### B.     Foundation's Desperate Need For Funds

30.     In or around May 2013, Foundation reached a non-binding agreement with a reputable investment management firm for it to potentially provide Foundation with as much as $1 billion of capital with which to make investments.

31.     Despite this potential source of funds for investments, Foundation found itself continuing to struggle to locate and close upon appropriate hedge fund targets for these investments.

32.     By the Fall of 2013, Foundation needed a capital infusion. Foundation was so low on cash reserves by that point that, if FIH had not made its investment, Foundation would have had to wind up its business and liquidate.

6

33.     The need for capital only continued to escalate as time went on.

34.     By January of 2014, Foundation was desperate for FIH's investment.  On January 16, 2014, Meehan sent an email to his partners Elmlinger and Ward stating that if FIH did not follow through with its proposed funding, Foundation would be forced to "wind up."  In an email sent on January 20, 2014 to Barr, Ward, and Elmlinger, Meehan similarly noted, "If we do not close with [FIH], we'll need the remaining money to close the business and report to our partners."  On February 5, 2014, Barr emailed his partners Meehan, Elmlinger and Ward, and others, noting that "[FIH] are not taking us seriously. We need to create a sense of urgency."

35.     The individual defendants could not afford to let the opportunity of FIH's possible investment pass by.  Barr needed FIH's influx of cash because he depended on using corporate resources to fund an extravagant lifestyle that was becoming harder to fund on the low cash reserves at Foundation.  And Elmlinger and Meehan needed FIH to invest so that they could rope FIH in, then try to use FIH to force Barr out of Foundation.

36.     Thus, Foundation and the individual defendants did everything in their power – including continuing to make material misrepresentations and omitting critical information – to induce FIH to invest.

### C.     FIH Invests with Foundation Based on Foundation's and the Individual Defendants' Material Misrepresentations and Omissions

37.     FIH was introduced to Foundation in September 2013.  The initial call between the representatives of FIH and Foundation took place in October 2013.

38.     For the next five months, Foundation, through the individual defendants, engaged in extensive communications with representatives of FIH to persuade them to make a substantial investment in Foundation.

39.     Over the course of these negotiations, FIH conducted due diligence on the partners and employees, Foundation's funding sources, and other Foundation investors.

40.     On November 18, 2013, Francie Heller, a third party intermediary who introduced FIH to Foundation, emailed to FIH a document entitled Preliminary Due Diligence Materials. The document was forwarded at the direction of the individual defendants and was drafted and/or approved by the individual defendants, Foundation's corporate insiders.  This version was represented to be current "as of September 2013."  At a later date, prior to its Investment, FIH received from Foundation, at the directive of the individual defendants and through Foundation's data room, a nearly identical document with the same title prepared "as of February 2014."  The two documents, referred to as the "Due Diligence Materials," are attached hereto as Exhibits A and B, respectively.

41.     The Due Diligence Materials were drafted and/or approved by the individual defendants as control persons of Foundation Capital Partners, L.P., the limited partner of Foundation, of which Barr was managing partner, Meehan was Chief Operating Officer, and Ward and Elmlinger were partners.  The documents noted that "all questions relating to the document should be directed to [defendant] Ward."  Exs. A and B, p. ii.

42.     The four individual defendants were the corporate insiders of Foundation and intimately involved with its day to day activities.  As such, they are each liable for the contents of the Due Diligence Materials.

43.     In the Due Diligence Materials, Foundation and the individual defendants represented that Foundation was a viable business that was in the position to execute on its business plan – investments in hedge fund GP minority interests.  The Due Diligence Materials specifically stated that Foundation was poised to make such investments as a result of (1) Barr's "extensive experience and relationships" in the hedge fund community and contacts with potential targets; (2) Barr's reputation in the hedge fund industry; (3) Barr's leadership; and (4) the successful long-term relationships between the principals at Foundation.

44.     In the Due Diligence Materials, Barr was described as the single most important person at Foundation.   He was described as the person to be "responsible for overall management" of Foundation, to whom was assigned "the primary leadership roles for the firm's Investment Strategy, Investor Relations and Fund Distribution."  Exs. A and B, p. 9.

45.     Moreover, Barr was said to be "actively involved in all aspects of Business Development (lead generation, manager evaluation) and Portfolio Management (risk management, operations)."  See Exs. A and B, p. 9.  Barr was also represented to be the "Acting Head of Investments."  Exs. A and B, p. 8.

46.     Lead generation refers to the creation of points of contact at hedge fund GPs who might be interested in selling interests in themselves to a company like Foundation.  It was one of the most critical aspects of the business.

47.     The ability to generate leads in the industry was integral to the success of Foundation because Foundation's business model was solely comprised of making investments in these hedge fund GP minority interests.  Absent these highly-touted leads to the target hedge funds, there would be no viable investments and, consequently, Foundation would not have a viable business.  Foundation's was a business that was feasible *only* if it were able to make investments.

48.     The Due Diligence Materials represented that Meehan was to "oversee[] day to day operations for [Foundation] including Finance, Legal, Operations, and Portfolio Management."  He was given the title Chief Operating Officer.  Exs. A and B, p. 9.

49.     The Due Diligence Materials represented that Elmlinger was Head of Restructuring and Risk and was responsible for "identifying potential future business line extensions for [Foundation]," and that Ward was Head of Distribution, and as such was responsible for Foundation's fundraising globally and would act as liaison between Foundation's

portfolio companies and distribution partners.  Exs. A and B, p. 9.  Ward was listed as the

Foundation contact person in the Due Diligence Materials.  Exs. A and B, p. ii.

50.     Barr, Meehan, Elmlinger and Ward were the four "partners" in Foundation, but

the Due Diligence Materials also described two other persons in addition to those four as

"Investment Professionals."  They were Hall O'Donnell, the Director of M&A, and Steven

Fedder, Vice-President of M&A, who was responsible for the development refinement and

implementation of advanced financial modeling.  Exs. A and B, p. 9.

51.     As a start-up, Foundation was selling to investors the confidence of its managers,

their experience and reputation in the industry, their integrity, and the fact that they had the

necessary relationships to effectuate the business plan.

52.     In the Due Diligence Materials, Foundation represented that the partners

"built/managed a number of successful asset management businesses, managed nearly $1 trillion

in assets, and participated in dozens of growth capital investments."  Based on this, the Due

Diligence Materials represented, "[t]he principals believe that these experiences in successfully

building alternative investment firms will enable Foundation to enjoy a strong start and long term

success."  Exs. A and B, p. 6.

53.     The individual defendants also represented to FIH, through the Due Diligence

Materials, that Foundation's partners worked well together, conflict free, and that they had

successful, long-term relationships in the industry – and with each other.

54.     Specifically, in the Due Diligence Materials, in a section entitled "Competitive

Advantage," Foundation described that advantage as follows:

> [Foundation's] team maintains extensive relationships with leading
> managers, prime brokers and operations/administrative servicing
> professionals that will assist the firm with deal sourcing and
> execution.… [Foundation] is differentiated due to its unique
> corporate structure, the quality of its employees and the firm's
> ability to provide value to fund managers. …

> [Foundation]'s principals bring highly valued skills, experience
> and relationships to Large Hedge Fund Managers. …

Exs. A and B, p. 26.

55.     In a section entitled "Deal Sourcing Capabilities," the Due Diligence Materials

stated:

> The Investment Manager plans to source deals directly through
> personal relationships and direct contacts with targeted leading
> managers in the alternative investment industry. The firm's
> partners maintain close working relationships with prime
> brokerage firms, investment banks, key funds-of-funds and
> strategic limited partners who represent some of the world's largest
> investors in hedge funds.
>
> The firm's sourcing strategy will benefit from the decades of
> experience in the alternative investment industry of Mr. Barr, Mr.
> Ward, Mr. Meehan and Mr. Elmlinger.
>
> The firm will use the extensive experience and relationships Mr.
> Barr cultivated at Citi Alternative Investments, where he evaluated
> and conducted due diligence on a number of alternative asset
> managers.  [Foundation] will utilize his background and
> experience in its discussions surrounding potential investment
> opportunities in Large Hedge Fund Managers  . . .

Exs. A and B, p. 26.

56.     Thus, Barr was represented to be the main source of investment opportunities.

57.     The Due Diligence Materials gave no suggestion whatsoever that Barr was

anything but the highly accomplished professional he was represented to be.  No mention was

made of any problematic traits, such as dishonesty, or other personality traits that made him

difficult to work with or a threat to the company.

58.     To the contrary, the Due Diligence Materials represented that a "third party

diligence group had been retained to conduct personal background checks on the managing

principals of [Foundation]," that the findings "validated the work history and achievements of

Mr. Barr and Mr. Meehan," and that "there were no negative legal or personal judgments involving those principals."  Exs. A and B, p. 14.

59.    Barr was touted, as late as February 2014, as a leader with substantial industry contacts, whose extensive professional network would enable Foundation to accomplish its business plan and make, as represented in the Due Diligence Materials and other materials provided by Foundation to FIH, three to four hedge fund GP minority interest investments a year, with four such deals done by June 2014.

60.    The Due Diligence Materials represented that there was a viable business in which FIH was investing – a business with real prospects for carrying out the essential function of the business (investments in hedge fund GP minority interests), a business with real management and leadership led by competent, skilled leaders.  Based upon these representations, FIH made its substantial investment.

61.    But the foregoing statements by each of the defendants were all objectively false, as demonstrated in detail below.  The individual defendants believed instead that Foundation had no realistic business prospects under Barr, the captain of their ship, because  he had no value, no contacts, no judgment, no integrity, was dishonest, and was steering Foundation towards the shoals and certain sinking.  Meehan and Elmlinger, in particular, knew – but never revealed anything of the sort to FIH -- that they were going to stage a mutiny.

62.    As part of the process to entice FIH to make its Investment and to play a role in the mutiny without its knowledge, numerous additional specific misrepresentations were made to confirm the representations made by defendants in the Due Diligence Materials, as detailed below.  The purpose of all the specific additional representations was to double down on the utterly false picture painted in the Due Diligence Materials of a viable business model managed

by highly competent, experienced professionals with the necessary skills and contacts to implement that business plan.

### a)   Representations as to Foundation's "Pipeline" and Capacity for Target Acquisition

63.     Through the individual defendants, Foundation assured FIH that the stars were aligned and that Foundation was on the brink of success:  namely, the strong confirmed interest of an investment management firm to commit investment capital and a list of viable hedge fund targets in the "pipeline" – *i.e.*, the list of target hedge funds with which Foundation was in discussion to acquire their GP minority interests per its business plan.

64.     Foundation, through the individual defendants, made express assurances to FIH that Foundation, because of its "active" pipeline, had the present capacity to support its plan for imminently closing on several hedge fund GP minority interest investments.

65.     The individual defendants did not simply make optimistic predictions about Foundation's prospects.  Instead, they provided FIH with specific information about concrete targets that they were touting as real prospects.  These representations were made during the courtship period with FIH and were intended to induce FIH to invest in Foundation.

66.     The Due Diligence Materials stated that Foundation's "[current] pipeline includes 40+ initial targets," which pipeline was said to be "increasingly active in recent months."

67.     The version of the Due Diligence Materials that was sent to FIH on November 18, 2013, cited fifteen specific targets, assigning to each a code name or a number:  Projects Delta, Lake, California and Corvette, and Projects #5 through #15.  See Ex. A, p. 27.

68.     Those fifteen targets were represented to be "the current representative [Foundation] Pipeline, including those with which the firm was in active discussion."  The Due Diligence Materials also represented that "this pipeline has become increasingly active in recent

months as a result of industry recovery, manager interest, regulatory reform and the presence of relatively few buyers."

69.     The version of the Due Diligence Materials that was dated February 2014 cited fourteen specific targets delineated by their code names:  Projects Lake, Apex, Corvette, Granite, Breakout, Pilot, Centaur, Pound, Tensor, Mainstay, Yale, Halo, Gun, and Bronco.   See Ex. B, p. 27.  The document also represented that non-disclosure agreements had been signed with the target hedge funds in Projects Lake and Granite.

70.     Those fourteen targets were also said to be "the current representative [Foundation] Pipeline, including those with which the firm was in active discussion," and it was represented again that "this pipeline has become increasingly active in recent months as a result of industry recovery, manager interest, regulatory reform and the presence of relatively few buyers."  See Ex. B, p. 27.

71.     Not only did the Due Diligence Materials make representations about Foundation's pipeline, Foundation's pipeline was also the subject of representations made specifically to FIH.

72.     First, Barr represented in a December 30, 2013 email to FIH that Foundation had four "possible transactions in the works," expressly referencing Projects Bronco, Corvette, Lake and Centaur.

73.     And on January 22, 2014, Barr, copying Meehan, emailed FIH an update on Project Apex and represented, "I believe we can move expeditiously on this deal."

74.     On February 3, 2014, Barr emailed FIH, copying Meehan, gave an update on Project Pilot, and represented:  "We have some reasonably good intel that suggests that this offer would be given serious consideration."  In sum, as Barr noted in the February 3, 2014 email to

FIH, copying Meehan:  "Our pipeline continues to expand with ***real [and] immediate*** deals."
(emphasis added)

75.     Foundation and the individual defendants complemented these misrepresentations
about the firm's present capacity for imminently closing deals in the Due Diligence Materials, in
which Foundation stated that it was poised to "close on three to four transactions each year."
Exs. A and B, p. 4.

76.     Importantly, the representation that Foundation was capable of closing on "three
to four transactions each year" did not change when the Due Diligence Materials were updated
between September 2013 and February 2014.

77.     Foundation made additional, specific representations to FIH.  On December 2,
2013, Barr circulated to a representative of FIH a document entitled "[Foundation] Portfolio
Model," representing in a spreadsheet that Foundation would close on four hedge fund GP
minority interest transactions by June 30, 2014.  The spreadsheet indicated Projects Lake and
Granite would close by March of 2014 and Projects California and Corvette by June 2014.  This
corporate document was drafted and/or approved by the individual defendants, as corporate
insiders at Foundation.

78.     This same representation – that Foundation was in the position to close on four
deals by June 30, 2014 – was conveyed in a document entitled "Project Foundation General
Partner Forecast" emailed on December 19, 2013 by Hall O'Donnell, the Director of M&A for
Foundation, to FIH, copying defendants Barr, Meehan, and Elmlinger.  This document, too, was
drafted and/or approved by the individual defendants, as corporate insiders at Foundation.

79.     All of the foregoing representations were made with the intention of creating the
impression and having FIH believe that Foundation had a pipeline of real prospects and that

Foundation was, and/or the individual defendants believed it to be, in the position to close on such prospects in the near term.

80.    Based on all of these representations, FIH reasonably believed that Foundation had, and/or that the individual defendants genuinely believed that Foundation had, the present capacity to support its acquisition plan and that it was progressing with a number of real and immediate targets.

81.    But in fact, at the time they made these misrepresentations, Foundation and the individual defendants knew that these statements were materially false.  As explained in detail below, the individual defendants each knew that the targets represented to FIH as real, immediate prospects were not in fact so, and none of the individual defendants genuinely, reasonably believed that Foundation had the capacity to close on four deals within a few months.

### b)  Representations as to Foundation's Leadership's Ability to Work Together Collegially

82.    Foundation also represented to FIH that Foundation's leadership was functional and able to work together as a management team.  This was essential information for any reasonable investor, because the success of Foundation, a small company, depended on the ability of the two most important people in its leadership to work well together in leading the company.

83.    On at least two occasions, FIH's agent asked both Barr and Meehan—the two most senior people in Foundation's leadership—if their relationship as brothers in law, especially in light of Barr's divorce from Meehan's wife's sister, posed a threat to their ability to work together.

84.    Each answered unequivocally no, and each insisted that they could maintain a professional relationship with the other.  Barr made this representation in a phone call with FIH's

representative on December 5, 2013.  Meehan made this representation in a separate phone call with FIH's representative on December 5, 2013.

85.     These representations were echoed in the Due Diligence Materials, which stated that "Mr. Barr and Mr. Meehan have known each other for 16 years, meeting through family relationships in 1997" and that "[b]oth have worked closely together since the concept for Foundation [] was created in 2007."  There was no suggestion in the materials that there was a less than professional working relationship between the two.

86.     Moreover, these materials stated that "the partners have stated that they do not believe they have any potential conflicts of interest with [Foundation]."  This representation was made even after divorce proceedings between Barr and his wife, Meehan's wife's sister, had become acrimonious.

87.     Finally, the Due Diligence Materials stated that Foundation "will be focused on ensuring open and continuous communication across all levels, departments and offices" – even though one faction of leadership hated the other with such intensity that it was secretly plotting a coup.

88.     FIH reasonably relied on these representations to its detriment.  As discussed at length below, representations that Barr and Meehan had a professional working relationship, and that there were no conflicts of interest, were false.

89.     At the time the statements were made, the two had a deep hatred for each other that made Foundation's leadership dysfunctional.  In fact, their relationship was so hostile that Meehan stated, only a couple of weeks after FIH's Investment was finalized, that he was "unlikely to stay" at Foundation under the current leadership model.  But Meehan did not make this known to FIH prior to its Investment.

### c) Representations as to Barr's Spending

90.     FIH was told unequivocally by Barr's partners, the individual defendants Elmlinger and Meehan, that Barr would be kept in check and that he was not a threat to the firm's success.

91.     At FIH's second meeting with Foundation on December 4, 2014 at Foundation's Greenwich office, at which Barr, Meehan, Elmlinger, and Ward were present, FIH's representative asked the assembled group of defendants directly if there was anything FIH needed to know about Barr's background or personality, or if there were other concerns about him that they should know about before proceeding with an investment.  Barr responded that there were no concerns.  Meehan, Elmlinger, and Ward were present at the meeting and present for Barr's response, but said nothing to supplement, correct, or otherwise contradict his response to FIH, despite believing that Barr had a "spending disease" and that he was on track to "ruin this firm."

92.     The same false assurances were given and not corrected in the Due Diligence Materials, where Foundation and the individual defendants represented that a third party diligence group found "no negative legal or personal judgments involving [Meehan or Barr]." Exs. A and B, p. 13.

93.     On January 20, 2014, Barr emailed FIH, copying defendants Meehan, Ward, and Elmlinger.  In the email, Barr solicited input from FIH, asking if it were comfortable with the Foundation partners making "the monthly Jan[uary] salary draw and conduct normal business travel."  In making that request, Barr effectively was representing to FIH that Barr's request to draw his salary was fiscally responsible and in the company's best interests.  The representation was false.

94.     Defendants Meehan, Elmlinger, and Ward knew that Barr's pattern of advances on company funds was a drain and worse – a threat – to Foundation.  Yet they observed silently as Barr obtained authorization to make more irresponsible draws of cash that Meehan, Elmlinger and Ward knew were part and parcel of Barr's pattern of frivolously, irresponsibly, and destructively spending advances on Foundation's money for his own personal gain.

95.     In fact, immediately following this January 20, 2014 email exchange with FIH, Meehan privately emailed Barr, copying Elmlinger and Ward – but not FIH – and chastised Barr's request to draw funds given that "[Foundation] do[es] not have enough free cash to pay partner draws … ."

96.     By failing to disclose to FIH that Barr's advances on Foundation funds was a threat to the company – as they each believed – Meehan, Elmlinger and Ward were participating in a purposeful misrepresentation to FIH, and/or making a material omission.

97.     Had Meehan, Elmlinger, and Ward truthfully disclosed Barr's irresponsible spending of company funds and the state of Foundation's finances, FIH would not have made its Investment.

98.     Elmlinger and Meehan exacerbated the problem with yet another misrepresentation to FIH which belied the threat that they knew Barr posed to Foundation's ability to make successful investments – and, in fact, to Foundation's very existence.

99.     Specifically, at a dinner in a Greenwich, Connecticut restaurant on February 20, 2014, Meehan and Elmlinger assured FIH's representative that there were strong spending controls in place.  They stated at that time: "You're looking at the control room.  Nothing happens without us."

100.     Over the course of the dinner, both Meehan and Elmlinger repeated that they were the "control room."  In this context, Meehan and Elmlinger were referring to their proclaimed

ability to control what they knew to be Barr's propensity towards spending, and impulsiveness, which was not disclosed or known to FIH.  Essentially, Elmlinger and Meehan told FIH that Barr did not pose a threat to Foundation.

101.    In another reference to controls at that same meeting, Elmlinger and Meehan stated, "We will not spend your money foolishly."  What they intended to convey to FIH was that they had control of the purse strings and that there were adequate controls at Foundation to ensure that the money invested by FIH would be used to further the Investment objectives, and not on Barr's personal spending or other wasteful spending.

102.    As demonstrated below and in PROJECT SOOTHSAYER, Meehan and Elmlinger knew these statements were false at the time, and they made them to induce FIH to make the desperately needed investment and infusion of cash into Foundation.

103.    Finally, on or about January 15, 2014, FIH's representative saw a news headline reporting that Barr had lost $1 million in a deep sea treasure hunting fraud.  Concerned about Barr's judgment, FIH inquired of Barr whether the story was true.  In an email response on January 16, 2014, Barr claimed that his investment, and loss, was substantially less, i.e., $200,000.

104.    That was false, as demonstrated below.

105.    By falsely assuring FIH that his loss was substantially less than as originally reported by the media, Barr misrepresented his judgment and financial condition, and FIH relied upon Barr's misrepresentation to its detriment.

106.    FIH reasonably relied on the misstatements made by the defendants about Barr and the omission of information regarding the certainty of Foundation's demise if Barr were to remain at the helm.  Had FIH been told the truth about Barr's spending disease and the very real threat he posed to Foundation, FIH would not have made its Investment.

107.    Indeed, Barr was touted as the leader and chief investor of Foundation – a business that was viable *only* if it were able to make investments.  If the managing partner and head of investments at Foundation were in reality a dishonest, incompetent, imprudent spendthrift, a reasonable investor would have made a different investment decision.  And had the defendants not omitted this information about Barr or corrected the misleading statements they made about Barr in the Due Diligence Materials and subsequent conversations, FIH would not have made its Investment.

*****

108.    Ultimately, in reliance upon the aforementioned representations of a viable business at Foundation – *i.e.*, active "pipeline," imminent successful investments, real investment prospects, Foundation's present capacity to close on such targets, Foundation's functional leadership structure, and a capable, well-connected, well-regarded leader in Barr – FIH purchased interests in Foundation.

109.    FIH's purchase of interests in Foundation was comprised of four phases, the last of which was took place on February 27, 2014.  The final transaction entailed:  (1) FIH's direct purchase from Foundation of an interest in Foundation for $3 Million; (2) FIH's direct purchase from Foundation of a previous investor's interest in Foundation for a planned $4.2 Million, of which $2.1 Million was paid; (3) FIH's purchase of another previous investor's interest for $1.15 Million; and (4) FIH's purchase of some of Barr's interest in Foundation for $500,000.

**D.      The Truth Comes Out**

110.    Each of the defendants thus deceitfully induced FIH to invest a substantial amount of money into Foundation, after which Meehan and Elmlinger revealed the defendants' true beliefs about Barr and Foundation as a going concern.

### a)  PROJECT SOOTHSAYER

111.    Soon after the February 27, 2014 finalization of FIH's cash into Foundation's

account, on approximately March 14, 2014, Meehan and Elmlinger approached FIH's

representative and said that – despite what they had previously represented to FIH – Foundation

was in dire straits, and Barr was a real threat to Foundation and needed to be removed from the

company.

112.    One might think that they would wait a few months to do so, so as to create the

impression that they had not themselves come to know the truth about Foundation until after FIH

had made its Investment.

113.    But the situation was so dire in their view that they could not afford to take that

risk.  As they soon reported to FIH in writing, they had come to believe that Barr "need[ed] to be

removed from Foundation  . . . as soon as possible."  Not only did Barr need to be dethroned, a

replacement leader – one who had the characteristics that the individual defendants told FIH Barr

possessed – needed to be appointed so that Foundation could meet its business objectives.

114.    The revelation of the truth about Barr was not the only surprise Meehan and

Elmlinger would spring upon FIH.  After inducing FIH to invest over $6 million in Foundation,

Meehan and Elmlinger audaciously proposed that FIH buy Barr out for an additional $5 million

– nearly doubling down on their substantial investment in the company.

115.    Upon the first communication during which the truth began to be revealed, on

approximately March 14, 2014, no writing was provided to FIH.  Only oral statements were

made to the effect that Barr was dishonest, incompetent, and a disaster to Foundation who must

be removed if Foundation was to survive.  During this communication to FIH's representative,

Meehan and Elmlinger said that they would provide FIH with a written "briefing" on Barr,

explaining why he needed to be removed from the company.

116.    One week later, on March 21, 2014, Meehan emailed FIH's representative,

copying Elmlinger, and stated:

> I am finishing my stab at the previously mentioned
> briefing.  Elm[linger] has landed, and I have debriefed him.  He
> will take a thorough read and will add and edit where
> necessary.  This will be provided for your review Monday.  I think
> in advance of Monday you should speak on a call with him to
> validate our discussion, and receive further color.

117.    Meehan and Elmlinger did not have an epiphany in the mere days between FIH's

Investment on February 27, 2014, and the date they began to reveal the truth about Foundation

and Barr, on March 2014.  And the suggestion that Meehan had taken only a week between the

first revelation of the truth to "take a stab" at writing the promised "briefing" as to the truth about

Foundation and Barr was a deceitful, purposeful effort to create the impression that Meehan and

Elmlinger had only since the date of FIH's Investment come to the conclusions that they were

about to reveal.   This was not so.  Meehan and Elmlinger had instead been carefully planning to

reveal the true facts (*i.e.*, that Barr posed an existential threat to Foundation and that he must be

ousted if Foundation was to have any chance of success) to FIH after FIH had closed on its

Investment so that they could use FIH to oust Barr.

118.    Two days later, on March 23, 2014, Meehan and Elmlinger each called FIH's

representative, from their home telephones, and each gave more details as to the truth about Barr

and Meehan's and Elmlinger's belief in the certainty of Foundation's collapse if Barr were not

thrown out.

119.    The written "briefing" detailing Barr's and Foundation's many grievous

shortcomings was drafted by Meehan and Elmlinger, and perhaps others as well.  Entitled

"PROJECT SOOTHSAYER," it amounted to an indictment of Barr and a revelation of the false

image of Foundation that each defendant had presented to FIH in the Due Diligence Materials

and the numerous other misrepresentations made as detailed above.

120.     PROJECT SOOTHSAYER (attached hereto as Exhibit C)1 was sent by fax from a Federal Express office in Greenwich, Connecticut, where both Elmlinger  and Meehan live, to a Federal Express office in Nashville, Tennessee and then delivered by hand to FIH's representative's home on April 1, 2014.

121.     The delivery of PROJECT SOOTHSAYER on April 1 was preceded by the delivery via overnight Federal Express service on March 28, 2014 of a package bearing the return address of "Joseph Elmlinger, 61 Packsland Road, Greenwich, CT 06931."  That package contained 183 pages of emails printed out from both Meehan's and Elmlinger's Microsoft Outlook accounts which supported the statements made in PROJECT SOOTHSAYER.  The email printouts had either Meehan's or Elmlinger's name on the top, indicating the emails were printed from that person's personal email account.  Some of the emails had Meehan's and/or Elmlinger's handwritten notes.

122.     PROJECT SOOTHSAYER itself is a 10-page, single-spaced document.  It includes many separately headed sections detailing each of Barr's liabilities, with multiple bullets beneath providing concrete examples of such, and detailing their harmful effect on Foundation.

123.     PROJECT SOOTHSAYER is a remarkable document.   It is a road map spelling out in detail the writers' belief in the fundamental dishonesty, lack of experience, business contacts and appallingly poor business and personal judgment of Barr and detailing those qualities' disastrous effect on Foundation's performance in the past and its prospects for the future.

124.     The views expressed in PROJECT SOOTHSAYER were long held by its authors. They were formed over years of dealings with Barr, as evidenced by the fact that the writers

---

1 Page one of PROJECT SOOTHSAYER is comprised of the name and address of FIH's representative.  It is redacted to protect the private address information.

supported their conclusions regarding his character and performance with example of observed conduct over a period of years and 183 pages of emails covering a period from February 19, 2012 to March 26, 2014 – a period that long preceded FIH's Investment.  Meehan and Elmlinger needed a substantial amount of time to complete PROJECT SOOTHSAYER – certainly more than the mere two weeks between the final payment made by FIH and the first mention of PROJECT SOOTHSAYER to FIH.  Its composition required an effort that took months to meticulously conceptualize, draft, organize, and gather the supporting documentation.

125.    That the authors harbored the views expressed in PROJECT SOOTHSAYER about Foundation and Barr's disastrous effect on Foundation, and yet continued to raise funds at all for Foundation from FIH, and failed to disclose this information that would be material to any prospective investor, is shocking.

126.    A "soothsayer" of course, is someone who claims an ability to predict the future. When Elmlinger and Meehan named their enterprise PROJECT SOOTHSAYER, they were candidly claiming that by compiling and setting forth in an organized fashion the devastating array of charges about Barr and his adverse effect on Foundation's prospects for success, they could predict the future.

127.    Their vision of the future at Foundation was dismal.  The authors of PROJECT SOOTHSAYER predicted:

- There was "no potential for change in [Barr]'s behavior."

- Barr must be removed from Foundation "as soon as possible."

- That the authors would leave Foundation if no changes were made to its leadership.

128.    Critically, PROJECT SOOTHSAYER stated that "removal [from Barr] of all managing partner rights … is *critical to the success of* [Foundation]."  (emphasis added)

129.     The only way that apocalyptic vision of the future could be prevented was by ousting Barr and replacing him with an appropriate successor – one who had the honesty, capabilities, network, contacts, leadership, and competence that the individual defendants believed Barr lacked, and for that purpose even more money would be needed.

130.     In its "Introductory Note," PROJECT SOOTHSAYER announces to the newly defrauded investors that Barr was "actively destroying value for [Foundation's] members due to his rampant financial difficulties, his functional inability to tell the truth at any juncture, his rude and dismissive attitude towards his colleagues and his desire to be the only point of contact with potential investments or investors."

131.     The "Introductory Note" concludes by saying "[Barr] needs to be removed from [Foundation] – in a manner that maintains civility and with some remainder of economic only interest to enforce defensibility – as soon as possible."

132.     Following the Introductory Note, PROJECT SOOTHSAYER goes on for ten single-spaced pages to describe the authors' long-held views about Barr, his personal and business attributes and their disastrous effects on Foundation.  One bombshell after another is reported.  These astounding conclusions by PROJECT SOOTHSAYER's authors about Barr's profound lack of fundamental honesty and any degree of business acumen is shocking in its scope and in its degree of detail.

133.     PROJECT SOOTHSAYER is incorporated herein by reference in all of its sordid detail.  Among the most salient beliefs of Meehan and Elmlinger, memorialized in the document, are the following:

> •    Barr "is actively destroying value for [Foundations] members, due to his rampant financial difficulties, his functional inability to tell the truth at any juncture, his rude and dismissive attitude towards his colleagues, and his desire to be the only point of contact with potential investments or investors."  Ex. C, p. 2.

- "As a general rule, recent and long-term experience confirms [Barr] is a spendthrift, burning through cash exceptionally quickly. … History demonstrates that he rapidly burns through cash … and when pressed hard enough by financial distress he will do a distressed deal." Ex. C, pp. 2-3, 10.

- Barr's fundraising ability was said to be "none to date" and his judgment was said to be "exceptionally poor" making "exceedingly rash decisions without consideration of the opinions of [Foundation] staff, or the consequences." Ex. C, p. 2.

- Barr "has no respect for NDAs; constantly violates them despite pleas from staff to respect them." Ex. C, p. 3.

- "During pipeline meetings, [Barr] has previously insisted on taking responsibility for reaching out to all manner of [hedge fund] targets, however he rarely follows up. Often he notes that he knows someone and will therefore make a call – several times we have caught him stating that a call was made and a meeting will be set up, and no call was in fact made. … [Foundation] suffers [Barr] constantly ignoring staff/deal team agreed-upon approach to targets." Ex. C, pp. 3-4.

- Barr "has a strong tendency to desire to use corporate accounts for personal matters when his cash draws low." Ex. C, p. 4.

- Foundation partners' morale was low as a result of Barr's long-term history with the firm.  Five Foundation employees express open disdain for Barr.  Ex. C, pp. 5-6.

- Meehan "sees no potential for change in [Barr]'s behavior, or anything but degradation of [Meehan's] reputation from working with [Barr]." Ex. C, p. 5.

- Elmlinger "[d]oes not see success in short or long term with [Barr] continuing with the firm" and "[d]eeply concerned about reputation."[Foundation analysts] said to "dislike[] lack of professionalism/honesty in [Barr]." Ex. C, p. 5.

- Barr "lies to prospective investors and hedge fund partners." Ex. C, p. 10.

- Barr was said to have "few to none, nothing critical/irreplaceable" in the way of "stable of alternative investment industry leader contacts." Ex. C, p. 2.

- Barr was said to have a "functional inability to tell the truth," evidenced by fabrication of false claims of suffering from cancer, having a dying

mother and attending international meetings that were non-existent.  Ex. C, p. 4.

- "[Barr] is regarded, where he is known, as having a somewhat tarnished reputation."  Ex. C, p. 7.

- Meehan and Elmlinger stated that they would leave Foundation if Barr were not removed.  Ex. C, p. 5.

134.  The 183 pages of emails attached to PROJECT SOOTHSAYER are not attached in their entirety to this Complaint because of personal and/or potentially privileged information contained in the emails, but illustrative emails, attached hereto as Exhibit D, include the following:

- A December 2, 2012 email from Barr to Meehan asking for an advance on payment, prompting Barr to write, "I am very tired of asking you for money.  My loan issues on behalf of our collective families, emerald reef, foundation were disclosed and known.  I feel like s—t every time I walk into your office and ask.  It's not fun.  …. I am at my wits end.  Won't do this anymore.  Too much pressure."

- A June 19, 2013 email from Barr, copying Meehan, to a prospective investor, wherein Barr confirms the investor "will fund $150m to over $200m by the end of August or early September."  Of note is the handwritten notation at the top of the email, by either Meehan or Elmlinger, which states "made-up email" – indicating that Barr lied about having lined up an investor and the scope of that investor's promised funds.

- A July 17, 2013 email between Meehan and Elmlinger regarding Barr, noting:  "Typical Dean.  He disappeared for several hours.  Went to get a haircut then eventually called from his house at 6:30. … Dean got comp data weeks ago, didn't share it with anyone, finally looked at it today (after promising to send it to [investor]) and realized that it was bad data … .  Again, we look like f---ing amateurs.  Be Sure we are!  Or at least Dean is.  F---ing tired of this!"  The email chain continued with Elmlinger writing to Meehan:  "Dean will ruin this firm.  [The investment management firm] will soon realize that Dean isn't capable of delivering on anything and will walk away from us."

- A September 24, 2013 email from Barr to Meehan requesting an advance on his October payment, to which Meehan responds:  "I just looked at the September corporate Amex and you have a $14,700+ charge on our corporate credit card.  You need to switch that [to] your personal credit card right away … ."  Barr responds:  "Joe, I can't cover it now.  Hopefully you can based on the monies owed by you."  Meehan forwards this conversation to Elmlinger, who responds:  "I demand that a reply be sent to him stating that the partnership will no longer enable his spending disease.  He makes $250k more than any other partner, but he has no money because he spends it like a f---ing drunk.  He

spends it on NY hotels, CA vacations, luggage for girlfriends, $14k rugs. … You send it or I will.  I have f---ing had it with this f---ing guy."

- A September 25, 2013 email from Barr to Elmlinger, Ward, and Meehan, where he admits that "I do owe money on the corporate amex card that are my responsibility … . [Because of his divorce], I am unable to pay the mortgages or personal Amex bill this month.  I believe that our corporate cards are linked to my personal acct and they probably will be shut off.  In addition, my credit rating is part of due diligence conducted by our LP's.  … Sorry, but this is now a Partnership issue and unavoidable."

135.    PROJECT SOOTHSAYER and its supporting emails demonstrate that virtually every word written or uttered by any of the defendants to FIH about Foundation's condition or prospects was false.  PROJECT SOOTHSAYER reveals that in the eyes of the individual defendants, at the time they were soliciting FIH's Investment, there was ***no viable business at Foundation at all --*** let alone that certain details about Foundation's condition or prospects were misrepresented.

136.    PROJECT SOOTHSAYER revealed not only that, in the opinion of its writers, Barr had to be removed from Foundation entirely if it was to have any chance to succeed, it also revealed that all of the individual defendants (other than Barr) believed that Foundation would need someone with competence and integrity to actually perform the functions that Barr had demonstrated to everyone he was incapable of performing.  PROJECT SOOTHSAYER states:

> "*Replacement M&A Professional*.  It has been expressed among the professionals that [Foundation] requires a mature M&A professional.  This would require either a hire or consultancy."  (italics in original.)

137.    Thus, not only did Barr have to go, a replacement had to be hired or retained, a project for which there had been no planning, were no resources and of which there was no real prospect at all.

138.    While PROJECT SOOTHSAYER was drafted by Meehan and Elmlinger, the truths revealed therein about Barr and Foundation were certainly known to Barr, as it is

impossible he did not know of the lies he was telling his colleagues and his investors.  Moreover,

Ward, as a corporate insider, had knowledge of the incidents documented in PROJECT

SOOTHSAYER which, according to PROJECT SOOTHSAYER, were plainly obvious and

known to the employees (and certainly the partners) of Foundation.  In fact, PROJECT

SOOTHSAYER expressly implicates the knowledge of all of Foundation's employees of many

of its contents.

139.    The below chart summarizes PROJECT SOOTHSAYER's assessment of Barr's

actual abilities as they relate to Foundation's ability to function as a business.  The left hand

column list the topic on which its authors express a view, the right hand column states their

conclusions on those topics:

| Area of Assessment | Conclusion |
|---|---|
| Alternative investment industry leader contacts | "Few to none."  Ex. C, p. 2.<br><br>Notes that statements by Barr suggesting a hedge fund relationship are "*never* the case" and Barr "***has no contacts***."  Ex. C, p. 3 (emphasis added)<br><br>Notes that Barr "has raised his hand on the vast majority of target hedge funds on the pipeline list but has made contact with very few.  He has overstated the extent of his relationship with (and ability to get a meeting with) [a number of hedge funds]" and as a result, "the transaction pipeline presented on a no-names basis in the investor pitchbook strains credibility." Ex. C, p. 9 |
| Fundraising ability. | "None to date" Ex. C, p. 2 |
| Judgment. | "Exceptionally poor. Makes exceedingly rash decisions without consideration of the opinions of [Foundation] staff, or the consequences. Refuses to follow pre-arranged plans for negotiations. … Impulsive and quickly jumps to conclusions. … He is drawn to the easy money solution and rarely asks questions."  Ex. C, p. 2, 9 |

| Marital Situation and Impact on Foundation | "We expect that his divorce will be messy, expensive & protracted" and will affect Foundation at least with respect to Barr's equity.  Ex. C, p. 2 |
|---|---|
| Spending/cash management habits. | "As a general rule, recent and long-term experience confirms [Barr] is a spendthrift, burning through cash exceptionally quickly. … History demonstrates that he rapidly burns through cash … and when pressed hard enough by financial distress he will do a distressed deal."  Further notes that "when [Barr] runs out of money, he threatens to declare bankruptcy (and ruin the firm) …. ."  Ex. C, p. 2-3, 10 |
| Attitude toward colleagues. | "Rudely dismissive of thoughtful, contrary opinions."  Ex. C, p. 3 |
| Attitude towards confidentiality | "[H]as no respect for NDAs; constantly violates them despite pleas from staff to respect them" and deals "will not [materialize] with his ceaseless chatter."  Ex. C, p. 3<br>Further notes that Barr "demonstrates a reckless disregard for confidentiality."  Ex. C, p. 10 |
| The "Pipeline" | "During pipeline meetings, [Barr] has previously insisted on taking responsibility for reaching out to all manner of [hedge fund] targets, however he rarely follows up. Often he notes that he knows someone and will therefore make a call – several times we have caught him stating that a call was made and a meeting will be set up, and no call was in fact made. Staff are uniformly of the opinion that he has lied in several instances about having made contact with [hedge fund] managers during a meeting. … [Foundation] suffers [Barr] constantly ignoring staff/deal team agreed-upon approach to targets."  Ex. C, p. 3-4 |
| Industry Reputation | "[Barr] is regarded, where he is known, as having a somewhat tarnished reputation" and "[Barr] has burned many a bridge."  Ex. C, p. 7 |
| Truthfulness | Barr was said to have a "***functional inability to tell the truth***" including claims of suffering from cancer, having a dying mother and attending international meetings that were non-existent.  Ex. C, p. 4<br><br>Concludes that "***it has come to the point now that most people assume that whatever [Barr] says is not true. … Most importantly, he lies to prospective investors and hedge fund partners***."  Ex. C, p. 10 (emphasis added) |
| Misuse of corporate funds. | "has a strong tendency to desire to use corporate accounts for personal matters when his cash draws low."  Ex. C, p. 4 |
| Compliance with Tax laws | Has potential personal tax issues, an opinion "predicated on both [Barr]'s general behavior and the desperation he has evidenced in the past when low on cash. … Obviously IRS issues for [Barr] would have a terrible |

| | |
|---|---|
| | effect on Foundation."  Ex. C, p. 5 |
| Effect on team morale. | Of six Foundation employees listed in the Due Diligence Materials as Foundation's "Investment Professionals," four are so disgusted with Barr that they may leave: |

1.  Meehan – Partner, Chief Operating Officer – "Unlikely to stay under current model"  . . "Sees no potential for change in Barr's behavior or anything but degradation of [his] reputation from working with Barr . . "  Ex. C, p. 5

2.  Elmlinger  -  Partner, Risk and Structuring --  "Unlikely to stay under current model"  ."does not see success in short or long term with [Barr] continuing with the firm"  . . . "Deeply concerned about reputation.  . ." Ex. C, p. 5

3.  Hall O'Donnell – Director, M&A --  "critical member of team . . . is exceedingly strong short term flight risk – dislikes lack of professionalism/honesty of [Barr] and has increasingly  been treated shoddily by [Barr]."  Ex. C, p. 5

4.  Steven Fedder – Vice-President, M&A --  "brilliant analytical mind . . Like [O'Donnell], [Fedder] is an exceedingly likely short term flight risk – similarly dislikes lack of professionalism/honesty of [Barr]."  Ex. C, p. 5-6

The only two Investment Professionals not expressly said to be likely to leave was Barr himself and Ward.

Of another person, Stephen Griffin, an Associate at Foundation in M&A three years – PROJECT SOOTHSAYER says the he was "without adequate supervision" – he was judged to be a "low flight risk" but only, because "he is still at that stage of his career where he is more of a commodity."  Ex. C, p. 6

PROJECT SOOTHSAYER also notes that it will be "tricky" to "keep staff motivated until [Barr] can be removed."  Ex. C, p. 7

140.    As the above amply demonstrates, the representations made to FIH to induce its

Investment were materially false.

141.    Months later, in a conversation between Meehan and an FIH representative,

Meehan made an astonishing admission that he did not believe he was under any obligation to

reveal adverse facts about Foundation to an investor until *after* an investment was made.  He said that once an investor was a partner, he understood that he owed a fiduciary duty to that partner, but that he had no duty of candor to a potential investor.

142.    In addition to revealing the falsity of the big picture representations about Foundation's viability and prospects, PROJECT SOOTHSAYER and other information discovered by FIH after its Investment also reveals that the specific representations made by Foundation and the individual defendants to FIH were false.

**b)  The Truth Comes Out About Foundation's Prospects**

143.    The dismal truth about Foundation's deal pipeline was revealed upon FIH's receipt, after it had made its Investment, of the internal Foundation documents entitled "Project Activity Logs."  Project Activity Logs were internal documents which listed hedge fund targets in Foundation's pipeline under three categories:  Live Deals, Prospects, and Dead Projects.  For each hedge fund target, the Project Activity Log was updated to reflect progress in columns named "recent activity/notes," "next steps" and "process milestones."  The Project Activity Logs served as an internal diary of the progress made by Foundation on each of the targets to date and also catalogued the historical progress with each target to date.  Thus, each Project Activity Log version built upon the previous version and added additional information but did not delete prior progress notes.  The Project Activity Logs were distributed to Foundation's employees – including the individual defendants – for discussion at weekly meetings to discuss movement on the pipeline as demonstrated in the Project Activity Logs.

144.    FIH did not have access to the Project Activity Logs until after the Investment had been made.  The first version it received was on March 4, 2014 and was dated March 3, 2014, and this version included historical information on all of Foundation's prospects up to that date.

145.    The Project Activity Logs demonstrated that the representations made by Foundation and the individual defendants in the Due Diligence Materials and the spreadsheets circulated to FIH on December 3, 2013 and December 19, 2013 that Foundation was capable of closing three to four years a deal – and, specifically, four deals by June 2014 – were knowingly false when made.  This is because the Project Activity Logs, which each of the individual defendants were given, demonstrate that no progress had been made on any targets that could possibly support the statement that any more than one target – if any – would be closed upon by June.

146.    By March 4, 2014, when FIH received its first Project Activity Log, there was only **one** target in the "Live Deals" category of the Project Activity Log representing a target with realistic potential for fruition.  And even that target had only progressed to the point of "ongoing [due diligence] dialogue."  Of the 40 targets listed in the "Prospects" category of the March 3, 2014 Project Activity Log, only five had even progressed to the point of introductory meetings; of those, two had gone stale before Foundation ever met with FIH.  The rest of the targets listed in the "Prospects" category had "no [recent] activity" or were still waiting for the initial call or introduction to be made – despite the Due Diligence Materials' representation that Foundation's "pipeline has become increasingly active in recent months."

147.    In addition to demonstrating that the representation of Foundation's capacity to close deals by a certain date was false, the Project Activity Logs – possessed by each of the individual defendants – demonstrated the falsity of the specific target representations made by the individual defendants.  The below table demonstrates the representations made against the truths revealed in the Project Activity Logs:

148.

| Representation to FIH | Truth as Revealed in Project Activity Logs |
|---|---|
| 1. February 2014 Due Diligence Materials listed 15 "increasingly active projects," including Projects Pilot, Centaur, Pound and Bronco | Projects Pilot, Centaur, Pound and Bronco were actually in the "Dead Projects" section of the March 3, 2014 Project Activity Log and the notes in the Project Activity Log demonstrate that these projects were known to be not viable long before FIH's Investment was finalized:<br><br>Project Bronco – non-viable as of 1/29/14;<br>Project Centaur – non-viable as of 2/7/14;<br>Project Pound – non-viable as of 2/10/14;<br>Project Pilot – non-viable as of 2/24/14. |
| 2. February 2014 Due Diligence Materials stated that Projects Bronco and Lake had non-disclosure agreements signed | This was a false representation as demonstrated by March 3, 2014 Project Activity Log |
| 3. Representation by Barr in December 30, 2013 email that Projects Bronco, Pilot, and Centaur were "in the works," with no follow up. | These three projects were deemed as of February 2014 to be no longer viable (Project Bronco – non-viable as of 1/29/14; Project Centaur – non-viable as of 2/7/14; Project Pilot – non-viable as of 2/24/14) and were listed on the March 3, 2014 Project Activity Log as "Dead Projects" – with no such information provided to FIH. |
| 4. In email dated December 30, 2013, Barr represented that Project Bronco was "in the works." | Foundation did not have an introductory call or meeting with Project Bronco until January 7, 2014. |
| 5. In Barr's December 30, 2013 email to FIH, he represented that Projects Corvette and Lake were "in the works." | As of that date, Projects Corvette and Lake had not progressed beyond the point of preliminary emails or phone calls – let alone any definitive term sheets signed.  Rather, Project Corvette was put on hold until May 2014, without any information provided to FIH. |

149.    Thus, during the months of December 2013 through February 2014, there was no

more than one "real" and "immediate" prospect on Foundation's pipeline.  The continued

representations by Foundation and the individual defendants that the pipeline was "active" or that four deals could close by June 2014 was preposterous – and therefore not genuinely or reasonably believed by the individual defendants – given the facts actually known at the time the statements were made.  Importantly, these representations about four deals closing by June 2014 were not changed even as hedge fund targets became non-viable.

150.    Because they had access to the Project Activity Logs and its updates on the progress of each potential target, the individual defendants knew of the lack of movement on Foundation's deals at the time representations to the contrary were made to FIH.  Thus, the progress reports given to FIH in the aforementioned emails and documents were false and knowingly and purposefully so.

151.    The individual defendants made these false representations and material omissions with knowledge of their falsity.  The individual defendants, as Foundation insiders, knew what the Project Activity Logs showed.  They actually recorded their true beliefs in writing.

152.    In PROJECT SOOTHSAYER, Meehan and Elmlinger acknowledged that the pipeline list in the February 2014 Due Diligence Materials was false.  In PROJECT SOOTHSAYER, the two candidly admit:  "The transaction pipeline presented in a no-names basis in the investor pitchbook *strains credibility*." (emphasis added)   In this statement, they conceded that they knew of the falsity of information provided to FIH.

153.    This assessment was not confined to Meehan and Elmlinger.  The individual defendants and others at Foundation knew of the same falsity and were talking about it internally for months.

154.    On March 27, 2014 – just a few weeks after FIH made its Investment – Hall

O'Donnell, Foundation's Director of M&A, emailed Barr, Meehan, Elmlinger, Ward and

Stephen Fedder, Foundation's Vice President of M&A, and delivered a bleak report:

> Per the attachment, you can see our pipeline [of hedge fund GP
> minority interest investments] beyond Apex [one of the deals listed
> in the February 2014 Due Diligence Materials] is pretty crappy. …
> ***Other than that, we have nothing***.  For the benefit of those who
> did not attend the [investment management firm's] meeting
> yesterday, they were keen to understand our current pipeline which
> we committed to them we'd work on filling. (emphasis added)

155.    Barr was angry to be told the truth publically by the Director of M&A.  He

responded to O'Donnell privately, angry that O'Donnell had stated what he had publically to all

of those to whom he had sent the email.  Barr said:

> I know your heart is in the right place but it is not your
> responsibility to call me or anyone else out this way.   One on one
> fine. Group email inappropriate. ***I know our situation too.***
> Regardless of what you or others might think of me I run the firm.
> I have 80% of the hedge fund relationships and I created the
> concept  . . I don't like the way you delivered this and feel you are
> being influenced by others.   (emphasis added)

156.    By stating "I know our situation too," Barr evidenced that he was aware of the

truth of O'Donnell's report.  He even told O'Donnell that O'Donnell could tell him what he

thinks one-on-one.  Barr just did not want everyone to hear the truth said aloud, even within the

firm.

157.    O'Donnell responded privately to Barr, saying:  ". . . Rightly or wrongly, your

partners and the deal team ask me pretty much daily how the pipeline looks.  I feel a

responsibility to respond."

158.    A few hours later, O'Donnell forwarded his private exchange between himself

and Barr to Meehan, saying:

> My job is increasingly hard to do when **people don't want to
> confront basic facts.**   I grant that my initial email may have been

a little harsh, but none of my efforts to date . . . . seem to have done anything to lift the ***inertia around deal sourcing***.    Instead, I am getting backlash for being too personal and aggressive by calling out all responsible (including myself) for contributing to this major issue.  ***Let me state what I have been stating for months, the sorry state of the M&A pipeline is the single biggest problem in the firm. Based on the timing before the firm runs out of cash, this issue may not even be fixable at this point without some indication from the GP backers that the runway might be extended.***

A copy of the email chain is appended hereto as Exhibit E.

159.    These emails convey the true state of affairs at Foundation:  the Director of M&A had been reporting "for months" about "the sorry state of the M&A pipeline" and Barr, Foundation's Acting Head of Investments, "kn[e]w [Foundation's] situation too."  Indeed, everyone knew these facts:  Barr, Meehan, Elmlinger and Ward.

160.    The exchange also reveals the desire to keep Foundation's lack of real prospects a secret, to not even acknowledge this truth publicly within the firm, let alone to investors.  It also reveals the dysfunction between the firm's partners, with the Director of M&A being admonished for stating the truth to all of the partners and an accusation that by stating the truth publically within the firm, O'Donnell was being "influenced by others," an obvious reference to Barr's personal feud with Meehan and Elmlinger.

161.    It was also well known within Foundation why its pipeline was so bleak.  Despite representations in the Due Diligence Materials about Barr's "extensive experience and relationships" in the hedge fund community and contacts with potential targets, and despite the representation that the deal pipeline would be sourced primarily from Barr's contacts, Meehan and Elmlinger did not, at the time these representations were made to FIH, believe Barr had anything resembling the type of network Foundation was representing to prospective investors.  As they wrote in PROJECT SOOTHSAYER, Meehan and Elmlinger knew that Barr had "few to none" alternative investment industry leader contacts and believed Barr "***has no contacts***."  They

confessed their knowledge that, in the absence of real relationships with the right parties as per his representations, Barr relied largely on cold-calls to industry contacts to source deals.  Most damningly, they stated that Barr – Foundation's head of investments, whose contact list was supposed to be the source for Foundation's deal pipeline – had a "tarnished reputation" and that hedge fund targets would view Barr's removal from Foundation as "addition by subtraction."

162.     The March 3, 2014 version of the Project Activity Log revealed that Barr was put in charge of following up with the *only* "live deal" Foundation could muster by this point (Project Apex) and with 27 of the 40 targets listed as "Prospects."

163.     Meehan and Elmlinger were therefore aware that Foundation did not have the infrastructure, connections, or the relationships to develop a successful pipeline for closing on four hedge fund GP minority interest investments in only a matter of months.  With Barr in charge of progressing the pipeline, the individual defendants knew, or were reckless in not knowing, that Foundation could never achieve any of the deal targets it represented to FIH in the Due Diligence Materials and in the additional spreadsheets and email representations discussed herein.

164.     FIH relied to its detriment upon the representations about Foundation's pipeline as set forth in the Due Diligence Materials and the emails dated December 30, 2013, January 22, 2014 and February 3, 2014 that Foundation had "real" and "immediate" deals in the pipeline and that the individual defendants genuinely believed, at all times between November 2013 and February 2014, that Foundation was *capable* of sourcing and closing on four hedge fund GP minority interest deals by June 2014.

165.     FIH would not have made its substantial investment in Foundation had it known that Foundation had no real or immediate investment prospects and that its head of investments had no network that would enable successful investments – the opposite of what had been

represented in Foundation's marketing materials and in statements by the individual defendants to FIH and its representative.

### c)   The Truth Comes Out About Foundation's Leadership Rift

166.     Despite Foundation's and the individual defendants' representations to the contrary, Barr's and Meehan's relationship was anything but professional, functional, or conflict-free.  PROJECT SOOTHSAYER made clear that Barr and Meehan—two of the most powerful people in Foundation's leadership—were enemies who had a deep hatred for one another and who repeatedly stated internally that they were unable to work together.

167.     Specifically, during the time Foundation was courting FIH, defendants Barr and Meehan made clear between themselves—and, upon information and belief, to the other individual defendants—that they could not continue working together because of ongoing family issues.

168.     Barr and Meehan were married to sisters, and Barr's antagonistic divorce added to the tremendously strained working relationship between Barr and Meehan.

169.     On September 25, 2013, at the same time that FIH was being introduced to Foundation, Barr wrote to Meehan, Elmlinger, and Ward: "I am truly sorry but I am not sure I can work with Joe [Meehan] going forward.  Because of my divorce, I am unable to sell any equity in [Foundation] without [Barr's estranged wife]'s permission."

170.     On October 1, 2013, just prior to the first meeting between FIH and Foundation, Barr emailed Meehan saying, "I know you dislike me intensely and there is no trust."

171.     On February 3, 2014 – just a couple of weeks before FIH made its Investment – Barr emailed Meehan, copying Elmlinger and Ward:  "Joe, we are officially broken from each other."

172.    And on February 4, 2014, Barr's ex-wife emailed the individual defendants, copying her divorce lawyer, and chastised Barr for a "nasty email" he sent Meehan that morning accusing him of betrayal and of leaking information to Barr's ex-wife.

173.    The above communications demonstrate that the statement made in the Due Diligence Materials, which stated that "Mr. Barr and Mr. Meehan have known each other for 16 years, meeting through family relationships in 1997" and that "[b]oth have worked closely together since the concept for Foundation [] was created in 2007," was materially misleading in that the hateful relationship between two of the leaders of the small company was not disclosed, despite Foundation's representations that the interpersonal relationships of its leaders was an important part of its operational success and despite representations by each Barr and Meehan that they were able to maintain a professional relationship.

174.    Moreover, the statement in the Due Diligence Materials that none of the Foundation principals had any conflicts of interest was also materially false and/or misleadingly incomplete.

175.    Despite their roles as corporate insiders responsible for the Due Diligence Materials, the individual defendants did not communicate to FIH that the top two managers of the firm had severe personal conflicts that had paralyzed the company's ability to do business. Nor did any of the individual defendants correct the misrepresentation in the Due Diligence Materials that represented that Barr and Meehan worked together for many years without a hint of conflict.  They intentionally omitted this material information.

176.    Finally, in PROJECT SOOTHSAYER, Meehan made clear—for the first time— that he would not stay at Foundation if Barr remained at the company.

177.    The fact that two of the leaders of Foundation had a deep hatred and distrust for each other would be material for any investor prior to making an investment.  Had this

information about conflict at the top levels of leadership been communicated to FIH, it would not have made its Investment.

### d)   The Truth Is Revealed About Barr's Spending Disease and its Threat to Foundation

178.   PROJECT SOOTHSAYER exposed the falsity of the individual defendants' representations about Barr.

179.   FIH learned that Meehan and Elmlinger, for a long time, had grave concerns about Barr's financial recklessness and the potential for this recklessness to unravel the firm. Prior to FIH's Investment, Meehan and Elmlinger were regularly internally complaining about Barr's irresponsible and irrational spending habits, including but not limited to his use of corporate credit accounts for his own extravagant spending, his frequent requests for advances on his partner salary draw, and the potential financial impact of his pending divorce on the company's financial stability.

180.   As Meehan and Elmlinger knew, Barr's abuse of the corporate credit card had serious ramifications for Foundation.  Indeed, on December 3, 2013, as documents were being sent to FIH for review, Foundation's office manager emailed Meehan and Elmlinger to let them know that their corporate American Express cards were declined for a mere $11 purchase as a result of Barr's spending and failure to pay his bill.  The firm's corporate credit cards were suspended several other times during the course of 2013-2014 as a result of Barr's irresponsible spending.

181.   Barr himself notified Meehan, Elmlinger, and Ward of the potential toll his spending could take on the firm.  On September 25, 2013, Barr wrote to Meehan, Elmlinger, and Ward:  "I am unable to pay the mortgages or personal AMEX bill this month.  I believe that our corporate cards are linked to my personal acct and they probably will be shut off.  In addition, my credit rating is part of due diligence conducted by our LP's."

182.     Moreover, in PROJECT SOOTHSAYER, Meehan and Elmlinger noted that "when [Barr] runs out of money, he threatens to declare bankruptcy (and ruin the firm)."

183.     Barr also frequently took advances on his partner salary, depleting corporate funds that were necessary for continued operations.  Meehan, Elmlinger, and Ward were aware of these frequent advances.

184.     Already on September 23, 2013, Elmlinger and Meehan discussed over email the extent of Barr's overspending, prompting Elmlinger to email:  "I demand that a reply be sent to him stating that the partnership will no longer enable his spending disease. He makes … more than any other partner, but he has no money because he spends it like a f---ing drunk.  …  I have f---ing had it with this f---ing guy."

185.     Meehan, Elmlinger, and Ward failed to tell FIH about the terminal threat to Foundation posed by Barr's financial instability prior to FIH's Investment in February 2014 – despite opportunities to correct representations to the contrary in the December 4, 2013 meeting with FIH (where Barr said he had no personality or background concerns), in the January 20, 2014 email with FIH (where Barr asked for a partner advance, but Meehan, Ward, and Elmlinger failed to explain to FIH what they had known and discussed amongst themselves for months – that Barr was using Foundation's financial resources to fund his own extravagant lifestyle, and that Barr's actions threatened Foundation's very viability), and in the February 20, 2014 meeting with FIH (where Meehan and Elmlinger said that Barr was kept under control).

186.      Had Meehan, Elmlinger, and Ward not concealed this material information about Barr's spending disease which Meehan and Elmlinger believed would destroy Foundation, FIH would not have made its Investment.

187.     Moreover, PROJECT SOOTHSAYER demonstrates that Meehan and Elmlinger were aware of Barr's financial imprudence with his personal funds and history with speculative

investment endeavors.  Specifically, they were aware that Barr lost more than a nominal sum in the emerald treasure fraud, calling it a "major … sinkhole of cash for him" in PROJECT SOOTHSAYER.  Whereas Barr represented to FIH that he had only invested and lost only $200,000, FIH later learned that Barr had listed a $1.875 million note receivable from the emerald fraud on his personal financial statement as part of a mortgage refinancing effort.

188.    Meehan was well aware of the potentially financially destructive implication of the litigation surrounding the emerald treasure fraud for Foundation's viability.  In a November 15, 2012 email, Barr told Meehan that the emerald fraud litigation was "spinning out of control" and that he was at risk of "go[ing] bankrupt from legal fees to protect all of [Foundation and its partners'] interests."

189.    Barr's financial instability, and the individual defendants' knowledge of and concerns about it, were not communicated to FIH prior to its Investment in February 2014, and Meehan and Elmlinger omitted this critical information when they met with FIH days prior to the Investment and represented that Barr was not an obstacle to Foundation's success.  FIH would never have invested with Foundation had it known that its principal and Head of Investments had a significant blow up in his personal financial statement and lost more than nine times on the emerald fraud than he originally represented to FIH prior to its closing.

### e)    The Truth Is Revealed About Barr's Dishonesty

190.    PROJECT SOOTHSAYER demonstrates that Meehan, Elmlinger, and Ward had long internally expressed concerns about Barr's lack of truthfulness in his pursuit of capital for Foundation's operations as well as hedge fund GP minority interest investments.  During the time that Foundation was pursuing an investment by FIH, and with the knowledge of the other individual defendants, Barr repeatedly told the investment and hedge fund community that Foundation had secured – in fact, "closed on" – $2 billion in equity.  But this was not true, as

only $1 billion was via a non-binding letter of intent to provide capital on a contingent basis from the investment management firm.  The second $1 billion "commitment" by another entity was merely an "agreement to agree," as Meehan noted in a July 3, 2013 email to Foundation's corporate counsel, adding that he had "doubts as to their ability to deliver such capital."  Indeed, Meehan later referred to this potential second $1 billion as "illusory."

191.    Barr made this false representation to the press in October 2013, resulting in a threat by Foundation's legal counsel to resign if no retraction were printed.  Barr was adamantly opposed to making such a retraction, and only agreed to a correction after strong pressure by his Foundation partners.

192.    In PROJECT SOOTHSAYER, Meehan and Elmlinger state these concerns in the most emphatic of terms, noting that Barr has a "functional inability to tell the truth" and that "[i]t has come to the point now that most people assume that whatever [Barr] says is not true."

193.    Meehan's and Elmlinger's concerns regarding Barr's dishonesty were not relayed to FIH prior to its Investment in February 2014.  Instead, Meehan and Elmlinger made an oral representation to FIH on February 20, 2014 to the contrary – stating that Barr was under control and that he did not have the capacity to destroy Foundation – despite the very real threat they believed that Barr posed to Foundation.

194.    Had FIH been told the truth about Barr and his potential to ruin Foundation, FIH would not have made its Investment.

*****

195.    Taken together, PROJECT SOOTHSAYER and the Project Activity Logs revealed to FIH that Foundation's and the individual defendants' representations that Foundation was a viable enterprise, with the leadership, infrastructure and contacts necessary to make the investments required to keep Foundation a going concern, were false and the opposite was true:

Foundation was *never* capable of making the investments necessary for it to be a viable business because the senior leader charged with such investments had no contacts, no relationships in the hedge fund industry, no business competence, no impulse control and no spending restraint and because two of the senior managers at Foundation had a deep personal hatred for each other that created a leadership standstill.

### E.   Post-"PROJECT SOOTHSAYER" And Request For Rescission

196.   Once they provided FIH with PROJECT SOOTHSAYER, Meehan and Elmlinger's scheme was brought to fruition.  But FIH refused to double down on its Investment to buy out Barr.

197.   It was clear already to FIH upon the receipt of PROJECT SOOTHSAYER that Foundation could not be salvaged and that its Investment was worthless.

198.   Foundation never closed on a single hedge fund GP target, and never even came close to doing so.

199.   Foundation's demise was the result of its fundamental problems which were not divulged to FIH prior to its Investment – namely, that Foundation did not have the capacity to close deals; Foundation's Head of Investments did not have the network for making the types of deals that were necessary to Foundation's business plan; Foundation had no leadership because the principals had deep and irreparable hatred for each other and had personal and familial issues that were incapable of being reconciled; and that Foundation's "leader," its managing partner, was a wasteful, lying, careless and incompetent person who was not capable of leading a company to success – all conditions which were expressly, purposefully, and fraudulently concealed from FIH by Foundation and the individual defendants.

200.   On August 14, 2014, FIH emailed Barr and Meehan seeking rescission of FIH's Investment and reimbursement for legal fees incurred.  The email noted that, "based on what FIH

has learned about the underlying facts regarding [Foundation] in just six months since its investment, FIH would never have made its investment had it known the true facts at the time of its investment."

201.    In a response dated August 15, 2014, Meehan denied FIH's request for rescission.

202.    That same date, Foundation sent an email to its members notifying them that, given the lack of capital, the responsible path would be to wind down the firm.

203.    Shortly afterwards, Elmlinger, Meehan, and others resigned from Foundation.

204.    Upon information and belief, Foundation has ceased operations.

## COUNT I - VIOLATION OF § 10(b) of the SECURITIES EXCHANGE ACT OF 1934

205.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

206.    FIH's interest in Foundation, purchased in four pieces, is an "investment contract" and is therefore governed by the federal securities laws.  FIH invested a sum of money with Foundation in a common enterprise, and FIH's profits were to come solely from the efforts of others.

207.    Defendants made misrepresentations of fact to FIH with the intention of inducing FIH to invest in Foundation.

208.    Foundation and the individual defendants represented to FIH that Foundation was a viable business with the capacity to close on hedge fund targets, which was its only business, because of the contacts, functionality and competence of its leadership.

209.    Foundation and the individual defendants made the following material misrepresentations of fact in the Due Diligence Materials for which they are responsible as corporate insiders:  that "the current representative [Foundation] pipeline … has become increasingly active in recent months."

210.    Barr and Meehan also misrepresented to FIH, in phone calls with its agent, that the two had a professional working relationship.

211.    Finally, Barr made the following misrepresentations to FIH prior to its Investment:

- that Foundation's "pipeline continues to expand with real, immediate deals"; and
- that Barr had no personal issues or background concerns that would threaten FIH's Investment.

212.    Moreover, Barr failed to tell FIH when potential hedge fund GP minority interest investments represented as viable lost its potential for fruition.  Specifically, Barr failed to update FIH regarding his statement that Foundation had a green light to pursue Project Apex and that he believed Foundation could "move expeditiously on this deal" when these characterizations were no longer accurate.

213.    Foundation and the individual defendants made these statements and/or omissions knowing they were contrary to Foundation's actual situation and that they were misrepresentations of existing facts or omissions of material facts.

214.    Thus, Defendants failed to provide FIH with accurate information and misrepresented Foundation's ability to ever actually close the deals it represented it would make because the truth was that Foundation had no leadership, no network, no contacts, no functionality, and therefore had no capacity to close such deals, which were its only objective.

215.    Defendants acted with scienter and knew that these statements were false when made.  Each of the individual defendants was in possession of internal documents – including, but not limited to, the Project Activity Logs, which made clear that Foundation had no active pipeline – that demonstrated that the pipeline as presented to FIH in the Due Diligence Materials and in emails by Barr and Meehan was false.  The Project Activity Logs demonstrated that the

pipeline had not progressed in the manner represented by the individual defendants.  As such, any statements to the contrary constitute conscious misbehavior and/or recklessness.

216.    The individual defendants' knowledge of the falsity of these representations was conceded.  Meehan and Elmlinger acknowledged that the target list in the Due Diligence Materials "strains credibility."  Moreover, the individual defendants' knowledge about Foundation's non-existent deal pipeline is evident from the March 27, 2014 email exchange between the individual defendants and Hall O'Donnell, wherein the "sorry state" of Foundation's M&A pipeline, which had been discussed "for months," was addressed, and to which Barr responded that he "kn[e]w."  These statements confirm that the individual defendants did not reasonably or genuinely believe, at the time the representations about Foundation's pipeline and prospects were made to FIH, that such representations were true.

217.    Barr and Meehan each knew of the falsity of their representation to FIH that they had a professional working relationship, as demonstrated by the documents attached to PROJECT SOOTHSAYER showing their disdain for each other.

218.    Finally, Barr had knowledge that his representation to FIH – that there was nothing FIH needed to know about his background or personality prior to investing with Foundation – was false.  The statements of belief in PROJECT SOOTHSAYER and the facts as set forth in its accompanying internal emails demonstrate Barr's financial recklessness, his lies, his lack of contacts, and his broken relationship with his partner, Meehan, and it is impossible that Barr did not know of the lies he was telling his colleagues and his investors.

219.    Each of the individual defendants was a corporate insider and therefore had the opportunity to commit fraud.

220.    The individual defendants had a motive to commit fraud.  Barr needed corporate cash to fund his extravagant lifestyle.  Meehan and Elmlinger were motivated to get the leverage

of a new investor to oust their managing partner who they knew for a long time posed a threat to the firm's existence.  Meehan and Elmlinger would therefore have control of Foundation. Meehan was also motivated by a deep hatred of Barr.

221.    FIH reasonably and justifiably relied on the defendants' misrepresentations and omissions in deciding to invest in Foundation.  The misrepresentations and omissions about Foundation's pipeline, about Meehan's and Barr's deep hatred for each other, and about Barr's threat to the company were not readily verified or disproved and/or were outside FIH's ability to understand and discern.

222.    Had it been told the truth about Foundation's pipeline, its leadership rift, and about Barr – and, essentially, the truth about whether Foundation was ever capable of sourcing the deals it represented it would make – FIH would never have invested in Foundation.

223.    FIH's Investment in Foundation is now worthless as there have been no acquisitions, a function of the misrepresentations and omissions made by the defendants.

224.    As a result of Defendants' material misrepresentations and omissions, FIH has suffered a loss in the amount of its Investment with Foundation, which has not seen any returns.

## COUNT II – VIOLATION OF THE CONNECTICUT SECURITIES ACT, CONN. GEN. STAT. SEC. 36b-29(a) and (c)

225.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

226.    FIH's interest in Foundation, a limited liability company, purchased in four pieces, is an "investment contract" and is therefore governed by the Connecticut Securities Act. Moreover, FIH's interest in Foundation constitutes a certificate of interest and/or participation in a profit-sharing agreement.

227.    Each of the defendants' conduct falls within the ambit of "offer[ing] or sell[ing]" a security, in that the defendants attempted to offer or dispose of or solicited an offer to buy a

security or interest in a security for value, or entered into a contract of sale or disposition of such a security or interest in a security for value.

228.   Defendants made misrepresentations of fact to FIH with the intention of inducing FIH to invest in Foundation.

229.   Foundation and the individual defendants represented to FIH that Foundation was a viable business with the capacity to close on hedge fund targets, which was its only business, because of the contacts, functionality and competence of its leadership.

230.   Foundation and the individual defendants made the following material misrepresentations of fact in the Due Diligence Materials for which they are responsible as corporate insiders:  that "the current representative [Foundation] pipeline … has become increasingly active in recent months."

231.   Barr and Meehan also misrepresented to FIH, in phone calls with its agent, that the two had a professional working relationship.

232.   Finally, Barr made the following misrepresentations to FIH prior to its Investment:

- that Foundation's "pipeline continues to expand with real, immediate deals"; and
- that Barr had no personal issues or background concerns that would threaten FIH's Investment.

233.   Moreover, Barr failed to tell FIH when potential hedge fund GP minority interest investments represented as viable lost their potential for fruition.  Specifically, Barr failed to update FIH regarding his statement that Foundation had a green light to pursue Project Apex and that he believed Foundation could "move expeditiously on this deal" when these characterizations were no longer accurate.

234.     Foundation and the individual defendants made these statements and/or omissions knowing they were contrary to Foundation's actual situation and that they were misrepresentations of existing facts or omissions of material facts.

235.     Thus, Defendants failed to provide FIH with accurate information and misrepresented Foundation's ability to ever actually close the deals it represented it would make because the truth was that Foundation had no leadership, no network, no contacts, no functionality, and therefore had no capacity to close such deals, which were its only objective.

236.     FIH reasonably and justifiably relied on the defendants' misrepresentations and omissions in deciding to invest in Foundation.  The misrepresentations and omissions about Foundation's pipeline, about Meehan's and Barr's deep hatred for each other, and about Barr's threat to the company were not readily verified or disproved and/or were outside FIH's ability to understand and discern.

237.     Had it been told the truth about Foundation's pipeline, its leadership rift, and about Barr – and, essentially, the truth about whether Foundation was ever capable of sourcing the deals it represented it would make – FIH would never have invested in Foundation.

238.     FIH's Investment in Foundation is now worthless as there have been no acquisitions, a function of the misrepresentations and omissions made by the defendants.

239.     Each of the defendants is also liable under Connecticut Securities Act, Sec. 36b-29(c) because each defendant directly or indirectly controls or occupies a similar status, performs similar functions or is a partner of a person liable under Connecticut Securities Act, Sec. 36b-29(a).

240.     As a result of Defendants' material misrepresentations and omissions, which they knew, or in the exercise of reasonable care should have known, to be misrepresentations and omissions, FIH has suffered a loss in the amount of its Investment with Foundation, which has

not seen any returns.  FIH is entitled to recover the consideration paid for its Investment, plus

interest at 8% annually since the date of the Investment, as well as its reasonable attorneys' fees

and costs, or, in the alternative, damages suffered as a result of Defendants' violation of the

Connecticut Securities Act, Sec. 36b-29(a) and (c).

### COUNT III – INTENTIONAL MISREPRESENTATION

241.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

242.    Defendants had a pecuniary interest in FIH's investment in Foundation and

expected to profit from the provision of information to FIH.  As such, Defendants had a duty to

provide accurate information to potential investors such as FIH.

243.    Defendants made material misrepresentations of fact to FIH with the intention of

inducing FIH to invest in Foundation.

244.    Foundation and the individual defendants represented to FIH that Foundation was

a viable business with the capacity to close on hedge fund targets, which was its only business,

because of the contacts, functionality and competence of its leadership.

245.    Foundation and the individual defendants made the following material

misrepresentations of fact in the Due Diligence Materials for which they are responsible as

corporate insiders:  that "the current representative [Foundation] pipeline … has become

increasingly active in recent months."

246.    Barr and Meehan also misrepresented to FIH, in phone calls with its agent, that

the two had a professional working relationship.

247.    Finally, Barr made the following misrepresentations to FIH prior to its

Investment:

- that Foundation's "pipeline continues to expand with real, immediate deals"; and
- that Barr had no personal issues or background concerns that would threaten FIH's Investment.

248.    Moreover, Barr failed to tell FIH when potential hedge fund GP minority interest investments represented as viable lost their potential for fruition.  Specifically, Barr failed to update FIH regarding his statement that Foundation had a green light to pursue Project Apex and that he believed Foundation could "move expeditiously on this deal" when these characterizations were no longer accurate.

249.    Foundation and the individual defendants made these statements and/or omissions knowing they were contrary to Foundation's actual situation and that they were misrepresentations of existing facts or omissions of material facts.

250.    Thus, Defendants failed to provide FIH with accurate information and misrepresented Foundation's ability to ever actually close the deals it represented it would make because the truth was that Foundation had no leadership, no network, no contacts, no functionality, and therefore had no capacity to close such deals, which were its only objective.

251.    Defendants acted with scienter and knew that these statements were false when made.  Each of the individual defendants was in possession of internal documents – including, but not limited to, the Project Activity Logs, which made clear that Foundation had no active pipeline – that demonstrated that the pipeline as presented to FIH in the Due Diligence Materials and in emails by Barr and Meehan was false.  The Project Activity Logs demonstrated that the pipeline had not progressed in the manner represented by the individual defendants.  As such, any statements to the contrary constitute conscious misbehavior and/or recklessness.

252.    The individual defendants' knowledge of the falsity of these representations was conceded.  Meehan and Elmlinger acknowledged that the target list in the Due Diligence Materials "strains credibility."  Moreover, the individual defendants' knowledge about Foundation's non-existent deal pipeline is evident from the March 27, 2014 email exchange between the individual defendants and Hall O'Donnell, wherein the "sorry state" of Foundation's

M&A pipeline, which had been discussed "for months," was addressed, and to which Barr responded that he "kn[e]w." These statements confirm that the individual defendants did not reasonably or genuinely believe, at the time the representations about Foundation's pipeline and prospects were made to FIH, that such representations were true.

253. Barr and Meehan each knew of the falsity of their representation to FIH that they had a professional working relationship, as demonstrated by the documents attached to PROJECT SOOTHSAYER showing their disdain for each other.

254. Finally, Barr had knowledge that his representation to FIH – that there was nothing FIH needed to know about his background or personality prior to investing with Foundation – was false. The statements of belief in PROJECT SOOTHSAYER and the facts as set forth in its accompanying internal emails demonstrate Barr's financial recklessness, his lies, his lack of contacts, and his broken relationship with his partner, Meehan, and it is impossible that Barr did not know of the lies he was telling his colleagues and his investors.

255. FIH reasonably and justifiably relied on defendants' misrepresentations and omissions in deciding to invest in Foundation. Had it been told the truth about Foundation's pipeline and about Barr – and, essentially, the truth about whether Foundation was ever capable of sourcing the deals it represented it would make – FIH would never have invested in Foundation.

256. FIH has suffered damages, including but not limited to, the amount of its Investment in Foundation and its attorneys' fees.

## COUNT IV – FRAUDULENT INDUCEMENT

257. Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

258.     Defendants had a pecuniary interest in FIH's investment in Foundation and expected to profit from the provision of information to FIH.  As such, Defendants had a duty to provide accurate information to potential investors such as FIH.

259.     Defendants made misrepresentations of fact to FIH with the intention of inducing FIH to invest in Foundation.

260.     Foundation and its partners misrepresented the activity of Foundation's deal pipeline and Foundation's capability of sourcing deals.

261.     Barr failed to update FIH regarding deals on which Foundation was said to be "mov[ing] expeditiously."

262.     Barr and Meehan failed to disclose to FIH that they had a deep hatred for each other and could not maintain a professional relationship, even though they were two of the leaders of the small company.

263.     Barr misrepresented to FIH that there was nothing about his background or personality that FIH should know before investing in Foundation – despite his financial recklessness, his propensity to lie, his lack of contacts in the hedge fund space, and his rift with Meehan – and the very real threat these issues posed to Foundation's very viability, let alone success.

264.     Thus, Defendants failed to provide FIH with accurate information and misrepresented Foundation's ability to ever actually close the deals it represented it would make.

265.      Defendants knew that these statements were false when made.  Each of the individual defendants was in possession of internal documents – including, but not limited to, the Project Activity Logs, which made clear that Foundation had no active pipeline – that demonstrated that the pipeline as presented to FIH in the Due Diligence Materials and in emails by Barr and Meehan was false.  The Project Activity Logs demonstrated that the pipeline had not

progressed in the manner represented by the individual defendants.  As such, any statements to the contrary constitute conscious misbehavior and/or recklessness.

266.   The individual defendants' knowledge of the falsity of these representations was conceded.  Meehan and Elmlinger acknowledged that the target list in the Due Diligence Materials "strains credibility."  Moreover, the individual defendants' knowledge about Foundation's non-existent deal pipeline is evident from the March 27, 2014 email exchange between the individual defendants and Hall O'Donnell, wherein the "sorry state" of Foundation's M&A pipeline, which had been discussed "for months," was addressed, and to which Barr responded that he "kn[e]w."  These statements confirm that the individual defendants did not reasonably or genuinely believe, at the time the representations about Foundation's pipeline and prospects were made to FIH, that such representations were true.

267.   Barr and Meehan each knew of the falsity of their representation to FIH that they had a professional working relationship, as demonstrated by the documents attached to PROJECT SOOTHSAYER showing their disdain for each other.

268.   Finally, Barr had knowledge that his representation to FIH – that there was nothing FIH needed to know about his background or personality prior to investing with Foundation – was false.  The statements of belief in PROJECT SOOTHSAYER and the facts as set forth in its accompanying internal emails demonstrate Barr's financial recklessness, his lies, his lack of contacts, and his broken relationship with his partner, Meehan, and it is impossible that Barr did not know of the lies he was telling his colleagues and his investors.

269.   FIH reasonably and justifiably relied on Defendants' misrepresentations and omissions in deciding to invest in Foundation.  Had it been told the truth about Foundation's pipeline and about Barr – and, essentially, the truth about whether Foundation was ever capable

of sourcing the deals it represented it would make – FIH would never have invested in Foundation.

270.    FIH has suffered damages, including but not limited to, the amount of its Investment in Foundation and its attorneys' fees.

### COUNT V - NEGLIGENT MISREPRESENTATION

271.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

272.    Defendants had a pecuniary interest in FIH's investment in Foundation and expected to profit from the provision of information to FIH.  As such, Defendants had a duty to provide accurate information to potential investors such as FIH.

273.    Defendants made misrepresentations of fact to FIH with the intention of inducing FIH to invest in Foundation.

274.    Foundation and the individual defendants represented to FIH that Foundation was a viable business with the capacity to close on hedge fund targets, which was its only business, because of the contacts, functionality and competence of its leadership.

275.    Foundation and the individual defendants made the following material misrepresentations of fact in the Due Diligence Materials for which they are responsible as corporate insiders:  that "the current representative [Foundation] pipeline … has become increasingly active in recent months."

276.    Barr and Meehan also misrepresented to FIH, in phone calls with its agent, that the two had a professional working relationship.

277.    Finally, Barr made the following misrepresentations to FIH prior to its Investment:

- that Foundation's "pipeline continues to expand with real, immediate deals"; and
- that Barr had no personal issues or background concerns that would threaten FIH's Investment.

278.     Moreover, Barr failed to tell FIH when potential hedge fund GP minority interest investments represented as viable lost their potential for fruition.  Specifically, Barr failed to update FIH regarding his statement that Foundation had a green light to pursue Project Apex and that he believed Foundation could "move expeditiously on this deal" when these characterizations were no longer accurate.

279.     Defendants failed to exercise reasonable care in making these statements and omitting this material information.  Foundation's own internal documents and the admissions in PROJECT SOOTHSAYER make clear that Foundation's pipeline was not "increasingly active." And the emails attached to PROJECT SOOTHSAYER make clear that Barr and Meehan did not have a professional working relationship.

280.     Moreover, Barr failed to exercise reasonable care in conveying to FIH that there was nothing about his personality or background of which FIH should be concerned prior to investing in Foundation.  Internal emails demonstrate Barr's financial recklessness, his lies, his lack of contacts, and his broken relationship with his partner Meehan – and the individual defendants frequently discussed these issues.  Meehan and Elmlinger even documented all of these beliefs in PROJECT SOOTHSAYER.

281.     Defendants failed to exercise reasonable care in communicating this information to FIH, given that, as corporate insiders and/or authors of PROJECT SOOTHSAYER, they had access to the information and knowledge of the incidents which exposed the falsity of these representations to FIH.

282.     FIH reasonably and justifiably relied on this information in deciding to invest in Foundation.  Had it been told the truth about Foundation's pipeline and about Barr – and, essentially, the truth about whether Foundation was ever capable of sourcing the deals it represented it would make – FIH would never have invested in Foundation.

283.     FIH has suffered damages, including but not limited to, the amount of its Investment in Foundation and its attorneys' fees.

## COUNT VI – UNJUST ENRICHMENT

284.     Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

285.     Foundation – and, as a result, the individual defendants – was enriched as a result of FIH's infusion of cash.  Conversely, FIH was impoverished as a result of its Investment in Foundation.

286.     Foundation and its partners appreciated this benefit.

287.     Given the materially false representations and promises made by Foundation's partners – who knew of the falsity of their statements, or who at minimum recklessly disregarded the truth of their statements – which induced FIH to make its Investment, it would be inequitable for Foundation to retain the benefit.


WHEREFORE, Plaintiff demands:  (a) judgment in an amount to be determined at trial, plus applicable interest, and including its reasonable attorneys' fees and costs; (b) rescission of its Investment; and (c) such other and further relief as the Court may deem just and proper.


Dated: May 10, 2016

By:  */s/ James I. Glasser*
James I. Glasser  (ct07221)
Kevin M. Smith (ct24774)
**Wiggin and Dana LLP**
One Century Tower
265 Church Street, P.O. Box 1832
New Haven, CT  06508-1832
Tel: (203) 498-4313
Fax: (203) 782-2889
E-mail:  jglasser@wiggin.com

ksmith@wiggin.com
-and-
B r i a n   F l a h e r t y      (admitted *pro hac vice*)
**Cozen O'Connor**
1 6 5 0   M a r k e t   Street
Philadelphia, PA   19103
Tel: 2 1 5 - 6 6 5 - 4 6 4 7
Fax: 2 1 5 - 6 6 5 - 2 0 1 3
E-mail:  BFlaherty@cozen.com
-and-
T a m a r   S .   W i s e      (admitted *pro hac vice*)
**Cozen O'Connor**
277 Park Avenue
New York, New York  10172
Tel:  212-883-4924
Fax:  646-461-2054
E-mail: TWise@cozen.com

*Attorneys for Plaintiff FIH, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2016, a copy of the foregoing Second Amended

Complaint was filed electronically and will be served by mail on anyone unable to accept

electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the

Court's electronic filing system or by mail to anyone unable to accept electronic filing as

indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's

CM/ECF System.


*/s/ James I. Glasser*
James I. Glasser