# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FIH, LLC, | Civil No. 3:15-cv-785 (JBA) |
| *Plaintiff,* | |
| *v.* | January 31, 2018 |
| FOUNDATION CAPITAL PARTNERS LLC, f/k/a FOUNDATION MANAGING MEMBER LLC; DEAN BARR; JOSEPH MEEHAN; THOMAS WARD; and JOSEPH ELMLINGER, | |
| *Defendants.* | |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

In this action for violation of § 10(b) of the Securities Exchange Act of 1934, the Connecticut Securities Act, and related state common law claims, Plaintiff moves [Doc. # 174] for summary judgment on all claims related to one set of alleged affirmative misrepresentations, and Defendants cross-move [Doc. ## 173, 176, 178, 179] for summary judgment on all claims. For the reasons set forth below, the Court DENIES Plaintiff's Motion for Summary Judgment as to Defendants' February 3, 2014 pipeline statements, and GRANTS Defendants' Motions for Summary Judgment as to Plaintiff's federal claim. The Court declines to continue to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims, which are dismissed for lack of subject matter jurisdiction.

# I.    Background

*Second Amended Complaint Allegations*

Plaintiff filed its Second Amended Complaint on May 10, 2016 ("SAC" [Doc. # 88].) The SAC alleges that Plaintiff FIH, "[i]n reliance upon Foundation's and the individual defendants' representations . . . purchased $6.75 million worth of interests in Foundation[.]" (*Id.* at 2.) According to the SAC, the individual defendants "misrepresented Foundation's prospects and management[]" by knowingly misrepresenting that "Foundation was capable with its then-existing management of making three to four investments a year in hedge fund GP [general partner] interests." (*Id.*) The SAC alleges that in fact, "[e]ach defendant knew that Foundation had not been making any progress towards closing on hedge fund GP targets" and also knew that this would not change due to Defendant Dean Barr's incompetence, financial irresponsibility, lack of contacts to develop leads, and "functional inability to tell the truth[,]" combined with Barr's family feud with Defendant Meehan. (*Id.* at 2-3 (internal quotation marks omitted).) Barr and Meehan were the founders of Foundation and were married to sisters, but had developed a "dysfunctional rift and animus" related to Barr's failing marriage. (*Id.* at 3.)

Defendant Dean Barr was the managing partner and managing principal of Foundation. (*Id.* at 5.) Defendant Joseph Meehan was a partner, managing principal, and the Chief Operating Officer. (*Id.*) Defendant Thomas Ward was a partner, principal, manager, and Head of Distribution. (*Id.*) Defendant Joseph Elmlinger was a partner, principal, and Head of Risk and Structuring. (*Id.*)

In February 2014, Foundation made available Due Diligence Materials to FIH that "cited fourteen specific targets delineated by their code names: Projects Lake, Apex, Corvette, Granite, Breakout, Pilot, Centaur, Pound, Tensor, Mainstay, Yale, Halo, Gun, and Bronco[]" and that

"represented that non-disclosure agreements had been signed with the target hedge funds in Projects Lake and Granite." (*Id.* at 14.) The February Due Diligence materials, in a section entitled "Investment Pipeline" list the projects, with the following introductory description: "Below is the current representative FCP pipeline, including those with which the firm is in active discussions. This pipeline has become increasingly active in recent months as a result of industry recovery, manager interest, regulatory reform and the presence of relatively few potential buyers." (Ex. B to SAC [Doc. # 89-1 at 33].)

One of the pipeline items listed is "Project Apex." (*Id.*) On January 22, 2014, Defendant Barr had "emailed FIH an update on Project Apex and represented, 'I believe we can move expeditiously on this deal.'" (SAC ¶ 73.) On February 3, 2014, Barr also wrote in an email to FIH that "[o]ur pipeline continues to expand with real [and] immediate deals." (*Id.* ¶ 74.)

The SAC alleges that "on at least two occasions, FIH's agent asked both Barr and Meehan— the two most senior people in Foundation's leadership—if their relationship as brothers in law, especially in light of Barr's divorce from Meehan's wife's sister, posed a threat to their ability to work together." (*Id.* ¶ 83.) According to the SAC, "[e]ach answered unequivocally no, and each insisted that they could maintain a professional relationship with the other[,]" with "Barr ma[king] this representation in a phone call with FIH's representative on December 5, 2013[,]" and "Meehan mak[ing] this representation in a separate phone call with FIH's representative" on the same day. (*Id.* ¶ 84.) FIH contends that "[a]t the time the statements were made, [Barr and Meehan] had a deep hatred for each other that made Foundation's leadership dysfunctional[,]" and that "their relationship was so hostile that Meehan stated, only a couple of weeks after FIH's Investment was finalized, that he was 'unlikely to stay' at Foundation under the current leadership model[,] [b]ut Meehan did not make this known to FIH prior to its Investment." (*Id.* ¶ 89.)

Finally, the SAC alleges that Barr falsely told FIH that there were no concerns to be had about him, including about his background or personality, before FIH invested their money in Foundation.[1] (*Id.* ¶ 91.)

FIH alleges that after completing their investment in Foundation, "[t]he dismal truth about Foundation's deal pipeline was revealed" by the disclosure of "internal Foundation documents entitled 'Project Activity Logs.'" (SAC ¶ 143.) Project Activity logs "were internal documents which listed hedge fund targets in Foundation's pipeline under three categories: Live Deals, Prospects, and Dead Projects." (*Id.*) "For each hedge fund target, the Project Activity Log was updated to reflect progress in columns named 'recent activity/notes,' 'next steps' and 'process milestones.' " (*Id.*) According to the SAC, "[t]he Project Activity Logs served as an internal diary of the progress made by Foundation on each of the targets to date and . . . were distributed to Foundation's employees – including the individual defendants – for discussion at weekly meetings to discuss movement on the pipeline as demonstrated in the Project Activity Logs." (*Id.*) The SAC alleges that "FIH did not have access to the Project Activity Logs until after the Investment had been made[:] The first version [FIH] received was on March 4, 2014 and was dated March 3, 2014, and this version included historical information on all of Foundation's prospects up to that date." (*Id.*

---

[1] The Court allowed this claim to proceed after the Motions to Dismiss. (*See* Order Granting Mot. Reconsideration at 4.) But the SAC also alleges that the other three individual Defendants were responsible for failing to correct Barr's false statements to FIH related to Barr's fitness for the job and for failing to disclose their concerns about Barr. (*See* SAC ¶ 90-107.) The SAC also faults Meehan and Elmlinger for "assur[ing] FIH's representative that there were strong spending controls in place" at a dinner in Greenwich on February 20, 2014, at which they told FIH that they were "'the control room[,]'" that "'[n]othing happens without us[,]'" and that they would "'not spend your money foolishly.'" (*Id.* ¶ 99-101.) The Court dismissed any claims based on these statements by Meehan and Elmlinger, along with any other alleged omissions to this effect by Meehan, Elmlinger, or Ward. (*See* Order on Mot. to Dismiss [Doc. # 63] at 52-53.)

¶ 144.) FIH contends that the Project Activity Logs "demonstrated the falsity of the specific target representations made by the individual defendants." (*Id.* ¶ 147.)

Similarly, FIH alleges that after its investment was finalized, the "truth [came] out" regarding Foundation's leadership rift and the threats that Barr posed to the company. (*Id.* ¶ 166-93.)

The SAC includes six counts, as follows:

- COUNT I - VIOLATION OF § 10(b) of the SECURITIES EXCHANGE ACT OF 1934

- COUNT II – VIOLATION OF THE CONNECTICUT SECURITIES ACT, CONN. GEN. STAT. SEC. 36b-29(a) and (c)

- COUNT III – INTENTIONAL MISREPRESENTATION

- COUNT IV – FRAUDULENT INDUCEMENT

- COUNT V - NEGLIGENT MISREPRESENTATION

- COUNT VI – UNJUST ENRICHMENT

Counts I, III, and IV require a showing of scienter, while Counts II and V require showing only negligence. The following charts show the alleged false statements and counts remaining in the case after the Order on the Motion to Dismiss and the Order Granting Motion for Reconsideration [Doc. # 77]:

**Alleged False Statements Remaining After Order on Motion to Dismiss**

| Alleged False Statement | Party(ies) Claim Asserted Against |
|---|---|
| 1. Statement in February Due Diligence Materials that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months" | Barr, Meehan, Elmlinger, Ward |
| 2. Barr/Meehan statement that their relationship with one another posed no threat to their ability to work together | Barr, Meehan |
| 3. Barr failure to update FIH regarding his statement that Foundation had a green light to pursue Project Apex and he believed Foundation could "move expeditiously on this deal" <br><br> 4. Barr statement that "[o]ur pipeline continues to expand with real, immediate deals" <br><br> 5. Barr statement that there was nothing "FIH needed to know about [his] background or personality" and no other matters concerning him that FIH should know about before proceeding with an investment | Barr |

**Claims and Parties Asserted Against**

| Claim | Asserted Against |
|---|---|
| Count I: Violation of § 10(b) of the Exchange Act (scienter) | • All Defendants (as to Statement 1, above) <br> • Barr and Meehan (as to Statement 2, above) <br> • Barr only (as to Statements 3-5, above) |
| Count II: Violation of the Connecticut Securities Act (negligence) | • All Defendants (as to Statement 1, above) <br> • Barr and Meehan (as to Statement 2, above) <br> • Barr only (as to Statements 3-5, above) |
| Count III: Intentional Misrepresentation (scienter) | • All Defendants (as to Statement 1, above) <br> • Barr and Meehan (as to Statement 2, above) <br> • Barr only (as to Statements 3-5, above) |
| Count IV: Fraudulent Inducement (scienter) | • All Defendants (as to Statement 1, above) <br> • Barr and Meehan (as to Statement 2, above) <br> • Barr only (as to Statements 3-5, above) |
| Count V: Negligent Misrepresentation (negligence) | • All Defendants (as to Statement 1, above) <br> • Barr and Meehan (as to Statement 2, above) <br> • Barr only (as to Statements 3-5, above) |
| Count VI: Unjust Enrichment | • All Defendants |

*Expert Discovery Dispute*

On September 26, 2016, less than a month before the then-scheduled close of discovery date, the Court conducted a telephonic status conference ([Doc. # 134]) that had originally been scheduled as a pre-filing conference. Two weeks prior to the status conference, Defendant Meehan, with the consent of all parties, moved to extend the discovery deadline and the deadline for filing dispositive motions forward 60 days, explaining that the "parties have scheduled seven (7) depositions through the end of October[,]" "responses to various third party subpoenas remain outstanding[,]" and "based on responses to said third party subpoenas, more depositions are likely to be scheduled in this matter." (Consent Mot. for Extension of Time [Doc. # 130].) Discovery had been scheduled to close on October 17, 2016, and Defendant Meehan, on consent of all parties, thus requested that discovery be extended through December 16, 2016. (*Id.*)

At the September 26, 2016 status conference, the Court and the parties discussed the reasons necessitating the extension of the discovery deadline, and the Court specifically inquired whether it was still the case that no parties anticipated using experts. (Transcript of September 26, 2016 Telephonic Status Conference, Ex. H to Barr Supp. Aff. [Doc. # 182-8] at 7.) Plaintiff's counsel stated "I believe that's true your Honor, for us, speaking for the plaintiff." (*Id.*) Counsel for Defendant Meehan stated that for his part, "[t]hat may not be true any longer[,]" noting that "[w]e may have an expert on the issue of reasonable reliance on the part of the plaintiff as a sophisticated investor[]" and that "we're still grappling [with] whether we want one." (*Id.* at 7-8.) In response, the Court noted that "if discovery is to be completed by [the extended deadline of] December 16th, that includes deposition of your expert. If that includes deposition of your expert, you're going to have to serve your expert report by mid November." (*Id.* at 8.) Counsel for Defendant Meehan

requested additional time for expert disclosure and deposition, which the Court expressly denied. (*Id.* at 8-9.) As the Court noted:

> I don't think that's going to work. I'm looking at your motion that says that this is - - you want 60 days, up to and including December 16th. And that's what I'm prepared to give. But I'm not prepared to have you run in an expert at the last minute that's going to postpone the rest of the schedule because the dispositive motions have to be filed by January 14th."

(*Id.* at 9.) The following day, pursuant to that colloquy with counsel on the record, the Court granted the Consent Motion for Extension of Time and issued a "final Scheduling Order" that provided that "[a]ll discovery, including any expert discovery, will be completed by 12/16/16." (September 27, 2016 Scheduling Order [Doc. # 135].)

On November 21, 2016, counsel for FIH withdrew their appearance, and on November 29, 2016, FIH's current counsel entered their appearance. ([Doc. ## 139, 144.]) On December 12, 2016, Plaintiff moved, with consent of all parties, for an extension of time that would move the close of discovery from December 16, 2016 to January 23, 2017, with a corresponding change in the deadline for the filing of dispositive motions and change in the trial ready date. ([Doc. # 149].) The motion made no mention of Plaintiff's or any other party's intention to disclose any experts, but under the Court's instructions on the record of September 26, 2016, the deadline to do so had already passed a month previously. On the same date as the motion for extension of time, the parties filed a joint status report, which similarly omitted any reference to any party's intention to disclose experts. ([Doc. # 150].) The following day, the Court granted the motion for extension of time. ([Doc. # 151].) Discovery closed on January 23, 2017.

On January 24, 2017, Defendant Ward e-filed a letter, labeled as a "Notice," requesting a telephonic status conference relating to expert discovery. (Ward Letter Regarding Late Expert

Disclosure (hereinafter "Ward Letter") [Doc. # 160 at 1].) Ward noted that "[d]uring the status conference on September 26, 2016, [the Court] asked whether any of the parties intended to utilize expert witnesses." (*Id.*) "Plaintiff's counsel stated that Plaintiff had no such intention." (*Id.*) The Court then "imposed a deadline of mid-November 2016 for the disclosure of expert reports, if any[,]" and "[n]one of the parties disclosed experts by the Court-ordered deadline." (*Id.*) Ward continues:

> On December 12, 2016, Plaintiff filed a Consent Motion for Extension of Time seeking to extend the discovery deadline from December 16, 2016 to January 23, 2017. Plaintiff's counsel made no reference whatsoever to the disclosure of an expert during scheduling discussions or in the Consent Motion. Similarly, Plaintiff did not raise the issue of expert disclosure during the telephonic conference with the Court on December 14, 2016.

> At 11:52 PM last night, eight (8) minutes prior to the expiration of the discovery deadline, Plaintiff served an expert report on all defendants. According to the disclosure, Plaintiff's expert will testify on the elements of materiality and reasonable reliance, both of which have been elements of Plaintiff's claims and, in turn, Defendants' affirmative defenses, since the inception of this case. Defendants object to this expert disclosure as untimely both because it was served after the mid-November 2016 deadline for expert disclosure and because it was served just minutes prior to the close of all discovery, thus making it impossible for Plaintiff's proposed expert to be deposed prior to the deadline for the completion of all discovery.

(*Id.* at 1-2.) Plaintiff responded that the operative Scheduling Order stated that "All discovery, including expert discovery, will be completed by 12/16/16" and that "[n]o 'mid-November' deadline appears in the Order." (Pl.'s Resp. to Ward Letter [Doc. # 161 at 1].) Plaintiff asserts in a footnote that "FIH's current counsel first appeared in this case on November 21, 2016, and is not aware of any mid-November deadline being imposed" for expert discovery but "acted in good faith by notifying Defendants of FIH's intent to identify an expert less than 60 days after appearing."

(*Id.* at 1 n.1.) Second, Plaintiff notes that the consent motion to move the discovery deadline from December 2016 to January 2017 calls for moving the deadline for "'[a]ll discovery, *including expert discovery*[,]'" such that "the agreed-upon schedule called for expert discovery through January 23." (*Id.* at 1.) Third, Plaintiff notes that "FIH notified Defendants in its December 7, 2016 Responses and Objections to document requests that Plaintiff was still 'decid[ing]' whether or not 'to use any expert witness' and, if so, would make 'Rule 26(a)(2)' disclosures[,]" and that "Defendants did not object at that time." (*Id.*) Similarly, Plaintiff notes that on January 19, 2017, "FIH also notified Defendants . . . that 'Plaintiff . . . intends to imminently identify an expert witness for this action,' and asked to 'discuss a schedule' for Defendants to 'provide a rebuttal expert and/or conduct' a deposition." (*Id.* at 1-2.) Finally, Plaintiff notes that the parties had already agreed that "several other discovery items [were] going forward beyond January 23, 2017" such that "Defendants' position essentially amounts to claiming that FIH should be precluded from providing an expert report *before* discovery closes, even as substantial fact discovery is proceeding *after* the discovery deadline." (*Id.* at 2.) The parties contest, in the cross-motions for summary judgment, whether Plaintiff's expert report should be considered as part of the record on the motions or not.

*The Instant Motions for Summary Judgment*

On March 13, 2017, Plaintiff filed a Motion for Summary Judgment as to Defendants' February 3, 2014 pipeline statements, and Defendants cross-moved for Summary Judgment against Plaintiff on all claims and counts. (Plaintiff's Mot. for Summary Judgment [Doc. # 174], Ward Mot. for Summary Judgment [Doc. # 173], Elmlinger Mot. for Summary Judgment [Doc. # 176], Barr Mot. for Summary Judgment [Doc. # 178], Meehan Mot. for Summary Judgment [Doc. # 179].)

**The Summary Judgment Record**

In the following section, the Court summarizes the deposition testimony and the contract at issue that together reflect the relevant portions of the factual record upon which the Court relies in this decision on the cross-motions for summary judgment.

*Nesanel Milstein's Deposition Testimony*

Lazer Milstein is the son of the co-founders of Burlington Coat Factory who was one of four shareholders in the company at the time of its sale for approximately $1.3 billion. (Ex. 8 (Nesanel Milstein Dep.) to Defs' Joint Loc. R. 56a(1) Stmt [Doc. # 72-9] at 11:23-12:25.) Lazer Milstein's son Nesanel Milstein began working for Lazer after November 2006, first for "an LLC called Nameah Holdings; and subsequent to that it was an S Corp., MFI Management." (*Id.* at 7:1-10.) The business of Nameah Holdings was "to help [Lazer Milstein] with investments" and tax-management. (*Id.* at 7:11-13.) Nesanel worked at Nameah Holdings from the "beginning of 2007 until around 2010[,]" where Nesanel and Nameah both "provide[d] advice or support" to Lazer, and where Nesanel "looked at investments for [Lazer]" and "helped [Lazer] in evaluating investments that he had[.]" (*Id.* at 8:5-25.) During this period, Nameah itself did not make investments, but Lazer made investments in "a hedge fund to fund" and a "private equity fund to fund[,]" which were Blackstone Strategic Advisor fund and McKenna Capital, respectively. (*Id.* at 9:2-25.) Lazer made a $10 million investment in the Blackstone fund, and invested in two separate private equity funds controlled by McKenna Capital, in the amounts of $10 million and $3 million. (*Id.* at 9:17-21, 10:4-9.) Nesanel analyzed these investments for his father and provided Lazer with his "view on these investments." (*Id.* at 10:10-15.) After working at Nameah Holdings, Nesanel did similar work for MFI Management, another vehicle for advising Lazer on investments. (*Id.* at 10:25-11:10.)

FIH, LLC is "a limited liability company that was created to invest in Foundation Capital to the general partner." (*Id.* at 13:1-4.) FIH stands for "Foundation Investment Holding" and is owned by LAZ May 10, LLC, which is owned by LAZN 510 LLC. (*Id.* at 13:7-19.) LAZN 510 LLC is owned by Lazer (who holds all of the "A membership units") and by Nesanel and his two brothers Asher and Elisha (the three of whom own "B membership interests"). (*Id.* at 13:20-14:22.) According to Nesanel, Lazer has "sole management authority for FIH" and FIH's decision making process consists of "a discussion with my father and based on information and work that Greg [Dyra] and I had done, it was basically a synopsis of what we thought about the investment and whether to make the investment." (*Id.* at 15:13-16:3.)

In connection with deciding whether to make an investment with Foundation, two individuals "evaluated investments" for FIH—Nesanel, and a contractor for FIH, Greg Dyra, whom Nesanel hired "as a consultant specifically to focus on investments and other things that may come up." (*Id.* at 17:16-24.) Dyra "helped MFI to advise [Lazer] with respect to the decision whether or not to invest in Foundation[.]" (*Id.* at 18:16-19.) In connection with its investment in Foundation, FIH also consulted with attorneys at Cozen & O'Connor. (*Id.* at 19:2-15.) Nesanel testified that he considered his father, Lazer, to be a person "who has sufficient investing experience and knowledge to weigh the risks and merits of an investment opportunity" and that he considered himself "knowledgeable in certain investments, in certain areas of investment[,]" including in hedge funds. (*Id.* at 20:24-21:16.) Nesanel also testified that his brother Asher has investing experience and that he "think[s]" Asher has sufficient investing experience and knowledge to weigh the risk and merits of an investment opportunity, but that his brother Elisha lacks such experience and knowledge to be sufficient at weighing the risks and merits of an investment

opportunity. (*Id.* at 22:19-23:6.) Nesanel also agreed that at the time FIH made its investment in Foundation, he and his father Lazer were sophisticated investors. (*Id.* at 61:10-13.)

*Greg Dyra's Deposition Testimony*

Greg Dyra testified that he had "institutional experience as an analyst and an investor on behalf of endowments" and that he had personally invested in a private equity firm approximately 20 years previously. (Ex. 7 (Dyra Dep.) to Defs' Joint Loc. R. 56a(1) Stmt [Doc. # 72-8] at 7:17-8:18.) As an investor working on behalf of endowments, private equity funds were not Dyra's sole focus—he was a "generalist analyst" who "worked at a lot of different investments" including "stocks, bonds, hedge funds[,]" private real estate, and real estate investment trusts. (*Id.* at 8:15-9:10.) Dyra was "the point man" for "doing due diligence" on "FIH's investment in" Foundation. (*Id.* at 14:10-12.) Including both investments made on behalf of an institution and personal investments, Dyra has "invested in North America in every asset class and some investments outside of North America." (*Id.* at 17:4-17.) Prior to advising FIH on its potential investment in Foundation, Dyra had, "either on an institutional basis or individual basis or co-investment basis[] invested in 50 to 100 different deals[,]" "most of those professional." (*Id.* at 17:18-18:2.) Prior to November 2013 and his due diligence review of Foundation, Dyra had "looked at a lot" of potential deals on behalf of the Milsteins, conducting due diligence on potential investments including hedge funds, loan only equity managers and municipal bonds, bond managers, venture capital, private equity, and real estate deals. (*Id.* at 26:15-27:19.) Altogether, on behalf of the Milsteins, Dyra had "looked at" over 100 potential deals between 2003 and 2006. (*Id.* at 27:9-24.)

Dyra testified that he moved to Tennessee from Connecticut twelve years prior to his 2016 deposition. (*Id.* at 27:25-28:5.) In Connecticut, Dyra worked for three years at a "fund to funds[,]" which he defined as "a commingled pool of assets like a mutual fund[,] [b]ut unlike a mutual fund

which invest in stocks, a fund to fund invests in multiple hedge funds." (*Id.* at 28:6-13.) A fund to funds generally invests as a limited partner in other funds, whereas Foundation Capital Partners allowed FIH to invest as a general partner in Foundation. (*Id.* at 28:14-22.) Fund to funds may, however invest in the general partner of other funds. (*Id.* at 28:20-24.) At the fund to funds, Dyra thinks his title was "director of research[,]" and he was an executive with research responsibility who had input in investment decisions. (*Id.* at 28:25-29:20.) Dyra acknowledged that prior to Foundation Capital Partners, he had a fair amount of experience in investing in both hedge funds and private equity funds. (*Id.* at 30:2-7.)

In addition to his work at the Connecticut fund to funds ("Mistral"), Dyra also worked at a fund of hedge funds named New Legacy where he analyzed prospective investments and made investment recommendations. (*Id.* at 35:8-36:5.) Before that, Dyra worked at Vanderbilt University as an assistant treasurer, where he made investment recommendations, analyzed investments at Vanderbilt, and analyzed hedge funds, while having "some involvement with private equity[.]" (*Id.* at 36:6-37:6.) Before Vanderbilt, Dyra worked as an investment analyst at Northwestern University, where he "ran the spreadsheet that modeled the three inputs for [the asset allocation] model. Returns, risk and correlation." (*Id.* at 37:7-15.) Dyra conceded that "alternative investments" and "hedge funds" were some of his "top skills" and that private equity was another of his skills. (*Id.* at 38:24-40:3.)

*The Contract at Issue*

On February 11, 2014, FIH LLC and Foundation Managing Member LLC executed the "Foundation Managing Member LLC Subscription Agreement" (the "Subscription Agreement").[2] (Ex. 4 (Subscription Agreement and LLC Agreement) to Defs' Rule 56.1(A)(1) Stmt. Supp. of Defs' Mot. for Summary Judgment [Doc. # 172-5] at 1, 4.)

The Subscription Agreement defines FIH as the "Subscriber" and Foundation Managing Member LLC as the "Company" and provides that FIH "tenders this subscription for a membership interest in the Company on the terms and subject to the conditions set forth in the Company Agreement (as defined below) as amended through the Seventh Amendment to the Company Agreement dated as of the date of this Subscription Agreement[.]" (*Id.* at 1.) The Subscription Agreement is divided into two primary sections: "Representations and Warranties of the Subscriber" and "Representations and Warranties of the Company." (*Id.* at 1-3.)

The first section, "Representations and Warranties of the Subscriber[,]" recites in paragraph (f) the following:

> The Subscriber has such knowledge and experience in financial and business matters that the Subscriber is capable of evaluating the merits and risks of an investment in the Interest, and of making an informed investment decision, and the Subscriber has consulted and relied solely upon the advice of its own counsel, accountant and other advisers with regard to such legal, investment, tax and other considerations regarding such investment and on that basis believes that an investment in an Interest is suitable and appropriate for such Subscriber. The Subscriber has had, either individually or through its duly authorized officers, employees or agents, an opportunity to (i) ask questions of and receive answers from the Company and its management concerning the terms and conditions of

---

[2] Later the same month, the parties executed a second subscription agreement and LLC agreement which do not differ substantively from this first subscription agreement, so the Court analyzes and cites to only the first subscription agreement and LLC agreement.

the Interests and the proposed operation of the Company and (ii) obtain information necessary to verify the accuracy of the information provided.

(*Id.* at 2.) The second section, "Representations and Warranties of the Company[,]" states that

The Company hereby represents and warrants to, and agrees with, the Subscriber that (a) attached hereto as Exhibit A is a true and correct copy of the Company Agreement that has been conformed to reflect all amendments to the Company Agreement through the Seventh Amendment to the Company Agreement dated as of the date of this Subscription Agreement and (b) the salary of each Managing Principal in 2014 will not exceed the amount set forth with respect to that Managing Principal in Exhibit B attached hereto.

(*Id.* at 3.) Exhibit A, the Company Agreement (hereinafter the "LLC Agreement"), is a 59-page document that contains eleven separate articles and four additional schedules. The articles delineate (1) the name, purpose, and principal office of the company, (2) the term and events causing dissolution, (3) the members, and admission of additional members, (4) management, duties and restrictions, and compensation, (5) contributions, liability, and capital accounts, (6) allocations of profit and loss, and expenses, (7) distributions, (8) transfer of interests, right of first refusal, and withdrawal, (9) dissolution and liquidation of the company, (10) financial accounting and reports, confidentiality, and outside activities, and (11) a catch-all article for additional provisions not covered by one of the ten previous articles. (*Id.* at 7-8.) Schedule 3.1 sets forth the members and economic interest holders, Schedule 3.3 establishes the equity conversion ratio, Schedule 4.1 lays out management percentages, and Schedule 11.14, a "consent of spouse" form. (*Id.* at 8-9.) Exhibit B is titled "Partner Salary Budget 2014" and lists a "partner roster" with base salary, deferred salary portion, and revised salary for Defendants Barr, Meehan, Elmlinger, and Ward. (*Id.* at 67.) The document states that "[p]artner salary deferral remains in place for each Partner until such time that a deal to purchase a Hedge Fund Manager's General Partnership has

closed." (*Id.*) "Upon the closing of the first deal to purchase a Hedge Fund Manager's General Partnership interest, a retroactive adjustment will be paid to each partner so that his base salary will be whole for the deferral period." (*Id.*)

Article III of the LLC Agreement covers members and the admission of additional members, and carves out the following specific guarantee for FIH:

> If any issuance of a Membership Interest pursuant to Section 3.2(a) would result in the Percentage Interest held by FIH immediately following such issuance to be less than the maximum Percentage Interest held by FIH at any time prior to such issuance (as adjusted for redemptions, if any), then the Managing Principals will notify the Members of the material terms, conditions, and timing of the proposed issuance and each Member may, within twenty (20) days of such Member's receipt of such notice, elect (by delivering written notice of such election to the Managing Principal) to participate in the proposed issuance on such terms and conditions in such amount as necessary to allow such Member to maintain its Percentage Interest in the Company immediately prior to such issuance; provided that, for clarification, this Section 3 2(b) shall not apply with respect to any Membership Interest or Economic Interest issued by the Company (1) to an employee of the Company or (ii) pursuant to Section 3.3, 3.4, 3.5, 3.6, or 3.7.

(*Id.* at 22-23.) Article III also provides that "following the admission of FIH as a Member, the Company shall not issue any additional Convertible Notes without the prior written consent of FIH." (*Id.* at 23.) Finally Article III also contains a provision regarding new ventures undertaken by Defendants Barr and Meehan,[3] in a section entitled "Participation in Other Vehicles":

> If one or both of the Managing Principals form or participate in the formation of a new entity for the purpose of serving as the general partner or managing member of an investment vehicle other than the Fund (or other entity that will receive the management fees and/or carried interest in that investment vehicle) with an investment strategy similar to that of the Fund, then the Managing Principals shall cause such new entity to issue interests to Bancroft and FIH in an aggregate amount

---

[3] The LLC Agreement defines "Managing Principals" to mean Dean Barr and Joseph Meehan. (*Id.* at 18.)

representing a 25% interest in such new entity (to be issued to Bancroft and FIH pro rata in accordance with their respective Percentage Interests at the time of such issuance or, if such issuance occurs following the Company's dissolution, their respective Percentage Interests at the time of the Company's dissolution); provided that any interest in a new entity issued to Bancroft or FIH pursuant to this Section 3.9 shall otherwise be on substantially the same economic terms as the Membership Interest in the Company held by Bancroft or FIH, as applicable; provided further that each of Bancroft and FIH may elect instead to participate on substantially the same economic terms as any other investor in such new entity (other than (x) the economic terms relating to an interest held by a Managing Principal or an employee of such entity or (y) the economic terms relating to any interest issued pursuant to this Section 3.9).

(*Id.* at 28-29.) Article VIII governs transfers of interests, right of first refusal, and withdrawal, and provides in relevant part that prior to a Managing Principal transferring more than 25% of his interest, that Managing Principal "will notify" FIH and two other specific members, who have the right to "tag-along" in the transaction in a specified proportional amount. (*Id.* at 44.)

Article XI contains a number of additional provisions, including paragraph 11.8, "Amendment Procedure[,]" which specifically provides that the LLC Agreement cannot be amended in a way that would "alter or waive the economic, management or other material rights of FIH under this Agreement without the prior written consent of FIH." (*Id.* at 51-52.)

Paragraph 11.9 is entitled "Entire Agreement" and provides that "[t]his Agreement constitutes the entire agreement of the Members and supersedes all prior agreements among the Members with respect to the subject matter hereof, including the Original Agreement[.]" (*Id.* at 52.)

## II.    Discussion

*Legal Standard*

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

*Expert Discovery Dispute*

As a preliminary matter, as described above, the parties contest whether Plaintiff's expert report should be considered as part of the record on the cross-motions for summary judgment. The Court instructed on the record on September 26, 2016 that any expert reports must be disclosed by mid-November, which would have allowed approximately 30 days for expert deposition prior to the then-scheduled close of discovery. ([Doc. # 182-8] at 8-9.) At the time that Plaintiff's substitution of counsel was made, the deadline for disclosing expert reports had thus already passed. Once the substitution of counsel was made, Plaintiff's substitute counsel could have

moved the Court to extend the deadline for disclosing expert reports, upon a showing of good cause, *see* Fed. R. Civ. P. 16(b)(4), but did not do so. Indeed, neither Plaintiff's motion for extension of time, nor the parties' joint status report, both filed on December 12, 2016, made any reference to any party's intention to disclose experts. ([Doc. ## 149, 150].) Plaintiff did not disclose its expert until 11:52 p.m. on January 23, 2017, the day discovery closed. (Ward Letter at 1-2.)

Plaintiff asserted that "FIH's current counsel first appeared in this case on November 21, 2016, and [were] not aware of any mid-November deadline being imposed" for expert discovery. (Pl.'s Resp. to Ward Letter at 1 n.1). While the Court has no reason to doubt Plaintiff's counsel's representation that it was unaware of this deadline, Plaintiff's counsel is charged with knowledge of the Court's instructions to the parties on the record, which were made at a teleconference attended by Plaintiff's prior counsel. As explained in Fed. R. Civ. P. 16(b)(3), the scheduling orders issued by district courts are permitted to memorialize the more granular details of pre-trial and discovery scheduling where appropriate but are only required to "limit the time to join other parties, amend the pleadings, complete discovery, and file motions." *Compare* Fed. R. Civ. P. 16(b)(3)(A) ("Required Contents") *with* Fed. R. Civ. P. 16(b)(3)(B) ("Permitted Contents.") Accordingly, the fact that not every detail of the schedule put on the record at the teleconference was included in the subsequently-issued scheduling order is immaterial.

The deadline had already been missed when Plaintiff's counsel was substituted, but had Plaintiff's substitute counsel given the Court any indication whatsoever that it was considering disclosing an expert, the Court could have decided at that time while discovery was still open whether there was good cause to permit the untimely expert disclosure, given the likely delay that would entail to the dispositive motion briefing and trial-ready dates. *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."); Fed. R. Civ. P.

6(b)(1)(B) ("When an act may or must be done within a specified time, the court may, for good cause extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect."); Fed. R. Civ. P. 29(b) ("a stipulation extending the time for any form of discovery must have court approval if it would interfere with the time set for completing discovery, for hearing a motion, or for trial.") Because Plaintiff failed to move to modify the expert discovery schedule, the missed deadline remained in effect, and Plaintiff's expert disclosure was untimely. Accordingly, the Court will not consider Plaintiff's expert report as part of the record on these cross-motions for summary judgment. But even if the Court were to consider the expert report, doing so would not change the outcome of this decision. Plaintiff's expert was asked to evaluate "the reasonable reliance FIH would have on Foundation statements . . . and the impact the [sic] such reliance could have on FIH's investment decision." (Expert Report of James K. Finkel, Ex. 44 to Plaintiff's Mot. Summary Judgment [Doc. # 175-17] at 3.) For the reasons discussed *infra*, however, the Court concludes that Plaintiff's reliance on these statements was not reasonable as a matter of law.

*Claim for Violation of § 10(b) of the Securities Exchange Act of 1934*

In order to prevail on a claim brought for violation of § 10(b) of the Securities Exchange Act of 1934, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (citation omitted); *see also IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (citing *Stoneridge*).

For material *omissions*, as opposed to affirmative misrepresentations, reliance may be presumed in certain circumstances. There is "a rebuttable presumption of reliance" where a party "with a duty to disclose" omits a material fact. *Stoneridge*, 552 U.S. at 159 (2008) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)). In that case, under the rebuttable presumption, "the investor to whom the duty was owed need not provide specific proof of reliance." *Id.*

A plaintiff under Section 10(b) must show not only *actual* reliance upon the alleged material misrepresentation or omission, but also "*reasonable* reliance on the alleged misrepresentations or omissions." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) (citations omitted) (emphasis added). "In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Id.* "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337–38 (2d Cir. 2011) (internal quotation marks and citation omitted).

> Factors relevant to this analysis include: (1) [t]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of longstanding business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Id.*

Under one line of Second Circuit cases, however, where certain conditions are met, courts need not engage in the eight-factor analysis described above to determine that reliance was

unreasonable as a matter of law: "Where the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007) (citations omitted). And where a plaintiff cannot establish reasonable reliance on alleged misrepresentations, any Section 10(b) claims based on those misrepresentations fail as a matter of law. *Id.*

> *Presumed Reliance under* Affiliated Ute

Plaintiff contends that the *Affiliated Ute* presumption of reliance applies to three material omissions related to three targets in the investment deal pipeline, arguing that (1) "Defendants had a duty to correct their misrepresentation of their 'Transaction Pipeline' in the Offering Memo that Foundation was in 'active negotiations,' *i.e.*, 'active M&A dialogue,' with 'Granite[,]'" (2) "Defendant Barr had an independent duty to 'update' the January 22, 2014 Project Apex statement[,]" and that (3) Defendants failed to update the statement in the November 13, 2013 Offering Memo that "Foundation was in 'active negotiations with . . . Lake.'" (Pl.'s Omnibus Mem. Law in Opp'n to Defs' Mot. for Summary Judgment [Doc. # 184] at 60 and at 60 n.15.) Thus, the three alleged material omissions relate to status of three potential targets in the deal pipeline—Granite, Apex, and Lake. But Plaintiff's case centers on its claim that Defendants made a material affirmative misrepresentation that "the current representative [Foundation] pipeline . . . has become increasingly active in recent months[,]" and Plaintiff similarly alleges that Defendant Barr made the affirmative representation that "[o]ur pipeline continues to expand with real, immediate deals."

As noted above, reliance be may rebuttably presumed where a party "with a duty to disclose" omits a material fact. *Stoneridge*, 552 U.S. at 159 (2008) (citing *Affiliated Ute*, 406 U.S. at

153-54). However, as the Second Circuit has recently emphasized, the presumption is inapplicable where "the claims of fraud at issue [are] not based primarily on omissions." *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017). In the *Waggoner* case, the Court of Appeals found that the presumption did not apply where (1) the plaintiffs' "complaint allege[d] numerous affirmative misstatements by the Defendants" such that the plaintiffs were "therefore not in a situation in which it is impossible for them to point to affirmative misstatements[,]" (2) the plaintiffs "focus[ed] their claims on those affirmative misstatements[,]" and (3) "the omissions the Plaintiffs list in their complaint are directly related to the earlier statements Plaintiffs also claim are false." *Id.* at 96. "The *Affiliated Ute* presumption does not apply to earlier misrepresentations made more misleading by subsequent omissions, or to what has been described as 'half–truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents." *Id.* (citations omitted).

Here, Plaintiff's claims are "not based primarily on omissions[,]" Plaintiff is "not in a situation in which it is impossible for [Plaintiff] to point to affirmative misstatements[,]" Plaintiff "focus[ed] [its] claims on those affirmative misstatements[,]" and "the omissions the Plaintiff[] list[s] in [its] complaint are directly related" to other affirmative misrepresentations that "Plaintiff[] also claim[s] are false." *Waggoner*, 875 F. 3d at 95-96. Indeed, with respect to the alleged omission regarding Granite, Plaintiff concedes that "the presumption of reliance applies to the *February 3, 2014 pipeline statements*"—the core affirmative misrepresentations in Plaintiff's case. (Pl.'s Omnibus Mem. Law in Opp'n to Defs' Mot. for Summary Judgment at 60) (emphasis added.) While a "failure to update" and a "failure to correct" are types of omissions that may entitle a plaintiff to presumed reliance under *Affiliated Ute*, they do not do so here, where the heart of this dispute goes to alleged affirmative misrepresentations about the status of a deal pipeline, of which

these three projects were an integral part. Accordingly, the *Affiliated Ute* presumption does not apply to the alleged material omissions at issue here.

*Reasonable Reliance*

As noted above, a plaintiff under Section 10(b) must show not only *actual* reliance upon the alleged material misrepresentation or omission, but also "*reasonable* reliance on the alleged misrepresentations or omissions." *Emergent Capital*, 343 F.3d at 195 (citations omitted) (emphasis added). Reasonable reliance is thus an essential element of Plaintiff's federal claim, and because the Court concludes, for the reasons that follow, that any reliance by Plaintiff on the alleged misrepresentations was not reasonable as a matter of law, this opinion does not analyze whether there is a dispute of material fact as to *actual* reliance or as to any of the other elements that Plaintiff must prove as part of its claim under Section 10(b).

As the Second Circuit has held, "[w]here the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation." *ATSI Commc'ns*, 493 F.3d at 105 (citations omitted). As discussed *infra*, the Court concludes (1) that there is no material dispute of fact as to whether Plaintiff was a sophisticated investor with respect to these transactions, (2) that as a matter of law, the contract at issue here constituted a fully integrated agreement, (3) and that, as conceded by Plaintiff, the contract did not include the alleged misrepresentations at issue here.

*Sophisticated Investor Status*

The Court concludes that Plaintiff was a sophisticated investor with respect to these transactions, and that there is no material dispute of fact as to this question. While courts have been less than clear about what makes an investor "sophisticated" for the purposes of determining

reasonable reliance, the facts of this case fit squarely in line with those of previous cases in which investors have been deemed to be sophisticated with respect to the transactions at issue.

In *Emergent Capital*, the Second Circuit found that the plaintiff was a sophisticated investor where the plaintiff was an LLC that managed between $5 and 7 million in investments, with two managing members who "[b]oth had previously worked in prominent Wall Street firms," and who "both ha[d] substantial business and investment experience." 343 F.3d at 192. The plaintiff in *Emergent Capital* had represented in the stock purchase agreement "that it had 'knowledge and experience in financial and business matters' and that it could readily evaluate the risks of the transaction." *Id.* at 196. The plaintiff had also "secured from defendants extensive contractual representations concerning NETV's financial condition and operations." *Id.*

In *ATSI Commc'ns*, the Second Circuit found that the plaintiff was a sophisticated investor where the plaintiff was a business organization that "was founded in December 1993 and hoped to become a leading provider of retail communications services in Mexico in the wake of the deregulation and privatization in Latin America's telecommunications markets" but which "never turned a profit" and sought investment from defendants in order to provide "an infusion of capital to expand its U.S. customer base and further develop its telephone network in Mexico." 493 F.3d at 93-94, 105. ATSI had alleged that defendants had "fraudulently induced it to sell to them its convertible preferred stock" and that "defendants then aggressively short sold ATSI's common stock and converted the preferred stock to cover their short positions" resulting in a "'death spiral' in the price of ATSI's stock." *Id.* at 87.

District courts applying *Emergent* and *ATSI Commc'ns* have gauged investors' sophistication by looking at the investors' depth and breadth of business and investment experience, their position in the market, the type of business in which they were ordinarily

engaged, and investors' representation by counsel, among other indicia of sophistication. *See, e.g.*, *Carlin Equities Corp. v. Offman*, No. 07-CIV-359 (SHS), 2008 WL 4387328, at *7 (S.D.N.Y. Sept. 24, 2008) (finding an investor was sophisticated where he had "years of experience trading securities, managing securities traders, and acting as a part-owner of various companies."); *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 481 (S.D.N.Y. 2005) (finding plaintiffs to be sophisticated investors where plaintiffs "were the principle [sic] shareholders" of a "telecommunications software company" who "[b]oth . . . have studied business, and have an extensive practical business background[,]" and where "[d]uring the process of negotiating and effectuating the merger at issue in this litigation, the law firm Paul, Hastings, Janofsky and Walker represented plaintiffs."); *In re Vivendi Universal, S.A.*, No. 02 CIV. 5571 (RJH), 2004 WL 876050, at *1, 4 (S.D.N.Y. Apr. 22, 2004) (finding plaintiffs to be sophisticated where plaintiffs Liberty Media Corporation "held an equity interest" in "USA Networks' entertainment assets" that Defendant Vivendi Universal S.A. "sought to acquire" and where plaintiffs "exchanged shares of one of its subsidiaries for" shares of defendant Vivendi as part of a merger agreement).

Here, as discussed in greater detail *supra*, at the time this transaction was consummated, Nesanel Milstein had several years of experience evaluating investments for businesses owned by his father, including investments in "a hedge fund to fund" and a "private equity fund to fund." (Nesanel Milstein Dep. at 7:1-13, 8:5-25, 9:2-25, 10:10-15.) Nesanel Milstein also agreed that at the time FIH made its investment in Foundation, he and his father Lazer Milstein were sophisticated investors. (*Id.* at 61:10-13.) FIH also relied on the investment expertise of Greg Dyra, who had decades of experience analyzing different types of investments across all asset classes in North America, and who had invested previously in 50 to 100 different transactions, including investments in both hedge funds and private equity funds. (*Id.* at 18:16-19; Dyra. Dep. at 7:17-9:10,

17:4-18:2, 26:15-27:19; 28:6-30:7, 36:6-37:15, 38:24-40:3.) Dyra had worked as a director of research at a Connecticut fund to funds, as well as at a fund of hedge funds, where he analyzed investments and made investment recommendations. (*Id.* at 27:25-28:5, 28:6-13, 28:25-29:20, 35:8-36:5.)

At oral argument, Plaintiff did not dispute that, given Dyra's role as an agent of FIH who allegedly relied upon the representations at issue here, Dyra's expertise should be imputed to FIH for the purpose of this analysis. Plaintiff claims, however, that Defendants "overstate the level of FIH's sophistication" because "[a]lthough FIH had sophisticated knowledge of investments generally, they had never before invested in the general partnership of a private equity fund with FIH's investment strategy[,]" nor invested in a "fund that had a strategy of investing in minority interests in hedge fund general partnerships." (Pl.'s Omnibus Mem. in Opp'n. to Defs' Mot. for Summary Judgment at 31-32.) Plaintiff contends that "Foundation had a 'novel' investment strategy FIH had not invested in before – and FIH lacked expertise in this area." (*Id.*)

Even assuming that the investment here was a totally novel strategy for Dyra and the Milsteins—an assumption that is not necessarily supported by the record[4]—Plaintiff fails to explain why the purported novelty of this investment type impaired its ability to evaluate the risks of this investment in a manner consistent with the Milsteins' and Dyra's combined extensive experience investing in very similar (even if not identical) offerings. While the Court takes heed of the important general proposition that investors' sophistication is to be judged concretely with respect to the investment at issue, and not in the abstract, Plaintiff's proposed distinction here cuts too

---

[4] While FIH invested as a general partner in Foundation, and a fund to funds such as the one Dyra had worked at generally invests as a limited partner in other funds, Dyra acknowledged that a fund to funds may invest in the general partner of other funds. (Dyra Dep. at 28:14-24.)

finely, defies common sense, and lacks legal support. With this line of reasoning, Plaintiff would have the Court hold that to be considered a sophisticated investor, an investor must not only have extensive expertise in investments substantially similar to the transaction at issue, but must have previously invested in identical offerings, structured in an identical manner. Such a distinction would insulate plaintiffs of great sophistication from the *ATSI-Emergent* rule for any type of transaction involving investment products that were structured in any novel manner, for no good reason. Between Nesanel Milstein's and Greg Dyra's respective experience, and given the extensive terms negotiated by FIH and included in the contract at issue here, *see supra*, FIH was certainly a sophisticated investor with respect to this transaction.

*The Contracts at Issue*

The parties do not dispute the fact that the LLC Agreement contains a merger clause, while the Subscription Agreement does not. At oral argument, Defendant Meehan argued that reading the Subscription Agreement and LLC Agreement together, and given the former's incorporation of the latter, the two documents are one contract. For its part, Plaintiff argued that the Subscription Agreement was in effect a separate contract from the LLC Agreement, noting that the *LLC Agreement* does not specifically incorporate the Subscription Agreement. Indeed, argued Plaintiff, the terms of the merger clause itself appear inconsistent with the idea that the two agreements are a single contract, insofar as the merger clause refers to "[t]his Agreement" as the "entire agreement of the Members" and "Agreement" is a defined term in the LLC Agreement that refers to the LLC Agreement itself.

"Generally, incorporation by reference of existing documents produces a single contract which includes the contents of the incorporated papers." *566 New Park Assocs., LLC v. Blardo*, 97 Conn. App. 803, 810 (2006) (internal quotation marks and citations omitted). And under

Connecticut law, "'[w]hen there are multiple writings regarding the same transaction, the writings should be considered together' in construing the contract." *United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665, 671 (2002) (citing *Mongillo v. Commissioner of Transportation*, 214 Conn. at 225, 229 (1990).) A "contract must be viewed in its entirety, with each provision read in light of the other provisions and every provision must be given effect if it is possible to do so." *Id.* (internal citations omitted). Finally, the "court [should] not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." *Id.* (internal quotation marks and citations omitted).

Here, despite Plaintiff's efforts to read the Subscription Agreement and the LLC Agreement against each other as contradictory and internally inconsistent, the Court finds no such conflict.

The Subscription Agreement clearly, by its terms, incorporates the LLC Agreement as the entire universe of Foundation Capital Partner's representations and warranties to FIH. (*See* Subscription Agreement and LLC Agreement at 3.) And the LLC Agreement contains an unambiguous merger clause. (*See* Subscription Agreement and LLC Agreement at 52.) The LLC Agreement is peppered with numerous specific references to rights reserved not just to members generally, but to FIH specifically. (*See, e.g.*, Subscription Agreement and LLC Agreement at 22-23, 28-29, 44, 51-52.) Nothing in the Subscription Agreement or the LLC Agreement undermines the unambiguous language of the Subscription Agreement incorporating the LLC Agreement in its entirety, or the efficacy of the merger clause contained in paragraph 11.9 of the LLC Agreement, described previously. And Plaintiff has provided the Court with no authority for its position that in order for these two agreements to be treated as a single contract, the LLC Agreement must incorporate the Subscription Agreement in addition to the Subscription Agreement incorporating the LLC Agreement—a proposition that seems plainly belied by Connecticut law. *See 566 New*

*Park Assocs.*, 97 Conn. App. at 810 ("Generally, incorporation by reference of existing documents

produces a single contract which includes the contents of the incorporated papers." (internal

quotation marks and citations omitted)). Plaintiff has raised no valid argument for why the merger

clause should not be enforced.[5] Accordingly, the two documents together comprise a single,

integrated contract.

*Reasonable Reliance*

Plaintiff does not contend that the Subscription Agreement or the LLC Agreement contains

the alleged misrepresentations at issue here. Having found that Plaintiff is a sophisticated investor

---

[5] Two lines of argument bear mentioning here, however; one unmentioned by Plaintiff and another advanced by Plaintiff.

Under Connecticut law, a "merger clause . . . will not operate as a bar to the introduction of evidence of fraud by one of the contracting parties" and "[t]he opportunity to present evidence of fraud long has been recognized as an exception to the parol evidence rule." *Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 504–05 (2000) (citations omitted). This background rule of state contract interpretation may stand in some tension with the Second Circuit's *Emergent Capital-ATSI* line of cases, which involve claims of fraud. But the Second Circuit's holding that "[w]here the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation," *ATSI Commc'ns*, 493 F.3d at 105, is a binding interpretation of one of the elements of a claim for securities fraud under federal law, and so governs this claim.

Separately, Plaintiff cites to the *Caiola* line of cases for the proposition that it is not unreasonable as a matter of law for a sophisticated investor to rely on alleged oral misrepresentations, where the purchase contract contained generalized disclaimers that did not track the substance of the alleged misrepresentations. *See Caiola v. Citibank, N.A.*, New York, 295 F.3d 312, 330–31 (2d Cir. 2002). But *Caiola*, unlike *Emergent* and *ATSI*, involved generalized disclaimers, not a valid merger clause. And the Court does not find that Plaintiff's reliance was unreasonable on the basis of the admittedly generalized disclaimers contained in the Subscription Agreement, but rather in the merger clause contained in the LLC Agreement, so this argument is unavailing.

with respect to this transaction and that the parties entered into an integrated agreement that does not include these misrepresentations, Plaintiff cannot establish reasonable reliance on these misrepresentations, and its claim for federal securities fraud fails as a matter of law.

In its briefing and at oral argument, Plaintiff sought to distinguish *Emergent Capital* as a case involving extensive representations and warranties in the contract in question. Admittedly, the text of the Subscription Agreement, read in isolation from the LLC Agreement, does not contain extensive representations and warranties on the part of Foundation Capital Partners. (*See* Subscription Agreement and LLC Agreement at 3.) But that is only because the section of the Subscription Agreement entitled "Representations and Warranties of the Company" incorporates, in its entirety, the LLC Agreement, as the complete universe of representations and warranties made by Foundation Capital Partners. (*Id.*) And as described above, the LLC Agreement is a lengthy document that contains numerous representations, warranties, and disclaimers. Finally, even if the LLC Agreement did not contain numerous representations and warranties, it is not clear under the *Emergent Capital* line of cases that the presence of representations and warranties in the contract is a necessary condition to trigger the rule of that case. *ATSI Commc'ns*, for example, in citing *Emergent Capital* makes no mention of this requirement:

> Of the misrepresentations that ATSI claims, we can quickly dispose of all except the two alleged in the transaction agreements. The Registration Rights agreement between ATSI and the Shaar Fund plainly states that the only promises, restrictions, and warranties to the transaction were those set forth in the transaction documents. Where the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation. *See Emergent Capital Inv. Mgmt. v. Stonepath Group*, Inc., 343 F.3d 189, 196 (2d Cir.2003); *Dresner v. Utility.com, Inc.*, 371 F.Supp.2d 476, 491–93 (S.D.N.Y.2005). By engaging in these private placements of complex securities, ATSI is clearly a sophisticated investor. Accordingly, to the extent ATSI's causes of action are based on alleged

misrepresentations made during negotiations preceding the defendants' investment, those claims are barred by the merger clauses.

493 F.3d at 105. Accordingly, Plaintiff's contention here is without merit, and Plaintiff's federal claim must be dismissed. The Court has considered Plaintiff's remaining arguments and finds them to similarly be without merit.

*State Law Claims*

Because no federal claims remain to be tried in this case, the Court declines to exercise jurisdiction over the remaining state law claims. Under the supplemental jurisdiction statute, 28 U.S.C § 1367, a "district court[] may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C § 1367(c)(3). Where the district court has dismissed all claims over which it has original jurisdiction, "[f]ederal [district] courts will normally decline to retain jurisdiction" over remaining state law claims. *Silverman v. Teamsters Local 210 Affiliated Health & Ins. Fund*, 761 F.3d 277, 288 (2d Cir. 2014) (citation omitted). "Courts must consider 'the values of judicial economy, convenience, fairness, and comity' when deciding whether to exercise supplemental jurisdiction." *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014) (citation omitted).

Here, although discovery has been completed, the parties' briefing on the viability of the state law claims was perfunctory, relying primarily on incorporation by reference of the parties' arguments on the viability of the federal claim, despite substantial differences in the elements of a claim under § 10(b) of the Securities Exchange Act of 1934 and the elements of the state statutory and common law claims at issue here. *See, e.g.*, Pl.'s Mem. Supp. Mot. for Summary Judgment at 33 (contending that "summary judgment is warranted on FIH's unjust enrichment claim for the

same reasons stated above" and devoting approximately half a page to the claim in a 34-page memorandum of law); Elmlinger's Mem. Supp. Mot. for Summary Judgment ("Plaintiffs' [sic] claims for primary and secondary liability under the Connecticut Uniform Securities Act ('CUSA') § 36b-29 fail for the same reasons as their federal securities law claims fail."). This cursory briefing impairs the Court's ability to make a determination on the merits of the important state law questions raised in the cross-motions for summary judgment.

Finally, as Plaintiff brought to the Court's attention after oral argument on these motions, there is now pending in the Connecticut State Superior Court a related action, filed by Dean Barr, with substantial factual overlap with this matter. (*See* Pl.'s December 7, 2017 Letter and Notice [Doc. # 208] at 3-4.)

Given the parties' brevity in briefing the state law claims, the possibility that novel questions of state law may arise—which is difficult for the Court to accurately ascertain due to the limited briefing—and the fact that a pre-trial conference has not yet been held, the Court finds that the values of judicial economy, convenience, fairness, and comity would best be served by declining to exercise supplemental jurisdiction over the remaining state law claims and permitting Plaintiff to refile those claims in state court, where the related matter remains pending. Accordingly, Plaintiff's state-law claims are dismissed for lack of subject matter jurisdiction.

### III.     Conclusion

For the reasons set forth above, the Court DENIES Plaintiff's Motion for Summary Judgment as to Defendants' February 3, 2014 pipeline statements, and GRANTS Defendants' Motions for Summary Judgment as to Plaintiff's federal claim. Plaintiff's state-law claims are dismissed for lack of subject matter jurisdiction.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 31st day of January 2018.