18-357-cv
FIH, LLC v. Foundation Capital Partners, LLC.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2018

Argued: March 8, 2019     Decided: April 1, 2019

Docket No. 18-357-cv

FIH, LLC,

*Plaintiff-Appellant,*

— v. —

FOUNDATION CAPITAL PARTNERS LLC, FKA FOUNDATION
MANAGING MEMBER LLC, DEAN BARR, JOSEPH MEEHAN,
THOMAS WARD, JOSEPH ELMLINGER,

*Defendants-Appellees,*

B e f o r e:

JACOBS and LYNCH, *Circuit Judges,* and VILARDO, *District Judge.*[*]

---

[*] Judge Lawrence J. Vilardo, of the United States District Court for the Western
District of New York, sitting by designation.

CERTIFIED COPY ISSUED ON 04/01/2019

FIH, LLC ("FIH") appeals from the district court's grant of summary judgment dismissing its federal securities law claims against Foundation Capital Partners, LLC ("Foundation"), Dean Barr, Joseph Meehan, Thomas Ward, and Joseph Elmlinger (collectively "defendants"). FIH argues that it had reasonably relied on material misrepresentations by defendants in deciding to invest in Foundation, and that defendants are therefore liable under federal and state law. The district court concluded as a matter of law that FIH could not have reasonably relied on the alleged misrepresentations, because such reliance was precluded by a general merger clause in Foundation's LLC agreement, incorporated by reference into the subscription agreements by which FIH had invested in Foundation. Concluding that the merger clause did not as a matter of law preclude FIH's reasonable reliance on the alleged misrepresentations, we VACATE the judgment of the district court and REMAND for further proceedings.

————————

SAMUEL J. LIEBERMAN (Ben Hutman, *on the brief*), Sadis & Goldberg LLP, New York, NY, *for Plaintiff-Appellant*.

DAVID G. TRACHTENBERG (Stephen J. Arena, *on the brief*), Trachtenberg Rodes & Friedberg LLP, New York, NY, *for Defendant-Appellee Joseph Elmlinger*.

Peter M. Nolin, Carmody Torrance Sandak & Hennessey LLP, Stamford, CT, *for Defendant-Appellee Dean Barr*.

Stephen G. Walko, Andrea C. Sisca, Ivey, Barnum & O'Mara LLC, Greenwich, CT, *for Defendant-Appellee Thomas Ward*.

Jonathan P. Whitcomb, Diserio Martin O'Connor & Castiglioni LLP, Stamford, CT, *for Defendant-Appellee Joseph Meehan*.

————————

GERARD E. LYNCH, *Circuit Judge*:

FIH, LLC ("FIH") appeals from a grant of summary judgment against it, entered by the United States District Court for the District of Connecticut (Arterton, *J.*), in its action against Foundation Capital Partners, LLC ("Foundation"), the general partner in a private equity fund set up to invest in minority interests in general partnerships of large hedge funds, and its member-partners (collectively, "defendants"). FIH alleged that it had purchased a membership interest in Foundation on the basis of misrepresentations by defendants, and asserted claims against them under § 10(b) of the Securities Exchange Act of 1934, the Connecticut Securities Act, and Connecticut common law. The alleged misrepresentations are that Foundation had an active pipeline of investments and that two of Foundation's key partners were able t work together notwithstanding one partner's embittered divorce of the other's sister-in-law. The district court held that a merger clause in Foundation's LLC agreement, incorporated into the subscription agreements by which FIH invested in Foundation, precluded FIH's reasonable reliance on the alleged misrepresentations as a matter of law. For the reasons that follow, we VACATE and REMAND.

3

## FACTUAL BACKGROUND[1]

Foundation was formed to act as general partner in Foundation Capital

Partners, L.P. (the "Fund"), a private equity fund formed to invest in minority

interests in general partnerships of large hedge funds. Rather than directly invest

in assets under management by such hedge funds, the Fund was to receive a

portion of the annual management and performance fees taken in by the hedge

fund partnerships. Foundation was operated by four partners, Dean Barr, Joseph

Meehan, Joseph Elmlinger, and Thomas Ward.

In the Fall of 2013, Foundation solicited FIH to invest directly in it—rather

than in the Fund. As part of its solicitation of FIH, Foundation provided FIH with

an offering memorandum entitled "Foundation Managing Member LLC

Disclosure Statement November 13, 2013" (the "Offering Memo"). The Offering

Memo represented that the Fund was "in active negotiations" with two hedge

funds that it planned to invest in, codenamed "Granite" and "Lake," and

highlighted the Fund's "Current Transaction Pipeline" of 23 supposed potential

transactions relating to investment in other hedge funds. FIH alleges that

---

[1] The facts recited below are based on the evidence in the summary judgment
record, taken in the light most favorable to FIH and drawing all reasonable
inferences in FIH's favor. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir.
2016).

"[r]epresentations about active transaction negotiations in the pipeline were key to [its] investment decision, because Foundation needed to close its first acquisition of a hedge fund minority interest to start generating substantial income." Appellant's Br. at 4.

In February 2014, Foundation gave FIH access to due diligence materials, which identified fourteen specific targets delineated by their code names: "Projects Lake, Apex, Corvette, Granite, Breakout, Pilot, Centaur, Pound, Tensor, Mainstay, Yale, Halo, Gun, and Bronco." App'x at 146. The targets were identified only by code names, ostensibly to protect the confidentiality of Foundation's negotiations. Thus, at this stage of Foundation's solicitation of FIH, FIH had no opportunity to verify Foundation's claims by contacting the purported target hedge funds. The due diligence materials explained that these targets were "the current representative [Foundation] Pipeline, including those with which the firm was in active discussion," and that "this pipeline has become increasingly active in recent months as a result of industry recovery, manager interest, regulatory reform and the presence of relatively few buyers." *Id.* These materials also "represented that non-disclosure agreements had been signed with the target hedge funds in Projects Lake and Granite." *Id.*

5

In addition, in an email to FIH on December 30, 2013, Barr represented that Foundation had four "possible transactions in the works," referencing Projects Bronco, Corvette, Lake, and Centaur. *Id.* On January 22, 2014, Barr emailed FIH to update it on Project Apex, and represented that "I believe we can move expeditiously on this deal." *Id.* And on February 3, 2014, Barr again emailed FIH to give an update on Project Pilot, representing that "[w]e have some reasonably good intel that suggests that this offer would be given serious consideration." *Id.*

Through due diligence, FIH also learned that Barr was in the process of divorcing Meehan's sister-in-law. At that time, Barr was the managing partner of Foundation and Meehan was the Chief Operating Officer of Foundation. Barr and Meehan were each also managing principals of Foundation, and each held equal 46.175% interests in the company. FIH specifically asked the two men if they would be able to continue working well together following a potential investment by FIH in Foundation. Barr and Meehan each represented that they could "work together" professionally in spite of the divorce, and that they could "keep their professional and personal lives separate." *Id*. at 910. Barr represented to FIH that the divorce was "under control," "getting better," and "amicable," and was thus "not material" to FIH's decision to invest in Foundation. *Id.* Barr

6

also told FIH that "there was nothing FIH needed to know about [his] personality

and there were no other matters FIH should know about [him]." *Id.* at 913.

On February 11, 2014, FIH and Foundation executed a document entitled

"Foundation Managing Member LLC Subscription Agreement" (the

"Subscription Agreement"),[2] concretizing FIH's investment in Foundation. The

Subscription Agreement identifies FIH as the "Subscriber" and Foundation as the

"Company," and provides *inter alia* that FIH:

> tenders this subscription for a membership interest in the Company on
> the terms and subject to the conditions set forth in the Company
> Agreement (as defined below) as amended through the Seventh
> Amendment to the Company Agreement dated as of the date of this
> Subscription Agreement[.]

*Id*. at 586.

The Subscription Agreement also contains the following provision within a

section entitled "Representations and Warranties of the Subscriber":

> The Subscriber has such knowledge and experience in financial and
> business matters that the Subscriber is capable of evaluating the merits
> and risks of an investment in the Interest, and of making an informed
> investment decision, and the Subscriber has consulted and relied solely
> upon the advice of its own counsel, accountant and other advisers with
> regard to such legal, investment, tax and other considerations

---

[2] On February 28, 2014, the parties executed a second subscription agreement that
made several changes to the original Subscription Agreement, none of them
relevant to this appeal.

> regarding such investment and on that basis believes that an
> investment in an Interest is suitable and appropriate for such
> Subscriber. The Subscriber has had, either individually or through its
> duly authorized officers, employees or agents, an opportunity to (i) ask
> questions of and receive answers from the Company and its
> management concerning the terms and conditions of the Interests and
> the proposed operation of the Company and (ii) obtain information
> necessary to verify the accuracy of the information provided.

*Id.* The Subscription Agreement further provides the following within a section

entitled "Representations and Warranties of the Company":

> The Company hereby represents and warrants to, and agrees with, the
> Subscriber that (a) attached hereto as Exhibit A is a true and correct
> copy of the Company Agreement that has been conformed to reflect all
> amendments to the Company Agreement through the Seventh
> Amendment to the Company Agreement dated as of the date of this
> Subscription Agreement and (b) the salary of each Managing Principal
> in 2014 will not exceed the amount set forth with respect to that
> Managing Principal in Exhibit B attached hereto.

*Id.* at 588.

The "Company Agreement" to which the Subscription Agreement refers is

a document identified as the Limited Liability Company Agreement. Paragraph

11.9 of the Company Agreement, entitled "Entire Agreement" (the "merger

clause"), provides that "[t]his Agreement constitutes the entire agreement of the

Members and supersedes all prior agreements among the Members with respect

to the subject matter hereof, including the Original Agreement[.]" *Id.* at 637. The

8

Subscription Agreement itself, however, does not contain any merger clause or disclaimers of reliance on outside representations. Indeed, the Subscription Agreement omits specific anti-reliance disclaimers that Foundation had used in connection with other investments in the Fund.[3]

Shortly after investing in Foundation, FIH learned that defendants' representations about the active "pipeline" and about Barr and Meehan's supposedly workable relationship, which were material to FIH's investment decision, were false. On March 4, 2014, Foundation disclosed to FIH the first in a series of internal documents called "Project Activity Logs." The Project Activity Logs listed hedge fund targets in Foundation's pipeline under three categories: Live Deals, Prospects, and Dead Projects. These documents revealed that Foundation had overstated its deal activity in the Offering Memo and due diligence materials. For example, Projects Granite and Lake, which had been

---

[3] For example, one such agreement stated that:

> Other than the Memorandum and the Partnership Agreement, the Subscriber is not relying upon any other information, representation or warranty by the Fund, the General Partner, or the Investment Manager in determining to invest in the Fund.

App'x at 963.

touted in the due diligence materials as the most developed of the potential deals, were both "On Hold" with no ongoing negotiations. And although Foundation had stated in its February 2014 due diligence materials that the "pipeline has become increasingly active in recent months," in fact, Foundation had a decreasing number of active deals in February 2014 compared to prior months.

Similarly, in contrast to the representations about Barr and Meehan's supposedly cordial relationship, it became clear to FIH after investing in Foundation that the two were at loggerheads. A series of emails that FIH received from Meehan and Elmlinger one month after FIH's investment revealed that Barr and Meehan privately admitted that they were unable to work together (see emails in the margin).[4] Moreover, Barr, who apparently was on the verge of personal bankruptcy, had repeatedly threatened to quit working at Foundation

_____

[4] For example: On November 1, 2013, Barr emailed Meehan stating "If you're going to continue to behave like this during the divorce, I really don't think it's wise for us to work together going forward." App'x at 1024. On September 25, 2013, Barr emailed Meehan stating "I know you despise me . . . . I'm really thinking of calling it quits . . . . We're all headed for disaster." *Id*. at 1031–32. On February 3, 2014, virtually contemporaneously with Barr's assurances to FIH that he could continue to work well with Meehan, Barr emailed Meehan stating "Joe, we are officially broken from each other." *Id*. at 1034.

(see emails in the margin).[5] None of these facts had been disclosed to FIH as a prospective investor.

## PROCEDURAL HISTORY

Based on those misrepresentations, FIH filed this action against defendants in the District of Connecticut, alleging violations of § 10(b) of the Securities Exchange Act of 1934 and the Connecticut Securities Act, as well as related state common-law claims. After the district court, in a ruling not challenged on appeal by FIH, dismissed some of FIH's claims and limited the scope of potentially actionable misrepresentations, FIH filed its Second Amended Complaint, the operative complaint on appeal, specifically alleging that it had purchased a $6.75 million interest in Foundation in reliance on the misrepresentations by defendants discussed above.

In September 2016, Meehan, with the consent of all parties, moved to

---

[5] For example: On January 16, 2014, Meehan emailed Elmlinger and Ward, stating that "[Barr] has again posited that he needs" an advance on his partner draw, or he would face immediate "bankruptcy, etc." App'x at 1045. On January 30, 2014, Barr emailed Meehan, Ward, and Elmlinger stating that "I probably have a week before things implode around me . . . . I'm on the verge of collapse." *Id*. at 1042. On February 4, 2014, Barr emailed Meehan stating that "I can't make it passed [sic] Friday. My world caves in. I'm not kidding and I don't know if I can live through it. It's that serious." *Id*. at 1038.

extend by 60 days the deadlines for discovery and for filing dispositive motions.

On September 26, 2016, the district court held a telephonic status conference,

during which the parties discussed the reasons necessitating the extension of the

discovery deadline. During that conference, the court asked whether it was still

the case that neither party anticipated using experts. FIH's counsel stated, "I

believe that's true your Honor, for us, speaking for the plaintiff." *FIH, LLC v.*

*Found. Capital Partners LLC*, No. 15 Civ. 785 (JBA), 2018 WL 638997, at *3 (D.

Conn. Jan. 31, 2018). Nevertheless, at 11:52 pm on the last day before discovery

closed, FIH attempted to serve an expert report, which the district court excluded

as untimely. In March 2017, defendants moved for summary judgment on all

claims.[6]

     On January 31, 2018, the district court granted defendants' motions for

summary judgement as to FIH's federal securities law claims, and declined to

exercise supplemental jurisdiction over its state-law claims. *Id*. The court held

that (1) there was no material dispute between the parties that FIH was a

sophisticated investor with respect to its investment in Foundation; (2) the

---

[6] Concurrently, FIH moved for summary judgment on its claims regarding
defendants' misrepresentations about the pipeline. FIH does not appeal from the
district court's denial of that motion.

investment contract constituted a fully integrated agreement; and (3) the contract did not include the alleged misrepresentations at issue, and therefore as a matter of law FIH could not reasonably have relied on those misrepresentations. This appeal followed.

## DISCUSSION

### I. Standard of Review

We review a district court's decision granting summary judgment *de novo*, and will affirm only if the record, viewed in the light most favorable to the non-movant, shows no "genuine dispute of material fact" and demonstrates "the movant's entitlement to judgment as a matter of law." *Ace Partners, LLC v. Town of E. Hartford*, 883 F.3d 190, 194–95 (2d Cir. 2018). Issues of contract interpretation are also "subject to *de novo* review." *In re Delta Air Lines, Inc.*, 608 F.3d 139, 145 (2d Cir. 2010).

### II. Reasonable Reliance

FIH contends that the district court erred in holding that the merger clause contained in the Company Agreement made FIH's reliance on defendants' misrepresentations unreasonable as a matter of law. FIH makes three arguments in support of this position: First, FIH argues that the merger clause in the

13

Company Agreement does not apply to the Subscription Agreement because the Subscription Agreement does not expressly incorporate all relevant provisions of the Company Agreement. Second, FIH argues that even if the Subscription Agreement had fully incorporated the Company Agreement, the merger clause does not make FIH's reliance on defendants' misrepresentations unreasonable as a matter of law because it is only a "general" merger clause, as opposed to a specific disclaimer. Third, FIH argues that it reasonably relied on defendants' misrepresentations because they involved the "deliberate concealment of facts" known only to the defendants, which thus fell within the purview of the "peculiar knowledge doctrine."[7] Because we conclude that the general merger clause contained in the Company Agreement is not the type of disclaimer that could prevent FIH's reasonable reliance on defendants' alleged misrepresentations as a matter of law, we need not reach FIH's other arguments.

As we have repeatedly emphasized, the issue of reasonable reliance requires that we consider "the entire context of the transaction, including . . . its

---

[7] *See Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998) (A "specific disclaimer will not undermine another party's allegation of reasonable reliance on the misrepresentations" if "the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge.")

14

complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 235 (2d Cir. 2006). The reasonableness of a plaintiff's reliance is a "nettlesome" and "fact intensive" question, *Loreley*, 797 F.3d at 186 n.19, quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) and thus "is often a question of fact for the jury rather than a question of law for the court." *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011). Standing alone, therefore, a general disclaimer (still less a general merger clause) is not sufficient as a matter of law to preclude reasonable reliance on material factual misrepresentations, even by a sophisticated investor.

In *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 330–31 (2d Cir. 2002), we held that general disclaimers are insufficient to defeat reasonable reliance on material misrepresentations as a matter of law, even by a sophisticated party. *Accord, Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 186 n.19 (2d Cir. 2015). The plaintiff in *Caiola* was "an entrepreneur and sophisticated investor," engaged in complex trading activity with Citibank. *Caiola*, 295 F.3d at 315. Representatives of Citibank orally promised Caiola "that as his counterparty[, Citibank] would control its own risks through a strategy known as

15

'delta hedging,'"[8] *id.* at 317, and "that [Caiola's] synthetic trading relationship with Citibank would remain unaltered" by Citibank's upcoming merger, *id.* at 318. "However, . . . contrary to its representations and unknown to Caiola, Citibank had secretly stopped delta hedging and transformed Caiola's synthetic portfolio into a physical one by executing massive trades in the physical markets that mirrored Caiola's synthetic transactions." *Id.* Consequently, Caiola brought securities fraud claims against Citibank based on Citibank's misrepresentations.

The district court dismissed Caiola's claims, finding *inter alia* that it was unreasonable as a matter of law for him to have relied on the oral representations from Citibank. *Id.* at 320. "Apparently resting its analysis on parol evidence principles," *id.*, the district court relied on the following provisions in the relevant agreements between the parties:

> This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto . . .

---

[8] Delta hedging makes a derivative position, such as an option position, immune to small changes in the price of an underlying asset, such as a stock, over a short period of time. *See* John C. Hull, *Options Futures, and Other Derivatives* 311–12 (4th ed. 2000).

> [Caiola] has such knowledge and experience in financial, business and tax matters that render him capable of evaluating the merits and risks of this Agreement and the Transactions contemplated hereunder; [and] has determined that [] the Transactions contemplated hereunder are suitable for him . . .

> [Caiola] is not relying on any advice, statements or recommendations (whether written or oral) of the other party, . . . .

*id.* at 317–18.

Citibank argued that a "reasonable investor of Caiola's sophistication would not have relied upon Citibank's oral misrepresentations" because of the disclaimers that "Caiola would not be relying on Citibank's advice or recommendations, that he would make his own investment decisions, and that Citibank would not be his fiduciary or advisor." *Id.* at 330 On appeal, we reversed: "We are not persuaded that these disclaimers barred Caiola from relying on Citibank's oral statements." *Id.* We explained instead that "[a] disclaimer is generally enforceable only if it tracks the substance of the alleged misrepresentation," and that "[t]he disclaimer provisions contained in the [agreements] fall well short of tracking the particular misrepresentations alleged by Caiola." *Id.* (internal quotation marks omitted). The disclaimers were ineffective because, while "Caiola specifically allege[d] that Citibank offered false

17

assurances that after the . . . merger [that] the parties' existing trading relationship would not change and that Citibank would continue to act as a delta hedging counterparty," "[t]he disclaimer . . . state[d] only in general terms that neither party relied 'on any advice, statements or recommendation (whether written or oral) of the other party.'" *Id.*

Similarly, in the instant case, there are no disclaimers sufficiently specific to satisfy the standard set forth in *Caiola*. Nowhere in the Company Agreement or elsewhere is there explicit language disclaiming reliance on external representations of the kind alleged by FIH in this case (*i.e.* statements about ongoing deal activity or about personal relationships between Foundation's directors or officers). Rather, the relevant language in the Subscription Agreement and the Company Agreement on which defendants rely, quoted above, is strikingly similar to the merger clause and "sophisticated investor" language found insufficient in *Caiola*. And neither agreement in this case contains any clause as strong as the general disclaimer, found insufficient in *Caiola*, of reliance on "any advice, statements or recommendations (whether written or oral) of the other party." *Id.* at 317.

18

In its decision granting summary judgment in favor of defendants in this case, the district court attempted to distinguished *Caiola* by explaining that it did not find FIH's reliance unreasonable on the basis of the "admittedly generalized disclaimers" in the Subscription Agreement,[9] but rather on the basis of the merger clause in the Company Agreement. *FIH, LLC*, 2018 WL 638997, at *14 n.5. On appeal, defendants argue that according to our decisions in *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189 (2d Cir. 2003) and *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007), even *general* merger clauses (as opposed to disclaimers, as discussed in *Caiola*) can defeat reasonable reliance when an investor is sophisticated and the representations at issue are not contained in the operative agreement. We are not persuaded.

A merger clause is a provision of a contract signifying that the contract is a complete statement of the parties' agreement, superseding any prior oral or written terms. In other words, a merger clause operates to limit the universe of

---

[9] The district court was correct not to rely on that disclaimer. The language in the Subscription Agreement stating that "the Subscriber has consulted and relied solely upon the advice of its own counsel, accountant and other advisers . . . and on that basis believes that an investment in an Interest is suitable and appropriate for such Subscriber" is not specific enough to bar an action by FIH for fraudulent misrepresentation based on defendants' alleged misrepresentations.

the parties' contractual obligations to the text of the contract itself. This does not mean, however, that a merger clause serves as a catch-all disclaimer of reliance on any conceivable pre-contract misrepresentations about facts pertaining to the subject matter of the contract that could form the basis of a claim for fraud in the inducement.

As we explained in *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1997), because the concept of a merger clause "rests on the rationale that a later written agreement has supplanted prior negotiations, it follows that [it] does not come into play until the existence of an enforceable written agreement has been shown," and thus it cannot be used to "exclude evidence to show that there was no agreement or that the agreement was invalid." Therefore, we held, a "general merger clause does not preclude parol testimony where a claim is based on fraud in the inducement." *Id.* And it is for that reason that in *Caiola* we found "questionable" the district court's "importation of parol evidence principles into the federal securities laws" when it found that "the oral misrepresentations allegedly made by Citibank . . . can be disregarded" insofar as they contradict "unambiguous language in the [agreements between the parties]." *Caiola*, 295 F.3d at 330, n.9.

Moreover, contrary to defendants' characterization of *Emergent Capital* and *ATSI*, neither of those cases stands for the proposition that merger clauses can serve as all-encompassing disclaimers of pre-contract factual misrepresentations. The district court in *Emergent Capital* explicitly held that "a general merger clause 'stating that the signatories acknowledge [that] the written document supersedes all prior agreements and constitutes the sole embodiment of their obligations' does not bar an action for fraud." 195 F. Supp. 2d 551, 562 (S.D.N.Y. 2002). In that case, the court considered a merger clause, similar to the one in this case, which stated that:

> This Agreement, together with the exhibits and schedules hereto and ancillary Agreements, contains the entire understanding and agreement between or among any of them, and supersedes all prior understandings or agreements between or among any of them with respect to the subject matter hereof.

*Id.* The court explained that "[i]f this merger clause stood alone, there would be no question that it would not by itself preclude reasonable reliance as a matter of law." *Id.* However, the court found that given the specific facts of that case, Emergent could not claim reasonable reliance, because in addition to the merger clause, the relevant agreements made "29 separate representations and

21

warranties and 16 separate covenants in favor of the . . . purchasers, including Emergent." *Id.*

On appeal, we affirmed the relevant part of the district court's decision, holding that "Emergent should have protected itself by insisting that [the alleged misrepresentations at issue] be included in the stock purchase agreement[, because] [g]iven [defendant's] *extensive contractual representations about other matters*, [Emergent's] sophistication, and the size of the transaction, Emergent's failure to do so precludes as a matter of law a finding of reasonable reliance upon defendants' misrepresentations." *Emergent Capital*, 343 F.3d at 195 (emphasis added). Here, in contrast, there are no "extensive contractual representations" about the status of the Fund's transaction pipeline, the working relationships between Foundation's principals, or any similar subject matter, that might have operated as an implicit disclaimer regarding Foundation's extra-contractual factual representations to FIH. Instead, there is only the general merger clause in the Company Agreement.

Defendants argue that, like the plaintiff in *Emergent Capital*, FIH "did, in fact, actively negotiate and demand certain terms, representations and conditions in connection with its investment," and thus that *Emergent Capital* cannot be

distinguished on that ground. Appellees' Br. at 21–22. But each of the negotiated terms that defendants cite—including that "Foundation's partners [would] defer some of their compensation until Foundation closed a pipeline hedge fund deal," *id.* at 22; that FIH would "share in any management fee earned by Foundation in managing the Fund," *id.*; "a revised involuntary transfer provision[,] . . . terms concerning rights of first refusal, most favored nation status, pre-emptive rights, and tag-along rights," *id.*—relate to the parties' *obligations*, and do not constitute affirmative *factual* representations of any kind. This is an entirely different situation from that in *Emergent Capital*, where the parties actually negotiated factual representations to be included in the written agreements that suggest a closed set of such representations upon which the plaintiff's reliance was acknowledged.

The *ATSI* decision, on which defendants similarly rely for the proposition that "[w]here the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation," 493 F.3d at 105 (citing *Emergent Capital*, 343 F.3d at 196), is inapposite for the same reason. For one thing, the agreement at issue in that case contained an explicit disclaimer as

part of the merger clause, stating that "[t]here are no restrictions, promises, warranties, or undertakings, other than those set forth or referred to herein." *Id.* at 95. We specifically noted that disclaimer in our decision with regard to the plaintiff's reasonable reliance on the alleged misrepresentations in that case. *See id.* at 105 ("Of the misrepresentations that ATSI claims, we can quickly dispose of all except the two alleged in the transaction agreements. The . . . agreement between [the parties] plainly states that the only promises, restrictions, and warranties to the transaction were those set forth in the transaction documents."). Moreover, the subject matter of some of the alleged oral misrepresentations in *ATSI*—that defendants "would not engage in any activity to depress" the price of "stock" by rapidly selling it, *id.* at 94,—was specifically addressed by written representations in the agreements at issue, providing "that the [defendants] would soon sell its converted common stock into the public markets" within "90 days of closing" the deal, *id.* at 95. In this case, by contrast, the merger clause contains no disclaimer of any kind of representation, and the subject matter of defendants' alleged misrepresentations was not addressed by affirmative representations in any agreement between the parties.

24

We do not suggest in any way that general disclaimers or merger clauses, the sophistication of an investor, or the presence of various promises or representations in a written agreement are irrelevant to the reasonableness of a party's reliance on pre-contract factual misrepresentations. The defendants here remain free to argue to a jury, based on these or other factors, that FIH did not reasonably rely on any misrepresentations the jury might conclude were made. Indeed, as *Emergent Capital* demonstrates, there may be circumstances where a general disclaimer or merger clause, together with an extensive roster of specifically negotiated factual warranties and representations, can lead to a conclusion that, in the particular circumstances of a case, no reasonable jury could find reasonable reliance on a representation not inserted into the written contract. And, of course, careful investors negotiating the terms of an individualized investment can protect themselves by demanding that any representation that is critical to their investment decision be incorporated into the written investment agreement.

## III. Exclusion of the Expert Report

FIH also argues that the district court's summary judgment decision must be reversed because the court erred in excluding as untimely an expert report

opining that in accordance with private equity industry practice, "FIH was reasonable in relying on defendants' false statements." Appellant's Br. at 36. FIH claims that the district court abused its discretion in excluding this report, which FIH attempted to serve on January 23, 2018 at 11:52pm—eight minutes before the close of court-ordered discovery. Although we conclude above that the summary judgment decision must be vacated in any event, we address this argument because the district court's ruling on the proposed expert testimony is relevant to the anticipated trial of this matter.

We review a district court's discovery ruling for "abuse of discretion." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 41 (2d Cir. 2004). A district court abuses its discretion "when its decision cannot be located within the range of permissible decisions or is based on a clearly erroneous factual finding or an error of law." *United States v. Scully*, 877 F.3d 464, 474 (2d Cir. 2017). The reasonableness of a decision excluding expert testimony is evaluated according to the following factors: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result

26

of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006).

Having considered each of the above factors, we conclude that the district court was within its discretion to exclude the expert report. Although the report was technically served before the close of fact discovery and the court's scheduling order did not contain an explicit deadline to disclose expert witnesses, such a deadline had not been set only because FIH had advised the court that it did not intend to submit expert testimony, and therefore no party requested that the court amend the discovery schedule to include one. In any event, the district court acted well within its discretion in enforcing the discovery deadline that it did set. Because FIH's proposed expert would still have needed to be deposed, and defendants would have needed an opportunity to present a counter-expert, the literally eleventh-hour disclosure of the expert report would have extended discovery beyond the already-extended, agreed-upon, and court-ordered discovery deadline. We therefore identify no error or abuse of discretion in the district court's exclusion of the expert's report.

## CONCLUSION

For the reasons stated above, we VACATE the judgment of the district court granting summary judgment in favor of appellees, and REMAND for further proceedings.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

28